IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

JOHNATHAN JOHNSON,

                          Plaintiff,

                                                    Civil Action No.
                                                    9:07-CV-1237 (TJM/DEP)

          v.

B. CONNOLLY, Doctor *et al.,*

                          Defendants.

_____

APPEARANCES:                           OF COUNSEL:

FOR PLAINTIFF:

Johnathan Johnson, *Pro Se*
89-A-1042
Upstate Correctional Facility
P.O. Box 2001
Malone, NY 12953

FOR DEFENDANT:

HON. ANDREW M. CUOMO            CHRISTOPHER HALL, ESQ.
Office of Attorney General      Assistant Attorney General
State of New York
The Capitol
Albany, NY 12224-0341

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

Plaintiff Johnathan Johnson, a New York prison inmate and a prodigious litigant, has commenced this suit pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights.[1]  In his complaint, plaintiff asserts that prison officials at the Upstate Correctional Facility ("Upstate") were deliberately indifferent to his medical needs following his transfer into that facility, including by not providing him with medication previously prescribed for him at other prison facilities, and that his transfer into Upstate was in retaliation for his having engaged in protected activity. Plaintiff's complaint seeks both equitable relief, in the form of an unspecified permanent injunction, and recovery of compensatory and punitive damages.

Currently pending before the court is defendants' motion for summary judgment seeking dismissal of plaintiff's complaint in its entirety. In their motion, defendants assert that the record does not support either of plaintiff's substantive claims and that they are, therefore, entitled to

_____

[1]        In response to a request in the form complaint utilized by the plaintiff seeking information about prior lawsuits, Johnson identifies a single action brought in the New York Court of Claims in November of 2006 but states that he has not commenced any suits in federal court relating to his imprisonment.  *See* Amended Complaint (Dkt. No 7) § 4.  Despite this statement, which was given under penalty of perjury, the record discloses otherwise.  In fact, in this district alone plaintiff has commenced some thirty other actions addressing various aspects of prison life while incarcerated.

judgment dismissing those claims as a matter of law.  Having carefully

considered the record now before the court in light of defendants' motion

and plaintiff's arguments in response, I recommend that the motion be

granted with respect to all claims except plaintiff's retaliation cause of

action against defendant Burge, as to which genuine issues of fact exist

precluding summary judgment.

I.      BACKGROUND[2]

        The plaintiff is a prison inmate entrusted to the care and custody of

the New York State Department of Correctional Services ("DOCS").  *See*

*generally* Amended Complaint (Dkt. No. 7).  At the times relevant to his

claims in this action plaintiff was designated first to the Elmira Correctional

Facility, located in Elmira, New York, and later following his transfer out of

that prison on November 16, 2006, to Upstate, situated in Malone, New

York.[3]  It appears that at all relevant times plaintiff was designated to

---

        [2]      In light of the procedural posture of the case the following recitation is
derived from the record now before the court with all inferences drawn and ambiguities
resolved in favor of the plaintiff.  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).  It
should be noted, however, that many if not most of plaintiff's allegations are sharply
contested by the defendants.

        [3]      Upstate is a maximum security prison comprised exclusively of special
housing unit ("SHU") cells in which inmates are confined, generally though not always
for disciplinary reasons, for twenty-three hours each day.  *See Samuels v. Selsky*, No.
01 CIV. 8235, 2002 WL 31040370, at *4 n.11 (S.D.N.Y. Sept. 12, 2002).

special housing unit ("SHU") disciplinary confinement.[4]  *Id.*

While confined at Elmira, on November 13, 2006 plaintiff apparently

was the target of human feces thrown by another inmate in the SHU

during plaintiff's scheduled shower period.  Complaint (Dkt. No. 7) p. 5-B.

That incident prompted the sending by plaintiff of a letter to defendant

John Burge, the Superintendent at Elmira, requesting that the videotape

footage of the incident be preserved for use in a future lawsuit.[5]  *Id.*

Two days later, on November 15, 2006, the DOCS Classification

and Movement Office, which as a general matter controls inmate facility

assignments, received an electronic request that Johnson be transferred

out of Elmira.  Carvill Aff. (Dkt. No. 68-4) ¶¶ 4, 6, 11 and Exh. A; *see also*

Burge Aff. (Dkt. No. 68-3) ¶¶ 9-10.  The stated reason for the transfer

request was that plaintiff had a "severe problem at Elmira CF SHU."

Carvill Aff. (Dkt. No. 68-4) ¶ 12 and Exh. A.  As an explanation for that

observation, the statement noted that plaintiff "ha[d] created a

management problem in the SHU. . . he is disruptive to other [inmates] in

---

[4]      The record reflects that plaintiff has been in SHU confinement since
1997 and is currently scheduled to remain there until 2028, a date extending beyond
his current maximum prison release date.  *See* Hall Aff. (Dkt. No. 68-5) Exh. A.
(Transcript of Plaintiff's Deposition, held on January 22, 2009, hereainfter  "Johnson
Dep. Tr.") at pp. 20-21.

[5]      In response to his later requests for copies of the videotape, plaintiff was
informed that due to a "recorder malfunction" it does not exist.  *See* Johnson Aff. (Dkt.
No. 69) Exh. A at p. 3.

the unit. . ." and made reference to the November 13, 2006 incident.  *Id.* at

¶ 14 and Exh. A.  The transfer request was processed by John Carvill, a

Classification Analyst with the DOCS.  Carvill Aff. (Dkt. No. 68-4) ¶¶ 1, 6,

11 and Exh. A.  On recommendation of the SHU unit of the Classification

and Movement Office,  it was determined by defendant Carvill that the

plaintiff should be transferred into Upstate.  *Id.* at ¶¶ 9-14.  When making

that decision Carvill was unaware of plaintiff's contemplation of a lawsuit

concerning the feces throwing incident at Elmira on November 13, 2006.

*Id.* at ¶ 16.

    According to the plaintiff, Superintendent Burge, though not present

for the throwing incident, spoke with the plaintiff about the transfer on

November 15, 2006 from the catwalk adjacent to plaintiff's cell and stated

"I'm getting rid of you."  Amended Complaint (Dkt. No. 7) p. 5-C; Johnson

Dep. Tr. pp. 82-86; Johnson Aff. (Dkt. No. 69) ¶ 12.  Other than that

statement, during his deposition plaintiff admitted that he has no evidence

to support his allegation that Superintendent Burge initiated the transfer

request or was otherwise a participant in the decision to place him in

Upstate.  *Id.* at pp. 89-90.

    According to Superintendent Burge, the transfer of a prisoner is

typically initiated by the inmate's guidance counselor, who sends a

transfer request directly to the DOCS Classification and Movement Office in Albany.  Burge Aff. (Dkt. No. 68-3) ¶ 9.  Superintendent Burge denies any role in the transfer of Johnson to Upstate and specifically states that he did not ask plaintiff's guidance counselor at Elmira to initiate the transfer request.  *Id.* at ¶¶ 11-14.  While having no recollection of any conversation with plaintiff regarding the transfer, Superintendent Burge states that it is his practice never to discuss transfers with any inmates.  *Id.* at ¶ 5.

Plaintiff was transferred into Upstate on November 16, 2006.  *See* Smith Aff. (Dkt. No. 68-2) ¶ 11 and Exh. B.  According to plaintiff's medical records, prior to his transfer he had been prescribed various medications including Lactase, a drug prescribed for lactose intolerance; Nasacort, for nasal congestion; Naprosyn, a pain medication; Prilosec for a gastroenterlogical disorder; and Vitamin E lotion for a dry, irritated skin condition.  *Id.* at ¶¶ 15-16.  As an SHU prisoner at both Elmira and Upstate, by regulation plaintiff was allowed only a twenty-four hour supply of non-prescription items and a seven day supply of prescription medications.[6]  *Id.* at ¶ 18 and Exh. B, 11/18/06 entry.

Under established protocol, upon his transfer plaintiff's prescription

_____

[6]     As an SHU inmate, plaintiff similarly was not allowed to possess creams, lotions, or spray bottles.  Smith Aff. (Dkt. No. 68-2) ¶ 19.

medications should have been packed in a white medication bag and

transferred to the medical staff at Upstate.  Smith Aff. (Dkt. No. 68-2) ¶ 12.

This, unfortunately, did not occur upon plaintiff's transfer.  *Id.* at ¶ 13 and

Exh. A at p. 3.  Instead, plaintiff's medications were packed along with his

personal property, and consequently those medications were not received

by medical staff at Upstate until December 5, 2006.  *Id.* at ¶ 13 and Exhs.

A, B.

Plaintiff's medical records reveal that on November 20, 2006, four

days after his transfer into Upstate, a physician at the facility ordered a

seven day supply of Lactase, Naprosyn, and Prilosec for the plaintiff.

Smith Aff. (Dkt. No. 68-2) ¶ 20 and Exh. B, 11/18/06 entry.  Plaintiff

received those medications on November 21, 2006 and November 24,

2006.  *Id.* at ¶ 21 and Exh. C.  In the interim, over-the-counter medications

were made available to the plaintiff, upon request, to substitute for any

lacking prescription medications.  *Id.* at ¶ 22.  Plaintiff's medical records

reveal that, in fact, he did request such non-prescription medication on

November 17, 18, and 26, 2006, including Medicidin D for nasal

congestion and Ibuprofen for pain.  *Id. at* ¶ 22 and Exh. B, 11/18/60 and

11/26/06 entries.  The records also reflect that nasal spray was ordered

for the plaintiff on December 5, 2006, at the request of a facility nurse,

upon her review of plaintiff's records and that on that same date a prison physician, Dr. Connolly, reordered Nasacort to be restarted for the plaintiff. *Id.* at ¶¶ 23-24, and Exh. B, 12/5/06 entry. Plaintiff's medical records also reveal that he was provided Lactaid tablets for his lactose intolerance and that he had daily access to Vitamin E lotion. *Id. at* ¶¶ 27-28 and Exh. B, 11/18/06 and 11/26/06 entry.

II.   PROCEDURAL HISTORY

Plaintiff commenced this action on February 15, 2007 and later filed an amended complaint on April 12, 2007, with approval of the court.[7] *See* Dkt. Nos. 1, 7.   Named as defendants in plaintiff's complaint are B. Connolly, a prison physician at Upstate; C. Atkinson and K. Mulverhill, identified as nurses at that facility; M. Smith, a nurse administrator at Upstate; Elmira Superintendent Burge; Theresa Knapp-David, the DOCS Director of Classification and Movement; Lucien LeClaire, Jr., the acting DOCS Commissioner; N. Bezio, the Deputy Superintendent at Upstate; and Brian Fischer, the acting DOCS Commissioner. *Id.* Plaintiff's complaint asserts two causes of action, alleging that his transfer out of Elmira was in retaliation for his having engaged in protected activity in

---

[7]   This action was initiated in the Western District of New York but was transferred to this district as a result of the issuance of an order by District Judge David Larrimer on October 17, 2007. *See* Dkt. No. 16.

violation of his rights under the First Amendment and also that the

defendants at Upstate were deliberately indifferent to his serious medical

needs in violation of his right under the Eighth Amendment to be free from

cruel and unusual punishment. *Id.*

Since commencement of the action plaintiff has twice sought

preliminary injunctive relief, in both instances requesting that the

defendants be directed to transfer him out of Upstate and into another

facility for the safety of both Johnson and his family. Dkt. Nos. 21, 41.

Those motions were denied by Senior District Judge Thomas J. McAvoy

by decisions issued on January 30, 2008 and August 21, 2008,

respectively. Dkt. Nos. 30, 48. Plaintiff appealed those denials to the

United States Court of Appeals for the Second Circuit. By summary order

issued on October 16, 2009, and reissued as a mandate on November 12,

2009, that court affirmed Judge McAvoy's first preliminary injunction denial

and ordered the issuance of a briefing schedule with regard to the

second.[8] *See* Dkt. No. 70.

On April 27, 2009, following joinder of issue and the close of

discovery, defendants filed a motion for summary judgment seeking

---

[8]       According to publically available information, that appeal remains
pending, and was deemed ready as of the week of March 1, 2010. The pendency of
that appeal, which addresses only plaintiff's request for interim injunctive relief, does
not divest this court of jurisdiction to entertain and decide defendants' pending
summary judgment motion. *Webb v. GAF Corp.*, 78 F.3d 53, 55 (2d Cir. 1996)

dismissal of both of plaintiff's causes of action.  Dkt. No. 68.  In their

motion defendants argue that no reasonable factfinder could conclude

either that the plaintiff's transfer out of Elmira was provoked by his

contemplation of a suit regarding the November 13, 2006 incident, or that

once at Upstate the medical personnel there were deliberately indifferent

to his serious medical needs.  *Id.*  Plaintiff has since responded in

opposition to defendants' motion, Dkt. No. 69, which is now fully briefed

and ripe for determination and has been referred to me for the issuance of

report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and

Northern District of New York Local Rule 72.3(c).  *See also* Fed. R. Civ. P.

72(b).

III.   DISCUSSION

    A.   Plaintiff's Failure To File A Local Rule 7.1(a)(3) Responsive
          Statement

In support of their motion defendants properly filed with the court a

statement of material facts alleged not to be in dispute, as required by

Northern District of New York Local Rule 7.1(a)(3).  That rule imposes a

corresponding requirement upon a party who, like the plaintiff, opposes a

summary judgment motion, providing that

       [t]he opposing party shall file a response to the
Statement of Material Facts.  The non-movant's response shall
mirror the movant's Statement of Material Facts by admitting

and/or denying each of the movant's assertions in matching numbered paragraphs.  Each denial shall set forth a specific citation to the record where the factual issue arises.  The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs.  <u>The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.</u>

N.D.N.Y.L.R. 7.1(a)(3) (emphasis in original).

In opposing defendants' motion plaintiff did not submit the responding statement contemplated under Local Rule 7.1(a)(3).  The consequences of this failure are potentially significant.  By its terms, Local Rule 7.1(a)(3) provides that "[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."  N.D.N.Y.L.R. 7.1(a)(3).  Courts in this district have routinely enforced Rule 7.1(a)(3) and its predecessor, Rule 7.1(f), by deeming facts admitted upon an opposing party's failure to properly respond.  *See*, *e.g.*, *Elgamil v. Syracuse Univ.*, No. 99-CV-611, 2000 WL 1264122, at *1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases)[9]; *see also Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000) (discussing district courts' discretion to adopt local rules like

---

[9]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

7.1(a)(3)). [10]

As a counterbalance to this often fatal deficiency, a court has broad discretion to overlook a party's failure to comply with its local rules. *The Travelers Indemnity Co. of Ill. V. Hunter Fan Co.*, No. 99 CIV 4863, 2002 WL 109567, at *7 (S.D.N.Y. Jan. 28, 2002) (citing *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001)).  In deference to his *pro se* status, and given that he has actively opposed defendants' motion and that it is fairly clear from his submission which facts are disputed, though without minimizing the importance of Local Rule 7.1(a)(3), I recommend against deeming plaintiff to have admitted the facts set forth in defendants' statement of facts not in dispute.

B.   Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure.  Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317,

---

[10]      As to those facts not contained in the defendants' Local Rule 7.1(a)(3) statements, I assume for purposes of this motion that plaintiff's version of those facts is true, as plaintiff is entitled to the benefit of all inferences at this stage.  *Wright v. Coughlin*, 132 F.3d 133, 137 (2d Cir. 1998).

322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of*

*Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir.

2004).  A fact is "material", for purposes of this inquiry, if it "might affect

the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at

248, 106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d

549, 553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in

dispute "if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at

2510.

A party moving for summary judgment bears an initial burden of

demonstrating that there is no genuine dispute of material fact to be

decided with respect to any essential element of the claim in issue; the

failure to meet this burden warrants denial of the motion.  *Anderson*, 477

U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83.  In

the event this initial burden is met, the opposing party must show, through

affidavits or otherwise, that there is a material issue of fact for trial.  Fed.

R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*,

477 U.S. at 250, 106 S. Ct. at 2511.  Though *pro se* plaintiffs are entitled

to special latitude when defending against summary judgment motions,

they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party.  *See Building Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S. Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

C.    Retaliatory Transfer Claim

In their motion defendants contend no reasonable factfinder could conclude that plaintiff's transfer out of Elmira and into Upstate was motivated by his contemplation of a lawsuit regarding the November 13,

2006 incident.  Defendants further maintain that even if his protected activity were a motivating factor in the decision, the defendants have shown, as a matter of law, that regardless of the influence of that motive they would have taken the same action toward the plaintiff in any event, thereby establishing a complete affirmative defense to plaintiff's retaliation claim.

When adverse action is taken by prison officials against an inmate and is motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies.  *See Franco v. Kelly*, 854 F.2d 584, 588-90 (2d Cir. 1988).  As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care."  *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (same).

In order to state a *prima facie* claim under section 1983 for

retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action – in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S. Ct. 568, 576 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Dawes*, 239 F.3d at 492 (2d Cir. 2001). If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy*, 429 U.S. at 287, 97 S. Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (citations omitted).

Analysis of retaliation claims thus requires careful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case specific, are

alleged in only conclusory fashion and not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to summary judgment dismissing plaintiff's retaliation claims.  *Flaherty*, 713 F.2d at 13.

In this instance, drawing all inferences in plaintiff's favor, the record now before the court sufficiently establishes the first two elements to avoid the entry of summary judgment dismissing this claim.  Plaintiff's letter to Superintendent Burge on November 15, 2006, revealing his contemplation of a lawsuit regarding the feces throwing incident, could be viewed as activity protected under the First Amendment. *See Espinal v. Goord*, 558 F.3d 119, 128-29 (2d Cir. 2009); *Benitez v. Locastro*, No. 9:04-CV0423, 2010 WL 419999, at *13 (N.D.N.Y. Jan. 29, 2010) (Mordue, C.J.). Similarly, given his allegation that at Upstate he was allegedly exposed to danger at the hands of known enemy inmates, plaintiff's transfer from one facility into another, even though he was placed in disciplinary SHU confinement at both facilities, could be found by a reasonable factfinder to represent an adverse action sufficient to support a retaliation cause of action.  *Davis v. Kelly*, 160 F.3d 917, 920 (2d Cir. 1998).

Consideration of the evidence related to the third prong of the retaliation test, addressing the question of motivation, brings squarely into

focus a controverted fact.  At the outset it should be noted that the fact the transfer occurred one day after plaintiff's letter threatening suit was sent gives rise to an inference of retaliatory motivation.  *See Bennett v. Goord*, 343 F.3d 133, 138 (2d Cir. 2003) (noting that temporal proximity of protected conduct and alleged retaliatory conduct may serve as circumstantial evidence of retaliation).  In this instance, however, there is more.  According to the plaintiff Superintendent Burge appeared outside of his SHU cell on November 15, 2006 and told him that he was "getting rid of" the plaintiff.  Amended Complaint (Dkt. No. 7) at pp. 5-7; Johnson Aff. (Dkt. No. 69) ¶ 12. Notwithstanding defendant Burge's denial of having had that conversation, plaintiff's allegations raise a disputed issue of fact which must be resolved before the third element of the retaliation claim can be determined.  *See id.* at 138-39.

In their motion, defendants contend that even if plaintiff could establish a *prima facie* case of retaliation, they have successfully established, as a matter of law, that they would have taken the same steps irrespective of the retaliatory animus, thereby establishing a complete defense to plaintiff's retaliation claim.  When construed in a light most favorable to the plaintiff, however, the facts reveal that there is a significant question as to whether the motivation offered by the defendants

as having prompted the decision was pretextual.  *See Gill v. Calescibetta*, No. 9:00-CV-1553, 2009 WL 890661, at * 3 (N.D.N.Y. mar. 31, 2009) (Suddaby, J. and Peebles, M.J.).

Given the existence of the disputed facts which must be resolved before plaintiff's retaliation claim and defendants' *Mount Healthy* defense can be analyzed, I recommend that defendants' motion for dismissal of plaintiff's retaliation claim be denied.[11]

D.      Deliberate Medical Indifference Claim

Defendants' motion also challenges plaintiff's claim that upon his arrival at Upstate medical officials there were deliberately indifferent to his serious medical needs.  In support of that motion defendants assert both that the record fails to establish that plaintiff suffers from a medical need of constitutional significance, and, in any event, medical officials at Upstate were not subjectively indifferent to any such need.

Claims that prison officials have intentionally disregarded an inmate's medical needs fall under the umbrella of the protected afforded

---

[11]      As will be seen, several of the defendants named by plaintiff in connection with his retaliation cause of action, including Acting Commissioners LeClaire and Fischer, Director Theresa A. Knapp-David, and Deputy Superintendent Bezio, are nonetheless entitled to dismissal of plaintiff's retaliation claim against them based upon their lack of personal involvement in the alleged violation, *see* pp. 25 -27, *post,* while others, including Dr. Connolly, Nurses Atkinson, Miles and Mulverhill and Nurse Administrator Smith, do not appear from the record to be linked to plaintiff's retaliation claim.

by the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976). The Eighth Amendment prohibits the imposition of punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id.; see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084 (1986) (citing, *inter alia, Estelle).* While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement - that is, the conditions alleged must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." *See Leach v. Dufrain,* 103 F. Supp.2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 297 & 298, 111 S.Ct. 2321, 2323-2324 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn,

J. & Homer, M.J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321.  Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F. Supp.2d at 546 (*citing Farmer,* 511 U.S. at 837, 114 S.Ct. at 1970); *Waldo,* 1998 WL 713809, at *2 (citing *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1970).

### 1.   Serious Medical Need

In order to meet the objective prong of the governing Eighth Amendment test in a medical indifference case, a plaintiff must first allege a deprivation involving a medical need which is, in objective terms, "'sufficiently serious.'"  *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (quoting *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108 (1995).  A medical need is serious for constitutional purposes if it presents "'a condition of urgency' that may result in 'degeneration' or 'extreme pain'."  *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998) (citations omitted).  A serious medical need can also arise where "'failure to treat a prisoner's condition could result in further significant injury or the

unnecessary and wanton infliction of pain'"; since medical conditions vary in severity, a decision to leave a condition untreated may or may not raise constitutional concerns, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir. 2000) (quoting, *inter alia, Chance,* 143 F.3d at 702).   Relevant factors informing this determination include whether the plaintiff suffers from an injury that a "'reasonable doctor or patient would find important and worthy of comment or treatment'", a condition that " 'significantly affects'" a prisoner's daily activities, or "'the existence of chronic and substantial pain.'" *Chance,* 143 F.3d at 702 (citation omitted); *Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.) (citation omitted).

From the record in this case no reasonable factfinder could conclude that any of the conditions giving rise to the prescription medications of which plaintiff was deprived over an exceedingly brief period while at Upstate qualifies as serious for constitutional purposes. The medications involved were directed toward such modest conditions as lactose intolerance, nasal congestion, ankle pain, a gastrointestinal condition, and dry or irritated skin.  The record is devoid of any  indication that these conditions presented situations of urgency or resulted in degeneration or extreme pain over the brief period involved.  Indeed,

according to his medical records, plaintiff was seen by medical staff seven times over a four week period following his transfer into Upstate, including on November 16, 17, 18, 26, and 28, 2006 as well as December 5 and December 18 of that year.  Smith Aff. (Dkt. No. 68-2) ¶ 33 and Exh. B. None of the medical record entries associated with those examinations reveal evidence that would support a finding of the existence of a serious medical condition.  Accordingly, I recommend dismissal of plaintiff's medical indifference claim based upon his failure to establish the existence of a serious medical condition.

### 2.   Deliberate Indifference

In addition to establishing the existence of a serious medical need, to prevail on an Eighth Amendment medical indifference cause of an action a plaintiff must also establish indifference to that condition on the part of one or more of the defendants. *Leach,* 103 F. Supp.2d at 546. Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference."  *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F. Supp.2d at 546 (citing *Farmer,* 511 U.S. at 837, 114 S.Ct.

at 1979); *Waldo,* 1998 WL 713809, at *2 (same).

A physician's mere negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a § 1983 action. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 292; *Chance,* 143 F.3d at 703. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292. Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under § 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. If prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," however, such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138; *Kearsey v. Williams,* 2005 WL 2125874, at *5 (S.D.N.Y. Sep. 1, 2005).

The record now before the court also fails to substantiate plaintiff's claims of subjective, deliberate indifference on the part of the defendants The failure of prison officials to provide him with his prescription drugs

24

immediately upon his arrival at Upstate appears to have been the result of a mistake on the part of DOCS medical personnel at Elmira, who are not named in this complaint, in packing and forwarding those prescriptions along with plaintiff's personal belongings rather than following the established protocol of separately conveying them to the medical staff at Upstate.  The record also reveals that at Upstate plaintiff was offered alternatives to the medications and that his prescriptions for most drugs were renewed shortly after his transfer into the facility.  Neither plaintiff's complaint nor the record now before the court establishes a level of indifference on the part of any of the named defendants sufficient to support the subjective element of the deliberate indifference test. Accordingly, I recommend dismissal of that cause of action on this additional, independent basis.

      E.    <u>Personal Involvement</u>

      In their motion defendants also seek dismissal of plaintiff's claims against acting Commissioner's Fischer and LeClaire, defendant Knapp-David, and Superintendent Bezio on the basis that they lacked any personal involvement in the conduct giving rise to plaintiff's constitutional claims.

      Personal involvement of defendants in alleged constitutional

deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S. Ct. 1282 (1978)).  In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

The four defendants who are the subject of this portion of defendants' summary judgment motion occupy supervisory positions with the DOCS.  A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983.  *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501. Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who

caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring.  *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *rev'd on other grounds sub nom.*, *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009); *see also Richardson*, 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995); *Wright*, 21 F.3d at 501*.*

In this instance plaintiff has adduced no evidence to show any permissible basis to find liability on the part of the four defendants in question.  Accordingly, I recommend dismissal of plaintiff's claims against defendants Fischer, LeClaire, Knapp-David and Bezio on this separate, independent ground.

F.    Qualified Immunity

In their motion, defendants argue that even if plaintiff can establish a *prima facie* claim of medical indifference or retaliation, defendants should be shielded from liability based upon qualified immunity.  Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982) (citations omitted).  "In assessing an officer's eligibility for the shield, 'the appropriate question is the objective inquiry whether a

reasonable officer could have believed that [his or her actions were] lawful, in light of clearly established law and the information the officer[ ] possessed."  *Kelsey v. County of Schoharie*, 567 F.3d 54, 61 (2d Cir. 2009) (quoting *Wilson v. Layne*, 526 U.S. 603, 615, 119 S.Ct. 1692 (1999)).  The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. ___, 129 S. Ct. 808, 815 (2009) .

In *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims."  *Pearson*, 555 U.S. at ___, 129 S.Ct. at 816.  The first step required the court to consider whether, taken in the light most favorable to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right,[12] *Kelsey*, 567 F.3d at 61, with "the second step being whether the right is clearly established", *Okin v. Village of Cornwall-On-Hudson Police Dept.*, 577

---

[12]    In making the threshold inquiry, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.  *Saucier,* 533 U.S. at 201, 121 S. Ct. 2151.

F.3d 415, 430 n.9 (citing *Saucier*).[13]  Expressly recognizing that the

purpose of the qualified immunity doctrine is to ensure that insubstantial

claims are resolved prior to discovery, the Supreme Court recently

retreated from the prior *Saucier* two-step mandate, concluding in *Pearson*

that because "[t]he judges of the district courts and courts of appeals are

in the best position to determine the order of decisionmaking [that] will

best facilitate the fair and efficient disposition of each case", those

decision makers "should be permitted to exercise their sound discretion in

deciding which of the . . .  prongs of the qualified immunity analysis should

be addressed first in light of the circumstances of the particular case at

hand."[14]  *Pearson*, 555 U.S. at  ___, 129 S.Ct. at 818, 821.  In other

words, as recently emphasized by the Second Circuit, the courts "are no

longer *required* to make a 'threshold inquiry' as to the violation of a

constitutional right in a qualified immunity context, but we are free to do

_____

[13]       In *Okin*, the Second Circuit clarified that the "'objectively reasonable' inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful."  *Okin*, 577 F.3d at 433, n.11 (citation omitted).

[14]       Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability. . .", *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806 (1985), the Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson*, ___ U.S. at ___, 129 S.Ct. at 815 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 524 (1991) (per curiam)).

so." *Kelsey*, 567 F.3d at 61(citing *Pearson*, 129 S. Ct. at 821) (emphasis in original).

For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs . . . should be addressed in light of the circumstances in the particular case at hand.'" *Okin*, 577 F.3d 430 n.9 (quoting *Pearson*).  "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all.'" *Kelsey*, 567 F.3d at 61 (quoting *Pearson*, 129 S. Ct. at 818).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier*, 533 U.S. at 202, 121 S.Ct. at 2156 (citation omitted).  When deciding whether a right was clearly established at the relevant time, a court should consider

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the [Second Circuit] support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Wright v. Smith*, 21 F.3d at 500 (quoting *Benitez v. Wolff*, 985 F.2d 662,

666 (2d Cir. 1993)).  The objective reasonableness test will be met, and

qualified immunity enjoyed, where government officers of reasonable

competence could disagree as to whether by his or her alleged conduct

the defendant would be violating the plaintiff's rights.  *Okin*, 577 F.3d at

433 (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092 (1986)).

"If, on the other hand, no officer of reasonable competence would

conclude that the conduct in question is lawful, there is no immunity."

*Okin*, 577 F.3d at 433 (citing *Lennon v. Miller*, 66 F.3d 416, 420-21 (2d

Cir. 1995)).

        In this instance the surviving claim of retaliation implicates legal

principles that were firmly established in 2006, the time of the relevant

events.  Because there are disputed issues as to whether or not

defendant Burge ordered a transfer of the plaintiff out of Elmira in

retaliation for his protected activity, an action which could not be said to

be objectively reasonable for a superintendent in his position, I

recommend denial of defendants' motion for summary judgment based on

qualified immunity, without prejudice.

## IV.   SUMMARY AND RECOMMENDATION

        Plaintiff's complaint in this action alleges two discreet causes of

action.  The first, alleging that plaintiff was transferred out of Elmira and

into Upstate at the direction pf defendant Burge in retaliation for his having threatened to commence a lawsuit regarding an incident at Elmira, gives rise to disputed issues of material fact that must be resolved before the questions of whether plaintiff has established the requisite nexus between his protected activity and the transfer, and whether defendants have carried their burden in establishing that they would have taken the same action regardless of the plaintiff's protected activity, can be decided. Turning to plaintiff's cause of action for deliberate medical  indifference, because the record fails to establish that he suffers from a serious medical condition of constitutional proportions or that any of the defendants were deliberately indifferent to any such condition, summary judgment dismissing that claim is warranted.

Addressing defendants' remaining arguments, I find that the record further fails to disclose any basis for finding that defendants LeClaire, Fischer, Knapp-David, or Bezio were personally involved in the constitutional violations alleged, and that plaintiff has not alleged participation on the part of Dr. Connolly, Nurses Atkinson, Miles and Mulverhill, and Nurse Administrator Smith in the conduct giving rise to plaintiff's surviving retaliation cause of action.  Additionally, I conclude that at this juncture, it cannot be said that defendant Burge is protected by

qualified immunity from plaintiff's retaliation claim.  Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 68) be GRANTED, in part, and that plaintiff's deliberate medical indifference cause of action and all claims against defendants Fischer, LeClaire, Knapp-David, Smith, Bezio, Connolly, Atkinson, Miles, and Mulverhill be DISMISSED, leaving only plaintiff's cause of action against defendant Burge for retaliation to be tried in this action.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:     March 15, 2010
           Syracuse, NY

David E. Peebles
U.S. Magistrate Judge

33



Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Maurice SAMUELS, Plaintiff,
v.
Donald SELSKY, Glenn Goord, Paul Cecilia, Javier
Iurrue, G. Schwartzman, Dennis Bliden, Jeffery McCoy,
and Christopher P. Artuz, Defendants.
No. 01CIV.8235(AGS).

Sept. 12, 2002.

OPINION & ORDER

SCHWARTZ, District J.

I. Introduction

*1 Maurice Samuels alleges that while incarcerated at the
Green Haven Correctional Facility,[FN1] prison officials
searched his cell and confiscated a number of documents
which were deemed to be "subversive" and contraband.
Samuels claims that the materials, including theological
textbook excerpts, were of a Christian nature and were
used in a course he taught in the prison through the New
York Theological Seminary. Samuels' alleged possession
of these documents led to a misbehavior report and a
subsequent disciplinary hearing, for which Samuels was
sentenced to 180 days in keeplock and 180 days' loss of
packages, commissary privileges, and telephone use.
Samuels also alleges that instead of being punished as per
his disciplinary hearing, he was sentenced to a more
severe punishment, 180 days in a special housing unit
which entailed Samuels' being locked in his cell for
twenty-three hours per day. On the basis of the allegedly
unlawful sanctions to which he was subjected, Samuels
has filed the instant action pursuant to 42 U.S.C. § 1983
alleging violations of, *inter alia,* his First Amendment and

due process rights, and seeks equitable relief and damages.
Defendants have filed a motion to dismiss the action
pursuant to FED. R. CIV. P. 12(b)(1) and (6), and argue
that they enjoy qualified immunity barring this suit. For
the reasons set forth below, defendants' motion is granted
in part and denied in part.

FN1. Defendants repeatedly state that the events
giving rise to this action arose while Samuels
was incarcerated at the Great Meadow
Correctional Facility. Samuels states that the
events in question happened at the Green Haven
Correctional Facility. Moreover, Samuels'
evidence, including the Inmate Disciplinary
Report (Exhibit H), the Disciplinary Hearing
Record Sheet (Exhibit O), and the
Superintendent Hearing Disposition Report
(Exhibit P) all note the Green Haven
Correctional Facility. In light of the above, the
Court determines that defendants' position that
the events occurred at Great Meadow is
incorrect. The Green Haven Correctional Facility
is located in Dutchess County in the Southern
District, while Great Meadow is located in
Washington County in the Northern District.
Defendants make no argument regarding the
Court's jurisdiction with respect to the location of
the events in question.

II. Factual Background [FN2]

FN2. Unless otherwise indicated, the facts set
forth below are gleaned from Samuels'
submissions, because on a FED. R. CIV. P.
12(b)(1) or (6) motion, the adjudicating court
must assume as true factual allegations made in
the complaint. Defendants concede this fact. *See*
Defendants' Memorandum of Law in Support of
their Motion to Dismiss the Complaint, at 4. It
should also be noted that Samuels brings this
action *pro se.* As such, it is sometimes difficult to
understand fully his contentions. Accordingly,
the Court reads the (sometimes confusing)

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

factual allegations in the light most favorable to Samuels.

Maurice Samuels is currently an inmate at the Sullivan Correctional Facility. Since being incarcerated, Samuels has taken a keen interest in religion. He identifies himself as a member of the Five Percent Nation of Gods and Earths. [FN3] While confined at Sing Sing, he received a degree of Master of Professional Studies in Prison Ministry through the New York Theological Seminary ("NYTS"). *See* Complaint Pursuant to U.S.C.A. Section 1983 ("Complaint"), at 4; Exhibit ("Ex.") A. Upon completion of his studies with the NYTS, Samuels was transferred to the Green Haven Correctional Facility. [FN4] At Green Haven, Samuels was assigned a clerk's position in therapeutic "Reality and Pain Program." He subsequently redesigned the program, creating the "Reality and Pain Therapeutic Counseling Program." *See* Complaint, at 4. During this period he also served as a volunteer inmate instructor in the Black Studies program, and was later assigned as a clerk in Green Haven's Senior Counselor's Office, where he helped create a program for sex offenders. *See id.* at 4.

> FN3. The website of the University of Chicago's Divinity School provides a good summary of the beliefs of the adherents of the Five Percent Nation of Gods and Earths, commonly known as the "Five Percenters." *See* Jonathan Moore, *The Five Percenters: Racist Prison Gang or Persecuted Religion?,* SIGHTINGS, May 21, 1999, *available at* http://divinity.uchicago.edu/sightings/archive_1999/sightings-052199.html. The name of the group stems from its belief that only five percent of people are aware of and teach the truth. The term "Gods" refers to black male members; "Earths" refer to black female members. The group was founded by Clarence 13X, who left the Nation of Islam in 1964. According to Moore, "[m]any of the theological accoutrements of Black Muslim belief remain: many read the Qur'an and Elijah Muhammad's writings (especially his "Message to the Black Man"), and they hold to the exclusive divinity of black men." *Id.* (The Moore article, not part of the record, is provided for background purposes only). Samuels has

included two pages outlining the differences between the Nation of Gods and Earths and similar black Muslim groups-the Nation of Islam and the Temple of Islam. *See* Exhibit B.

> FN4. *See supra* note 1.

The NYTS later began a certificate program in Christian Ministry in conjunction with Marist College at Green Haven. Samuels was invited to teach several courses for the program, including a course entitled "World Views and Values" and another entitled "Introduction to Theology and Methods." *See* Complaint, at 4; Ex. E, at 12. Samuels is listed on the "Faculty and Administration" page of the Certificate in Ministry Program brochure. *See* Ex. E, at 10. In designing his theology course, Samuels, in conjunction with Professor Mar Peter-Raoul (currently the Chair of the Department of Philosophy and Religious Studies at Marist College), prepared a syllabus which included the following:

**\*2** a. This is an introductory approach to contemporary Christian Theology, there will be a broad range of material provided for the student so that they [sic] may see the evolution of Christian Theology and Contemporary Theologies, active in the world today.

b. The course is divided into different sessions (1) What is Theology; (2) Philosophy & Theology; (3) Contemporary Theology; (4) Political and Liberation Theology; (5) Feminist/Womanist Theology; and (6) Black & Third World Theology.

c. This is done so that the student can examine the evolution of Christian Theology and Contemporary Theologies, and arrive at the next step in the process, i.e. explore the [sic] how to do theology.

d. This introduction to theology course will be taught from a [sic] interdisciplinary and non-traditional approach.

Complaint, at 5. This syllabus was approved by the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

appropriate authorities from NYTS, Marist College, and the Department of Corrections ("DOCS"). *See id.* at 5.

The central issue in this case involves a search of Samuels' cell. On September 15, 1999, another member of the Five Percent Nation of Gods and Earths who was involved in the NYTS program was disciplined for allegedly possessing a pamphlet entitled "Awake" or "Awaken" which addressed topics such as racism in the criminal justice system and abuses of the Rockefeller drug laws. *See* Complaint, at 6. On October 19, 1999, the assistant inmate director for the NYTS certificate program was interrogated about the program and why some of its members were also members of the Five Percent Nation of Gods and Earths. At the time, Samuels was housed in the inmate honor block housing Unit and taught a pre-G.E.D. and adult basic education class in the morning and afternoon and taught his theology class in the evening. *See* Complaint, at 6. According to defendants, Sergeant Schwartzman, a member of the prison staff, received a report from a confidential informant that Samuels was a leader of a protest planned to occur around January 1, 2000 ("Y2K protest").[FN5] On October 20, 1999, Schwartzman ordered correction officers Williams and Kelly to search Samuels' cell. Samuels states that the confiscated materials included Marist College and NYTS course handouts for the certificate program, previously published material from the NYTS and Marist College, notes from newspaper articles, a manuscript Samuels had been working on since first attending the NYTS, and Kairos statements.[FN6] *See* Complaint, at 7. According to the Cell Search Report, contraband was found which consisted of a "folder of papers containing subversive material." Ex. G. On the same day, an Inmate Misbehavior Report was completed. *See* Ex. H. The rule violations are listed as 104.12 (action detrimental to the order of the facility) and 113.23 (contraband). *See id.* The narrative section of the Inmate Behavior Report states:

> FN5. While denying a link to the Y2K protest, Samuels provides some background on the matter. According to Samuels, DOCS created a program at Green Haven through the Corcraft Industry Division Program known as the Recreational Cell Building Project ("Project"). The Project initially used inmate volunteers to build Inmate Recreational Cells at recently

constructed S-Facilities (special housing institutions). According to Samuels, because of poor working conditions, low wages, and other factors, inmates increasingly refused to volunteer for the Project and sought other work assignments. Samuels alleges that DOCS personnel then began using the disciplinary process to systematically force inmates to work in the Project. *See* Complaint, at 3. Samuels also alleges that prison officials specifically targeted members of the NYTS and the Five Percent Nation of Gods and Earths for compelled work participation in the Project. *See id.* at 4. The planned Y2K protest, in which Samuels claims to have played no role, was intended to protest the program as well as prison conditions generally.

> FN6. The Kairos Statements (referred to by Samuels as "Karios Statements") are critiques of traditional church dogma. The most famous Kairos statement originated as a critique of alleged church complicity in the white *apartheid* regime in South Africa.

On the above date [10/20/99] and time while conducting a cell search on cell D-1-21 which houses inmate Samuels, Maurice 85A0184 the following contraband was found and recovered;

**\*3** (1) Folder of papers containing subversive material These papers speak about inmate [sic] uniting together to fight against opositions [sic] such as the N.Y. parole system and other dept. of correction [sic] programs.

This material is consistant [sic] with information recieved [sic] that inmate Samuels has been active in urging others to participate in a demonstration on or about Jan. 1, 2000, which led to his cell being searched.

Ex. H. The form is signed by G. Williams, a correction officer, and G. Schwartzman. The documents are not identified, nor is there an explanation of why they were considered "subversive." Samuels repeatedly asked prison authorities to identify the "subversive" documents without

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

success. *See, e.g.,* Exhibits ("Exs.") J, K, M, N, V, 7, 9. Defendants have not furnished the confiscated papers for the Court, and make no representation as to what documents were found in Samuels' cell or why they are considered "subversive." Samuels states that the materials seized by the prison officials is not literature pertaining to the Five Percent Nation of Gods and Earths but Christian ministry materials he used in teaching his class and which had previously been approved by the NYTS and prison authorities. *See* Complaint, at 5. Samuels also states that newspaper clippings and a manuscript he had been working on since 1986 were taken. *See* Affidavit [of Maurice Samuels] in Support of Opposition Motion ("Samuels Aff."), at ¶¶ 7-9.

Samuels was immediately placed in keeplock status pending a hearing on the misbehavior report. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint ("Motion Brief"), at 3. Under DOCS rules, Samuels was entitled to an employee assistant to assist in his defense of the charges set forth in the misbehavior report.[FN7] An Assistant Selection Form was provided to Samuels, which instructed Samuels to select three people, one of whom would be assigned to him based on availability. *See* Ex. I. Samuels selected Hanna, Lawrence, and Schwartzman as his three choices. *See id.* Instead, Paul Cecilia was assigned to Samuels. *See* Motion Brief, at 3. Samuels alleges that instead of assisting him in the preparation of his case, Cecilia proceeded to interrogate Samuels, asking him if he was in contact with Green Party candidate (formerly "Grandpa Munster") Al Lewis, whether he had any letters from him, whether he had any letters from outside organizations involved in prison reform, whether he was involved in any planned Y2K protest, and what the "Kairos" document was. *See* Complaint, at 8. Samuels further alleges that Cecilia did not explain the charges contained in the misbehavior report and failed adequately to conduct an investigation on Samuels' behalf.[FN8] Cecilia signed an Assistant Form on October 25, 1999, at 12:53 pm, indicating that he had interviewed witnesses, assisted as requested, and reported back to Samuels. *See* Ex. J. However, on October 26, Green Haven officials requested a one-day extension to hold a disciplinary hearing on the basis that the "assistant is trying to speek [sic] to with witness [sic]." *See* Ex. L. The extension was granted by "Alternate User 999SHURXR for 999SHU." *See id.* The name of the grantor is not listed on the computer printout.

[FN7.] *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1 (2002):(a) An inmate has the opportunity to pick an employee from an established list of persons who shall assist the inmate when a misbehavior report has been issued against the inmate if [...] (4) the inmate is confined pending a superintendent's hearing [...].

[FN8.] Samuels cites a number of failures on Cecilia's behalf: he failed to turn over documentary evidence relating to the charges against Samuels, he failed to provide a written record of the questions he was supposed to ask Samuels' witnesses, he failed to record the testimony of the witnesses interviewed on Samuels' behalf, he failed to explain exactly what material that was confiscated constituted contraband, and he failed to interview the confidential informant to determine his existence or credibility. *See* Complaint, at 9.

**\*4** The "Tier III" disciplinary hearing was held on October 27, 1999.[FN9] At the hearing, two inmates and Dr. George W. Webber testified on Samuels' behalf (Webber testified by telephone). Webber is the director of the Certificate Program and president emeritus of the NYTS. Sgt. Schwartzman testified against Samuels. *See* Ex. O. Samuels also submitted a written brief for the hearing. *See* Ex. M. Samuels was found guilty of "demonstration" and "contraband" on November 9, 1999. The hearing officer, Javier Irurre,[FN10] summarized his findings as follows:

[FN9.] Tier III hearings are held for "the most serious violations of institutional rules." *Walker v. Bates,* 23 F.3d 652, 654 (2d Cir.1994).

[FN10.] The name "Javier Irurre" appears on the Hearing Disposition form. *See* Ex. P. Samuels spells the name "Iurrue," *see* Complaint, at 9, while defendants in turn use two spellings for the name-"Iurre" and "Iurrue *See* Motion Brief, at 3. The Court uses the "Irurre" spelling found on the Hearing Disposition form, apparently in Javier

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Irurre's own handwriting, and on the Tier III assignment form signed by Superintendent Artuz. *See* Appendix 7.

Statement of Evidence Relied Upon: Papers & hand written papers retrieved from your cell show statements inciting revolt and prison unrest. Confidential tape shows similarity between statements made in papers you have written and others in your possession with statements found in written material belonging other [sic] inmates inciting the so called Y2K revolt.

Confidential tape and testimony at the hearing establish a link between the statements in papers found in your cell and phamphlets [sic] circulating among prison population urging to strike in Y2K.

Reason for Disposition: Inciting revolt can not be tolerated in a correctional setting.

Ex. P. Samuels was punished with 180 days of keeplock, 180 days of loss of packages, 180 days of loss of commissary privileges, and 180 days of loss of phone privileges. *See* Ex. P; Complaint, at 11. The hearing officer did not impose special housing unit placement. *See* Ex. P; Complaint, at 11. The Court has not been furnished with a transcript of the hearing or of the "confidential tape" referred to by Irurre.

Samuels alleges that his due process rights were violated at the misbehavior hearing. He alleges that he failed to receive a timely hearing, that he received inadequate assistance from the employee assistant assigned to him (Cecilia), and that Dr. Mar Peter-Raoul was not permitted to testify on Samuels' behalf. *See* Complaint, at 9, 11. Samuels also protests the fact that the misbehavior report never specifies exactly what Samuels did to constitute "demonstration." *See id.* at 11. No written record was apparently made stating the reasons Dr. Peter-Raoul was not permitted to testify. Dr. Peter-Raoul later wrote a lengthy letter addressed to defendants Bliden, McCoy, and Irurre in which she explained the nature of the Kairos documents and stated her desire to serve as a witness for Samuels. *See* Complaint, at 10.

On November 8, 1999 (one day before Irurre found Samuels guilty of demonstration and contraband), Samuels submitted a detailed written brief to First Deputy Superintendent Dennis Bliden and "Jeff Macoy" [sic] on November 8, 1999, requesting that his misbehavior report be dismissed. *See* Ex. N. While waiting for a response to his letter, Samuels was transferred to the Upstate Correctional Facility, a special housing unit facility, where he was housed for 180 days.[FN11] *See* Complaint, at 11; Motion Brief, at 4; Plaintiffs' [sic] Memorandum of Law in Opposition to Defendants' Motion ("Opposition Brief"), at 27. Neither Samuels nor defendants provides an explanation as to why Samuels was transferred to the special housing unit facility. Jeff McKoy (listed in the caption as Jeffery McCoy) wrote to Samuels on November 12, 1999, advising him that he lacked the authority to overturn a Tier III disposition. *See* Ex. R. Bliden wrote to Samuels on November 18, 1999, stating that any appeal Samuels wished to file had to be directed to the Commissioner in Albany. He stated that "[u]ntil such time as we receive a decision from [Albany], I will not modify the disposition." Ex. U.

FN11. Placement in a special housing unit involves confinement for twenty-three hours per day. The inmates assigned to special housing units receive virtually no programming, no congregate activities, and very little natural light. Reading materials are severely restricted, as are visits. *See* Ex. 16, at 5-6 (THE NEW YORK STATE SENATE DEMOCRATIC TASK FORCE ON CRIMINAL JUSTICE REFORM, CRIMINAL JUSTICE REFORM: A TIME THAT'S COME (2001)).

**\*5** As per Deputy Superintendent Bliden's instructions, Samuels submitted a seventeen-page letter to Donald Selsky, the Director of the Inmate Disciplinary Program, in Albany. *See* Ex. V. In the course of his letter to Selsky, Samuels voices his procedurally and substantively-based arguments for dismissing his misbehavior adjudication. Selsky affirmed the November 9, 1999 hearing on January 6, 2000 on behalf of Glenn Goord, the Commissioner.[FN12] *See* Ex. 6. Samuels filed a request for a "time-cut" from the determination of the Superintendent

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

on February 28, 2000. *See* Ex. 6. Prisoners' Legal Services of New York ("PLS") sent a letter to Selsky on March 2, 2000, asking him to reconsider his decision. On April 27, 2000, PLS sent a supplemental request for reconsideration, this time outlining in detail the legal bases for which Samuels' disciplinary charges should be withdrawn (by this point, Samuels had already served the imposed penalty; the letter asks Selsky to reverse the disciplinary hearing and expunge the disciplinary charges). *See* Ex. 9. Selsky did not alter his January 2000 decision. Samuels then appealed to the New York State Supreme Court, apparently by means of an Article 78 proceeding. The court, Canfield J., concluded that Samuels' appeal raised a substantial evidence question that could not be resolved by "reference to the objections in point of law." Decision and Order dated October 13, 2000. The court then transferred the matter to the Appellate Division, Third Judicial Department pursuant to N.Y. C.P.L.R. 7804(g).[FN13] *See id.*

> FN12. Prisoners' Legal Services of New York cite the date as January 20, 2000. *See* Ex. 7; Samuels cites the date as January 20, 1999. *See* Ex. 6.

> FN13. No Appellate Division decision on the matter is in the record. However, defendants' argument on the exhaustion of remedies focuses on administrative remedies and not on this potential deficiency.

Samuels then filed the instant action pursuant to 42 U.S.C. § 1983 based on defendants' alleged violations of his due process, First Amendment, and other constitutional rights, seeking equitable relief as well as compensatory and punitive damages.[FN14] The defendants move to dismiss the complaint pursuant to FED. R. CIV. P. 12(b)(1) (lack of subject matter jurisdiction) and (6) (failure to state a claim upon which relief can be granted). For the reasons set forth below, defendants' motion is granted in part and denied in part.

> FN14. In his complaint, Samuels also alleged an Eighth Amendment violation stemming from his treatment during a trip to and from his brother's

funeral. This claim was dismissed by order of Judge Mukasey dated September 4, 2001.

III. Legal Standard

A. *Pro Se* Complaints

The Second Circuit has repeatedly held that *pro se* complaints must be read more leniently than those prepared by lawyers. Recently, for example, the Second Circuit noted that a "*pro se* complaint should not be dismissed unless 'it appears beyond doubt that the plaintiff[ ] can prove no set of facts in support of [his] claim[s] which would entitle [him] to relief.' " *Weixel v. Board of Educ. of the City of New York,* 287 F.3d 138, 145 (2d Cir.2002) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). Moreover, when considering a motion to dismiss a *pro se* complaint, "courts must construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Weixel,* 287 F.3d at 146 (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (internal quotation marks omitted)). The Second Circuit has also emphasized that a liberal reading of a *pro se* complaint is especially important when the complaint alleges civil rights violations. *See Weixel,* 287 F.3d at 146;*Weinstein v. Albright,* 261 F.3d 127, 132 (2d Cir.2001). Consequently, Samuels' allegations must be read so as to "raise the strongest arguments that they suggest." *Weixel,* 287 F.3d at 146 (quoting *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (internal quotation marks omitted)).

B. Motions to Dismiss Pursuant to FED. R. CIV. P. 12(b)(1) & (6)

*6 Defendants move to dismiss the complaint pursuant to FED. R. CIV. P.12(b)(1) and (6). The standard of review for dismissal on either basis is identical. *See, e.g., Moore v. PaineWebber, Inc.,* 189 F .3d 165, 169 n. 3 (2d Cir.1999); *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997). In either case, a court must assume as true factual allegations in the complaint and construe the complaint in the light most favorable to the plaintiff. *See, e.g., York v. Association of Bar of City of*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

*New York,* 286 F .3d 122, 125 (2d Cir.2002); *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998).* While the question of subject matter jurisdiction goes to the power of the court to hear a case, the issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *York,* 286 F.3d at 125 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)).

IV. Legal Analysis

A. Exhaustion of Administrative Remedies

1. Legal Standards Governing Exhaustion of Administrative Remedies

Lawsuits by prisoners are governed by 42 U.S.C. § 1997e, which holds in part:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Under this section, where a prisoner brings an action in a district court before exhausting all available administrative remedies, the action must be dismissed. A unanimous Supreme Court has recently interpreted the term "prison conditions" expansively, requiring an exhaustion of all available administrative remedies whether the inmate suit concerns a general prison condition (i.e., quality of food) or a discrete incident specific to one prisoner (i.e., excessive force). *See* *Porter v. Nussle,* 122 S.Ct. 983 (2002). The Court also held that the exhaustion requirement applies regardless of whether the administrative remedies are "plain," "speedy," or "effective," and also applies when the prisoner "seeks relief not available in grievance proceedings" such as monetary damages. *Id.* at 988.

As a preliminary matter, defendants concede that Samuels has exhausted all administrative remedies concerning his due process violations. *See* Defendants' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Their Motion to Dismiss ("Reply Brief"), at 9. Defendants' concession is apparently based on DOCS Directive No. 4040, which holds that:

[T]he individual decisions or dispositions of the following are not grievable: [...] Media Review, disciplinary proceedings, inmate property claims (of any amount) and records review (Freedom of Information Requests, expunction). However, the policies, rules, and procedures of any of these programs or procedures may be the subject of a grievance.

*7 As noted above, Samuels unsuccessfully appealed his case within the prison facility and later to defendant Selsky in Albany, who denied it and denied reconsideration thereof.

Defendants argue, however, that "if a claim is incidental to a disciplinary determination [...] the fact that the disciplinary charge itself has been appealed does not excuse the failure to file a grievance." Reply Brief, at 9. Defendants thus seek to sever the alleged due process violations (for which Samuels has exhausted all administrative remedies) from several closely related claims-Samuels' claims protesting the confiscation of his papers, his transfer to the special housing unit, and DOCS policy regarding the Five Percent Nation of Gods and Earths (for which defendants argue Samuels has failed to exhaust all administrative remedies). *See* Reply Brief, at 9.

2. Confiscation of Documents

Defendants allege that the confiscation of the religious material is a matter separate from the underlying disciplinary hearing. While Samuels directly appealed his disciplinary adjudication, he concedes that he did not bring any complaint to the inmate grievance program. *See* Complaint, at 1. Defendants argue that Samuels' claim alleging the confiscation of religious material must

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

therefore be dismissed because he failed to exhaust administrative remedies. *See* Reply Brief, at 9-10. Defendants represent that confiscation of religious documents from a cell is a grievable matter. The Court notes, however, that in similar cases inmates have been told that such confiscations are not grievable. *See, e.g., Allah v. Annucci,* 97 Civ. 607, 1999 U.S. Dist. LEXIS 7171, at *2-*3 (W.D.N.Y. Mar. 25, 1999) (plaintiff filed an inmate grievance protesting confiscation of religious material and was told such a seizure was not grievable).

As a preliminary matter, there is considerable confusion regarding exactly which documents were confiscated. Samuels has sought these documents numerous times; defendants have not made the documents available to him or to the Court. Initially, defendants stated that "Plaintiff specifically alleges in his compliant that the defendants confiscated a pamphlet called 'Awake'." Motion Brief, at 8. Later, defendants state that it is "unclear from plaintiff's complaint and response whether the pamphlet 'Awake' was confiscated from him or another." Yet since defendants conducted the search and confiscation of the materials from Samuels' cell, they should know whether "Awake" was confiscated from Samuels' cell. Nonetheless, they claim ignorance. Samuels himself makes his position clear: "material taken from Plaintiff [sic] cell [...] was not [...] Awake." Complaint, at 2. In a later brief, he writes "Complainant NEVER POSSESSED a pamphlet entitled 'Awake.'" Opposition Brief, at 3 (emphasis in original).

In any event, it is clear that certain religiously-oriented documents were confiscated from Samuels' cell. Samuels seeks, *inter alia,* punitive and compensatory damages he claims to have suffered through defendants' alleged violation of his rights, including his First Amendment rights. *See* Complaint, at 13. Defendants argue that Samuels "never appealed any grievance relating to the confiscation of religious material" to the Inmate Grievance Program, citing an affidavit of Thomas G. Eagen ("Eagen Aff."), the Director of DOCS's Inmate Grievance Program, dated March 13, 2002. While this may be true, Samuels did protest the confiscation of documents in his direct appeal to Bliden and McKoy and later to Selsky. *See* Exs. N, V, 9. These appeals were denied.

**\*8** As noted, it is factually unclear whether seizures of

religious materials may be grieved through the Inmate Grievance Program. However, even if such seizures are grievable, Samuels' alleged failure to exhaust all administrative remedies as required by 42 U.S .C. § 1997e(a) goes only to the narrow issue of the confiscation *qua* confiscation-the damage Samuels suffered from the loss of his property (such as the property value of the books). The main confiscation issue put forward by Samuels is not the confiscation in and of itself, but the confiscation insofar as it was the basis for the misbehavior adjudication.[FN15] This issue was already effectively grieved by Samuels through his direct appeal of his misbehavior determination, which *per se* implicated the confiscation of documents. Defendants argue nonetheless that any confiscation that took place is separate from the disciplinary hearing and thus must be separately grieved. The Court does not agree.

> FN15. The real damage suffered by Samuels was, *inter alia,* his 180 days in keeplock (and later a special housing unit).

Disputes stemming from a disciplinary hearing are properly appealed directly and not through the Inmate Grievance Program. To the extent that the confiscation issue is a constituent element of the misbehavior adjudication, Samuels need not file an administrative grievance because he already sought review of the matter on his direct appeal. The recent case of *Flanagan v. Maly,* 99 Civ. 12336(GEL), 2002 WL 122921 (S.D.N.Y. Jan. 29, 2002), is instructive. In *Flanagan,* the plaintiff brought two separate claims-one stemming from inadequate access to medical and legal resources, and one stemming from an alleged due process violation in a disciplinary hearing. The court found that the plaintiff had not exhausted all administrative remedies with regard to medical and legal access because he failed to utilize the Inmate Grievance Program. With regard to the disciplinary hearing, however, the court held that utilization of the grievance procedures was unnecessary because the plaintiff had already appealed the issues directly:

To require [plaintiff] to file an administrative grievance in these circumstances would be absurd, and Congress cannot have intended such a requirement. When an inmate challenges the procedure at a disciplinary hearing that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

resulted in punishment, he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal. Pursuit of the appellate process that the state provides fulfills all the purposes of the exhaustion requirement of [§ 1997e(a) ]FN16, by giving the state an opportunity to correct any errors and avoiding premature federal litigation. Once the alleged deprivation of rights has been approved at the highest level of the state correctional department to which an appeal is authorized, resort to additional internal grievance mechanisms would be pointless.

> FN16. The district court mistakenly cites the provision as " § 1997a(e)," a nonexistent section.

*Flanagan,* 2002 WL 122921, at *2. While the issue referred to in *Flanagan* was a due process defect in the disciplinary hearing (not at issue here because defendants concede that Samuels exhausted all available administrative remedies), the underlying point, that issues directly tied to the disciplinary hearing which have been directly appealed need not be appealed again collaterally through the Inmate Grievance Program, is applicable to the confiscation issue. Moreover, the confiscation in the instant case is part and parcel of the misbehavior adjudication-unlike the medical claim made in *Flanagan* which was divorced from the due process claim.

*9 Defendants rely on a single case in support of their contention that the confiscation issue and the disciplinary hearing issue are wholly separate, *Cherry v. Selsky,* 99 Civ. 4636(HB), 2000 U.S. Dist. LEXIS 9451 (S.D.N.Y. July 7, 2000). It is not completely clear which section of the opinion defendants are citing, because no pinpoint citation is given. In *Cherry,* Judge Baer held that the filing of a false misbehavior report by a corrections officer is a grievable matter. *See id.* at *21. However, *Cherry* is readily distinguishable from the instant case because in *Cherry,* the plaintiff had "not brought a claim with respect to the due process afforded him at his disciplinary hearing [...]." *Id.* at *15. In contrast, Samuels makes this claim. As a consequence, the due process violations, including the allegedly wrongful confiscation (to the extent it led to the misbehavior adjudication) may be appealed directly.

Consequently, while Samuels has not exhausted his administrative remedies with regard to the injuries he suffered from the confiscation *alone,* he has exhausted his administrative remedies with regard to the injuries he suffered from the confiscation inasmuch as the confiscation of the religious materials serves as the basis for the disciplinary hearing.FN17

> FN17. The confiscation of Samuels' documents is not an ancillary issue unrelated to the disciplinary hearing (as was Samuels' Eighth Amendment argument, *see supra* note 14). Instead, the allegedly improper confiscation of materials is part and parcel of the disciplinary proceeding. The primary harm suffered by Samuels of the confiscation was not the value of the documents seized (which is never mentioned by Samuels) but the fact that the confiscation of allegedly harmless materials led to his confinement in keeplock and later in a special housing unit for 180 days.

3. Special Housing Unit Confinement

Defendants similarly argue that Samuels' claim of retaliatory confinement in a special housing unit is barred because he failed to exhaust all available administrative remedies.FN18 It is not entirely clear whether Samuels is making an argument based on retaliation. On one hand, he states that "Plaintiff [sic] claim is not on issue of retaliation." Samuels Aff., at ¶ 4. Elsewhere, he argues that "Plaintiff should not need to fear imposition of [special housing unit] confinement because they [sic] have engaged in prison litigation and/or prison reform activity [...]." Opposition Brief, at 25. As noted above, after being sentenced, Samuels was apparently transferred to a special housing unit for 180 days, which involves confinement for twenty-three hours per day.

> FN18. There are two separate retaliation issues at play in this action. The first, discussed here, is Samuels' claim of retaliatory confinement in a special housing unit. The second, discussed below, is Samuels' claim that the misbehavior adjudication itself was a form of retaliation for

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

the NYTS's opposition to the Cell Building Project. *See supra* note 5.

Defendants represent to the Court that confinement to a special housing unit is ordinarily grievable. *See* Reply Brief, at 11. Samuels failed to bring this grievance to the Inmate Grievance Program. However, Samuels argues, and defendants do not contest, that Samuels was transferred to the special housing unit as punishment for his misbehavior adjudication, even though he was sentenced to 180 days of keeplock. Consequently, his appeal of his misbehavior adjudication necessarily implicates his sentence-not only his *de jure* punishment of 180 days of keeplock, 180 days' loss of telephone, package, and commissary privileges, but also his *de facto* punishment of 180 days of special housing unit confinement. *See Flanagan,* 2002 WL 122921, at *2. The transfer to a special housing unit potentially implicates due process concerns. *See, e.g., Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at *3 (S.D.N.Y. July 11, 2002) (noting that in the Second Circuit, confinement in a special housing unit for more than 101 days generally implicates a liberty interest protected by the Due Process Clause).

4. DOCS Policy Regarding the Five Percent Nation of Gods & Earths

*10 Samuels makes an oblique reference to the fact that DOCS has treated members of the Five Percent Nation of Gods and Earths unfairly and partially. *See* Opposition Brief, at 3. To the extent that Samuels has a claim regarding DOCS's treatment of members of the Five Percent Nation, it is not directly tied to his disciplinary hearing and has not been grieved through the Inmate Grievance Program. Moreover, he has not taken issue with DOCS policies regarding the Five Percent Nation in his appeal. Consequently, this issue is dismissed with prejudice.

5. Dismissal of Action

Defendants argue that because Samuels seeks to assert certain unexhausted claims, "the entire action should be dismissed," irrespective of the fact that some claims are

(as defendants concede) exhausted. Reply Brief, at 11. Defendants point to no binding precedent in support of this contention. The only New York case cited by defendants is *Radcliffe v. McGinns,* 00 Civ. 4966 (LMM), 2001 U.S. Dist. LEXIS 15528 (S.D.N.Y. Sept. 27, 2001). However, *Radcliffe* does not support defendants assertion that dismissal of some unexhausted claims mandates the dismissal of all claims, because in that case the claims were unexhausted as to *all* defendants. On that basis, the *Radcliffe* court dismissed all claims without prejudice. This Court thus does not find that dismissal of the exhausted claims is warranted.

B. Due Process

1. Samuels Pleads a Valid Due Process Claim

Defendants argue that Samuels does not plead a valid due process claim, claiming that Samuels does not identify a liberty interest, protected by the Due Process Clause, of which he was deprived. *See* Motion Brief, at 9. Defendants state that "[other] then [sic] allege that he was sentenced to keeplock and transferred to Upstate, plaintiff does not allege any facts that distinguishes [sic] the disciplinary sentence from general prison population conditions." [FN19]*Id.* at 9. Defendants cite *Walker v. Goord,* 98 Civ. 5217(DC), 2000 U.S. Dist. LEXIS 3501, at *22 (S.D.N.Y. Mar. 22, 2000) for the proposition that a complaint that merely alleges that a plaintiff was housed in a special housing unit does not state a due process claim. *See* Motion Brief, at 10. In fact, *Walker*'s ruling is not so sweeping. In *Walker,* the court held that to establish a liberty interest, a prisoner "must establish that the restraint imposed creates an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." ' *Walker,* at *21 (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). The court also reiterated the Second Circuit's holding that there is no "bright-line rule regarding the length or type of sanction" necessary. *Walker,* at *21 (citation omitted). The prisoner must also establish that the state has granted its inmates a protected liberty interest in remaining free from that confinement or restraint. *Id.* at *21.

FN19. As noted *supra,* Samuels was also

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

sentenced to 180 days' loss of packages, telephone, and commissary privileges.

**\*11** Samuels is able to meet this burden. The deprivation of liberty Samuels suffered was onerous. He was moved from the inmate honor block housing unit to keeplock and then to a special housing unit. *See supra* note 11. Moreover, unlike the plaintiff in *Walker,* Samuels identifies the length of time he was punished (180 days). *See Walker,* at \*22. In light of these facts, and given the length of his confinement, Samuels has met the *Sandin* test cited above. *See Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at \*3 (S.D.N.Y. July 11, 2002). Additionally, the requirement of an appealable hearing, with certain procedural safeguards, *see infra,* indicates that the state has granted inmates a protected liberty interest in remaining free from keeplock and special housing unit placement.

Due process requirements for a prison disciplinary hearing are "in many respects less demanding than those for criminal prosecutions." *Espinal v. Goord,* 180 F.Supp.2d 532, 537 (S.D.N.Y.2002) (quoting *Edwards v. Balisok,* 520 U.S. 641, 647 (1997)). At the same time, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Duamutef v. Hollins,* 297 F.3d 108, 112 (2d Cir.2002) (citation omitted). With respect to Tier III hearings such as the one at issue here, the Fourteenth Amendment requires that:

(1) the inmate receive at least twenty-four hours written notice of the disciplinary charges against him;

(2) the inmate be permitted to call witnesses and present evidence "when permitting him to do so would not be unduly hazardous to institutional safety or correctional goals";

(3) the inmate be judged by a fair and impartial hearing officer;

(4) the disciplinary conviction be supported by some evidence; and

(5) the inmate be provided with a written statement of fact findings that support the disposition as well as the reasons for the disciplinary action taken.

*Espinal,* 180 F.Supp.2d at 538 (citing *Wolff v. McDonnell,* 418 U.S. 539, 563-69 (1974)) (internal citations omitted)).

2. Whether Samuels Received the Process Due Him

Defendants concede that Samuels was entitled to the aforementioned rights under *Wolff. See* Reply Brief, at 13. They argue, however, that Samuels received all the procedural safeguards due him. Before analyzing defendants points in detail, the Court notes the paucity of the record before it. While Samuels has provided nearly fifty exhibits, defendants have provided only a two-page affidavit by Inmate Grievance Program Director Thomas G. Eagen dated March 13, 2002, attached to which is a nine-line computer printout of what purports to be Samuels' grievance file. Defendants have failed to submit, *inter alia,* a transcript of the disciplinary hearing, a transcript or audio recording of the confidential witness statements, a written basis for the rejection of Samuels' witnesses, or a copy of the documents that were supposedly seized from Samuels' cell. While the Court is cognizant of the fact that the instant motion is not one for summary judgment, without these and other documents, it is difficult for this Court fully to evaluate the merits of the parties' arguments. More troubling is the fact that this is apparently not the first time an inmate has been sentenced to a special housing unit on the basis of evidence which has not been preserved for judicial review. Indeed, in *Cherry v. Selsky,* 99 Civ. 4636, 2000 U.S. Dist. LEXIS 9451, at \*9-\*12 (S.D.N.Y. July 7, 2000), a case cited by defendants, the court noted that on more than one occasion, Selsky was forced to reverse his previous decision denying an inmate's appeal because the "record of [the disciplinary] hearing was incomplete and the 'confidential tape' was 'unavailable for judicial review.' " *Id.* at \*9 (citation omitted). On the occasion cited by the *Cherry* court, the inmate's record was expunged, but only after the plaintiff had served 125 days in a special housing unit. *See id.* at \*9.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

a. Witnesses

**\*12** Samuels argues that his due process rights were violated because he was not permitted to call Dr. Peter-Raoul as a witness at his disciplinary hearing. *See* Complaint, at 9; Ex. V, at 2. Defendants state, without explanation, that "it is clear that the proffered testimony would have been irrelevant and redundant." Motion Brief, at 13. The Court agrees with defendants that the right of an inmate to call witnesses in his defense is not limitless. Nevertheless, prison authorities' failure to allow an inmate to call a witness may be grounds for reversal, where the authorities fail to justify their actions. *See Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). In this case, Dr. Peter-Raoul was apparently the author of some or all of the "subversive" materials and had close ties to the theological seminary program at the prison. According to Samuels, she also "assisted plaintiff with his course syllabus and provided much of the material utilized" therein. Complaint, at 9. She was therefore in a unique position to explain the appropriateness and relevance of the materials allegedly possessed by Samuels, who had in fact argued that the materials in question were issued to him through the NYTS program with the authorization of prison officials. *See, e.g.,* Complaint, at 5, Ex. V, at 2. The misbehavior hearing record sheet states that, "if any witness is denied [the opportunity to testify,] form 2176 explaining the reason for that determination must be given to the inmate and included as part of the record." Ex. O. No such form was filled out, and nowhere in the record do defendants explain or justify their exclusion of Dr. Peter-Raoul. *See* Ex. Q. Due process rights may be violated where prison authorities fail "without rational explanation" to obtain a witness requested by an inmate during a disciplinary hearing. *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). Defendants' failure to justify their exclusion of Dr. Peter-Raoul potentially gives rise to a due process violation. [FN20] Dismissal is therefore inappropriate.

FN20. Samuels also appears to allege that Cecilia, his employee assistant, was not permitted to testify on Samuels' behalf, and that Schwartzman testified outside Samuels' presence. *See* Ex. V, at 4; Plaintiffs' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Plaintiffs' Motion to Stay Complaint, at 8.

b. Confidential Informant

Samuels also protests the fact that he was not furnished with statements of the confidential informant, and argues that the record is insufficient to permit an assessment of the reliability of the informant's testimony. The Second Circuit has noted that "even if due process does require a hearing officer to conduct an independent assessment of the informant's credibility, that 'would not entail more than some examination of indicia relevant to credibility rather than wholesale reliance upon a third party's evaluation of that credibility.' " *Espinal v. Goord,* 180 F.Supp.2d 532, 540 (S.D.N.Y.2002) (quoting *Russell v. Scully,* 15 F.3d 219, 223 (2d Cir.1993)). In the instant case, the lack of a full record does not permit the Court to determine whether Irurre, the presiding officer at the Tier III hearing, made the required "examination of indicia relevant to the credibility of the confidential informant[ ], whether by an independent assessment or otherwise." *Espinal,* 180 F.Supp.2d at 540. Consequently, dismissal is inappropriate, because it is uncertain whether Samuels' punishment was supported by constitutionally sufficient evidence.

c. Assistance Provided by the Employee Assistant

**\*13** Samuels claims that his employee assistant, Cecilia, violated his due process rights by, *inter alia,* failing to explain the charges against Samuels, failing to provide Samuels with documentary evidence relating to the charges in the misbehavior report, failing to make a written record of the questions he asked the interviewees, failing to record the testimony of the witnesses he allegedly interviewed for Samuels, failing to interview the confidential informant on Samuels' behalf, and failing to interview one of the three witnesses requested by Samuels. *See* Complaint, at 9; Opposition Brief, at 22. Samuels also complains that his employee assistant did not assist in his defense but instead interrogated him about his alleged links to prison reform activists. *See* Ex. V, at 5-6.

Defendants concede that inmates have a limited right to assistance in misbehavior proceedings. *See Silva v. Casey,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 13

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

992 F .2d 20, 22 (2d Cir.1993) (per curiam). While
defendants are correct in asserting that inmates do not
have the right to appointed or retained counsel at a
misbehavior hearing, *see* *Wolff v. McDonnell,* 418 U.S.
539, 570 (1974), they do have a right to assistance in
"certain circumstances [in which they] will be unable to
'marshal evidence and present a defense' [...]." *Silva,* 992
F.2d at 22. Such situations include where the inmate is
confined pending a superintendent's hearing. *See* N.Y.
Comp.Codes R. & Regs. tit. 7, § 251-4.1(a)(4). The Green
Haven Notice of Assistance form given to Samuels
specifically states that an "inmate shall have the
opportunity to pick an employee from established lists of
persons who shall assist the inmate when a Misbehavior
Report has been issued against the inmate if [...] [t]he
inmate is keeplocked or confined to a special housing unit
and is unable to prepare his defense." Ex. J. In the instant
case, Samuels was entitled to an employee assistant
because he was keeplocked immediately after the search
of his cell and was unable to prepare his defense.

As noted, Samuels makes broad assertions as to the
deficiency of his employee assistant. *See* Ex. V, at 3-8.
Based on Samuels' factual assertions, it is possible that
employee assistant Cecilia failed to provide even the
"limited" assistance to which Samuels is entitled.[FN21] Such
a failure potentially implicates Samuels' due process
rights. *See* *Ayers v. Ryan,* 152 F.3d 77, 80-81 (2d
Cir.1998). Because the instant motion requires that the
Court accept Samuels' allegations as true, dismissal is
inappropriate.

> FN21. By statute, the "assistant's role is to speak
> with the inmate charged, to explain the charges
> to the inmate, interview witnesses and to report
> the results of his efforts to the inmate. He may
> assist the inmate in obtaining documentary
> evidence or written statements which may be
> necessary. The assistant may be required by the
> hearing officer to be present at the disciplinary or
> superintendent's hearing." N.Y. Comp.Codes R.
> & Regs. tit. 7, § 251-4.2. While failure to adhere
> to regulations does not itself give rise to a claim
> under 42 U.S.C. § 1983, it may constitute
> evidence of a constitutional deprivation. *See,*
> *e.g.,* *Duckett v. Ward,* 458 F.Supp. 624, 627
> (S.D.N.Y.1978).

d. Actions of the Hearing Officer

With respect to the hearing officer, Irurre, Samuels makes
a variety of claims, including the fact that Irurre prohibited
Samuels from calling various witnesses and that he was
partial. The Court has not been furnished with a copy of
the hearing transcript. Because Samuels' claims potentially
implicate constitutional rights, and because any holding on
this issue requires that the Court make factual
determinations, dismissal is inappropriate.

e. Timeliness of the Hearing

**\*14** Samuels claims that his due process rights were
violated because his misbehavior hearing was held eight
days after Samuels was confined following the search of
his cell. Where an inmate is confined pending a
disciplinary hearing (as was the case here), the hearing
must be held within seven days of the confinement unless
a later date is authorized by the commissioner or his
designee. *See* N.Y. Comp.Codes R. & Regs. tit. 7, §
251-5.1(a). In this case, Samuels' rights were not violated.
The search took place on October 20, 1999, and the
hearing occurred on October 27, 1999. Under § 251-5.1,
the date of the incident is generally excluded. *See, e.g.,*
*Harris v. Goord,* 702 N.Y.S.2d 676 (N.Y.App. Div.3d
Dep't 2000) (holding that the fourteen-day period in §
251-5.1(b), which runs from the date of the writing of a
misbehavior report, is calculated by excluding the day the
report is written). Thus, Samuels' hearing was held within
seven days of his detention. Moreover, as Samuels admits,
prison officials sought and received permission to begin
the hearing on October 27, 1999, as per the requirements
of § 251-5.1(a). *See* Ex. L. For these reasons, Samuels'
claim with regard to the timeliness of his hearing is
dismissed.

f. Notice

Defendants reject Samuels' argument that he received
inadequate notice of the charges against him. It is unclear
from the record what notice Samuels received, either

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

before or during the disciplinary hearing. While the Court is cognizant of the fact that inmates are entitled to fewer due process rights than other citizens, it is possible to read Samuels' allegations as presenting a valid due process claim. The Court notes, for instance, that inmate rule 104.12 provides that "[i]nmates shall not lead, organize, participate, or urge other inmates to participate in work-stoppages, sit-ins, lock-ins, or other actions which may be detrimental to the order of the facility." N.Y. Comp.Codes R. & Regs. tit. 7, § 270.2(B)(5)(iii). The Appellate Division has held that possession of threatening materials alone does not violate the rule because the inmate must actually lead, organize, participate, or urge other inmates to participate, and not merely intend to do so. See, e.g., Abdur-Raheem v. Goord, 665 N.Y.S.2d 152, 153 (N.Y.App. Div. 4th Dep't 1997). While Samuels may have possessed the documents, it is unclear whether he received any notice of how he allegedly led, organized, or participated in (or urged others to participate in) a prohibited activity. Because the determination hinges on a factual determination, dismissal is inappropriate.

C. Retaliation

Samuels alleges that his misbehavior adjudication was based on the prison authorities' perception that members of the NYTS were behind the planned Y2K protest. See Complaint, at 3-6. Samuels alleges that the materials seized were not subversive and were of a Christian nature. Defendants move to dismiss the retaliation argument, arguing that the prison authorities' decision is entitled to deference. While this may be true, such deference is inappropriate on a motion to dismiss, particularly given the paucity of the record. Without, for example, a transcript of the hearing, a transcript of the testimony of the confidential informant, or a copy of the allegedly subversive documents, the Court cannot blindly defer to the prison authorities. Consequently, dismissal is inappropriate. Defendants also argue that "even if it was improper to discipline plaintiff for possession of contraband, the evidence of plaintiff's involvement in the unauthorized demonstration provided a valid non-retaliatory basis for the disciplinary sanction and transfer." Reply Brief, at 19. This argument is incorrect for two reasons. First, the argument ignores the fact that the contraband documents and testimony of the confidential informant provide the basis for the prison

authorities' finding that Samuels was involved in the demonstration. None of these documents is in the record before the Court; thus deference is inappropriate. Second, this argument ignores the fact that Samuels' punishment was ultimately based on the fact that he had violated two rules. His prison file reflects a guilty adjudication on two counts; also, had Samuels been disciplined for violating only one rule, his penalty would likely have been less.

D. Personal Involvement

**15** Defendants correctly note that liability of supervisory officials under 42 U.S.C. § 1983 may not be premised on the doctrine of respondeat superior. See, e.g., Poe v. Leonard, 282 F.3d 123, 140 (2d Cir.2002); Emblen v. Port Auth. of New York/New Jersey, 00 Civ. 8877(AGS), 2002 WL 498634, at *10 (S.D.N.Y., Mar. 29, 2002). Consequently, a defendant's personal involvement in the alleged constitutional violation is required. See, e.g., Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 690-95 (1978). Such personal involvement may be proven in a number of ways:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995). The Court examines the alleged personal involvement of each defendant in turn.

1. Donald Selsky

Defendants concede Donald Selsky, Director, Special Housing/Inmate Disciplinary Program, was personally

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

involved in the alleged due process violations cited by Samuels. The Court notes that Selsky, acting "on behalf of the commissioner," reviewed and affirmed Samuels' superintendent's hearing and denied Samuels' appeal. Ex. 6, V.

### 2. Glenn Goord

Defendants argue that Glenn Goord, DOCS Commissioner, has no personal involvement in this case, and that the only link to him in this action is a newspaper article. *See* Reply Brief, at 20-21. This is incorrect, however, since the denial of Samuels' appeal was written by Selsky on behalf of Goord. As noted, defendants concede Selsky's involvement. Goord had a duty to supervise his subordinate who purportedly acted in his name.[FN22] Without further evidence, the Court cannot say as a matter of law that Goord was not personally involved, since personal involvement can include gross negligence "in supervising subordinates who committed the wrongful acts." *Colon*, 58 F.3d at 873.

> FN22. Whereas the doctrine of *respondeat superior* involves the legal assignment of liability to a supervisor for the acts of a subordinate, the instant case involves a subordinate who claims to be (and legally is) acting in the name of his supervisor.

### 3. Paul Cecilia

Defendants concede Paul Cecilia's personal involvement.

### 4. Javier Irurre

Defendants concede Javier Irurre's personal involvement.

### 5. Sergeant Schwartzman

Defendants concede Sergeant Schwartzman's personal involvement.

### 6. Dennis Bliden

Defendants allege that Samuels never argues that Bliden had the ability to remedy the alleged constitutional violation. However, Bliden wrote to Samuels in response to his appeal of the misbehavior adjudication, stating, "You may appeal this hearing to the Commissioner in Albany. Until such time as we receive a decision from this office, *I will not modify the disposition*." Ex. U (emphasis added). Significantly, Bliden did not state that he *could* not modify the disposition but stated that he *would* not. This provides at least *prima facie* evidence that Bliden had the authority to overturn the disposition. While further facts may reveal this to be untrue, at this stage dismissal is inappropriate.

### 7. Jeffery McKoy

**\*16** Samuels fails to provide any support for McKoy's personal involvement in this action. Indeed, in responding to one of Samuels' appeals, McKoy wrote that "I do not have the authority to overturn Tier 3 dispositions." Ex. R. McKoy does not appear to have been complicit in any alleged deprivation of Samuels' rights, and, in contrast to Bliden, he plainly lacked the authority to overturn the misbehavior adjudication. Consequently McKoy was not personally involved in the matter and all claims against him are dismissed.

### 8. Christopher P. Artuz

Christopher P. Artuz is Green Haven's Superintendent. Samuels states that his involvement stems from his failure to respond to a note sent to him. Although the note to Artuz does not appear to be in the record before the Court, it is referenced in a note from Bliden to Samuels. *See* Ex. T ("This is in response to your memo of November 12, 1999 to Superintendent Artuz"). Samuels also alleges that Artuz failed to respond when contacted by Dr. Peter-Raoul and Dr. Webber, who sought to intervene on Samuels' behalf. *See* Opposition Brief, at 27. While it is not clear

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

that Artuz was personally involved, the question of Artuz's involvement in this matter is a factual question. In such cases, dismissal should be denied. As the Second Circuit noted in *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986), "even if [the prison superintendent] did not actively affirm the conviction on administrative appeal, we cannot say, on this record, that as Superintendent [of the prison] he was not directly responsible for the conduct of prison disciplinary hearings [...]."

E. Qualified Immunity

Defendants move to dismiss this action based on the qualified immunity of defendants. As defendants correctly point out, government employees are generally immune from liability for civil damages "when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Duamutef v. Hollins,* 297 F.3d 108, 111 (2d Cir.2002) (citation omitted). As a preliminary matter, it should be noted that qualified immunity is only a defense to claims for money damages and are not a defense for equitable relief or injunctions. *See, e.g., Charles W. v. Maul,* 214 F.3d 350, 360 (2d Cir.2000). To the extent that Samuels seeks equitable relief, defendants' potential claims of qualified immunity are no bar.

The Court is unable to determine at this time whether the remaining defendants are entitled to qualified immunity in this case. The reason is that without having basic documentary evidence, including a transcript of the disciplinary hearing, a transcript of the testimony of the confidential informant, and the documents allegedly seized from Samuels' cell, the Court cannot determine whether these defendants violated Samuels' clearly established constitutional or statutory rights. Because it is a fact-intensive question, it cannot be disposed of at this stage.

V. Conclusion

**\*17** For the reasons set forth above, defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and (6) is DENIED with respect to defendants Selsky,

Goord, Cecilia, Irurre, Schwartzman, Bliden, and Artuz. Defendants' motion is GRANTED with respect to Jeffery McKoy, and with respect to the issue of DOCS policy regarding the Five Percent Nation of Gods and Earths and with regard to the timeliness of Samuels' misbehavior hearing.

SO ORDERED.

S.D.N.Y.,2002.
Samuels v. Selsky
Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 109567 (S.D.N.Y.)
(Cite as: 2002 WL 109567 (S.D.N.Y.))

☞ Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
THE TRAVELERS INDEMNITY COMPANY OF
ILLINOIS a/s/o the following entity and individuals:
Milstein Properties, Inc., Helen Abunasser, Jane
Everett, Stella Friedman, Zehava Mirkin, Arthur
Nadaner, Lisa Pettigrew, and Ziva Ben-Reuvan,
Plaintiff,
v.
HUNTER FAN COMPANY, INC., Capitol Lighting of
Paramus, Inc., M. Fortunoff of Westbury Corp., and
John Does "1" through "5", Defendants.
HUNTER FAN COMPANY, INC., Third Party
Plaintiff,
v.
Lionel HAMPTON, Lincoln Plaza Associates, Milford
Management Corp., One Lincoln Plaza Condominium,
20 West 64th Street Associates, Third Party Defendants.
**No. 99 CIV 4863 JFK.**

Jan. 28, 2002.

Robinson & Cole LLP, New York, NY, Michael B.
Golden, for Plaintiff, of counsel.

D'Amato & Lynch, New York, NY, Lloyd Herman, for
Defendant/Third Party Plaintiff Hunter Fan Co., Inc., of
counsel.

Gulino & Ryan, P.C., New York, NY, Joseph J. Gulino,
for Defendant Capitol Lighting of Paramus, Inc., of
counsel.

Lambert & Weiss, New York, NY, Richard Lambert, for
Third Party Defendant Lionel Hampton, of counsel.

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Wilson, Elser, Moskowitz, Edelman & Dicker LLP, New
York, NY, Eugene T. Boule, for Third Party Defendant
Lincoln Plaza Associates, of counsel.

*OPINION and ORDER*

KEENAN, J.

**\*1** Before this Court are Cross Motions for summary
judgment of Defendant/Third Party Plaintiff Hunter Fan
and Defendant Capitol Lighting of Paramus. Hunter Fan
moves to dismiss the claims of plaintiff The Travelers
Indemnity Company of Illinois and all cross-claims and
counter claims. Capitol Lighting moves to dismiss the
claims of plaintiff Travelers Indemnity Company and
seeks indemnification, costs and attorneys' fees from
Hunter Fan. For the reasons outlined below, the Court
denies all motions.

*Background*

Plaintiff the Travelers Indemnity Company of Illinois
("Travelers") was and still is an Illinois corporation with
its principal place of business located in Hartford,
Connecticut. *See* Am. Compl. ¶ 4. Defendant/Third Party
Plaintiff Hunter Fan, Inc. ("Hunter") was and still is a
Delaware corporation with its principal place of business
located in Memphis, Tennessee. *Seeid.* ¶ 5. Defendant
Capitol Lighting of Paramus, Inc. ("Capitol") was and still
is a New Jersey corporation with its principal place of
business located at Route 17, Paramus, New Jersey. *Seeid.*
¶ 7. Third Party Defendant Lionel Hampton ("Hampton")
was, at all relevant times, the lessee and resident at 20
West 64th Street, Apt. 28K, New York, New York. *Seeid.*
¶ 12.

This Court has jurisdiction pursuant to 28 U.S.C. § 1332
because the action is between citizens of different states
and the matter in controversy exceeds the sum of $75,000,
exclusive of interest and costs.

Not Reported in F.Supp.2d, 2002 WL 109567 (S.D.N.Y.)
(Cite as: 2002 WL 109567 (S.D.N.Y.))

On January 7, 1997, a fire broke out in Hampton's apartment. The fire allegedly started in Hampton's bedroom when a halogen lamp fell over onto the bed setting fire to the bed linens. There is no evidence as to exactly how the lamp tipped over. The fire consumed Hampton's apartment and caused damage to the building, other apartments in the building, and three individuals. Travelers had issued property insurance policies to the owners and various tenants of the building, and pursuant to those policies paid over one million dollars in claims arising from this fire. Travelers brought this subrogation action against Hunter and Capitol seeking reimbursement with interest of the amounts it had paid to settle these claims.

In its Amended Complaint, Travelers alleges that in or before February 1996, Hunter imported, distributed, and/or sold certain Halogen Adjustable Arm Torchiere Floor Lamps, model number 20727BL in black and model number 20727WH in white. Travelers alleges that Hunter distributed lamps to Defendant Capitol for resale to the public. Hampton's assistant Caprice Titone ("Titone") had purchased two lamps for Hampton, and purchased the fire-causing lamp (the "Lamp") at Capitol. Hampton's valet Rubin Cox ("Cox") assembled the Lamp. Hampton used both lamps in his bedroom in a position whereby the adjustable arm was horizontal to the floor allowing the shade and bulb to point toward the floor ("the downbridge position"). The first lamp fell over at least once burning a hole into the bedroom carpet. That lamp later broke and Hampton began to use the second lamp. Travelers alleges that the Lamp was defectively designed because, despite representations on the packaging, the Lamp did not meet applicable standards; the Lamp was inherently dangerous because the halogen bulb it required can reach temperatures of up to 970 degrees Fahrenheit; and the instructions furnished with the Lamp failed to warn of the Lamp's instability. Travelers asserts eight claims for relief including causes of action in strict liability, breach of warranty, and negligence. Hunter now moves for summary judgment to dismiss all claims brought by Travelers and all cross-claims and counter claims. Capitol moves to dismiss Travelers' claims and asserts claims for full indemnification and reimbursement of all costs, disbursements and legal fees from Hunter.

*Discussion*

**\*2** A motion for summary judgment may be granted under Fed.R.Civ.P. 56 if the entire record demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). The moving parties bear the burden of proving that no material facts are in dispute. *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.3d 54, 57 (2d Cir.1987). When viewing the evidence, the Court must "assess the record in the light most favorable to the non-movant and ... draw all reasonable inferences in its favor." *Delaware & Hudson Ry. Co. v. Consol. Rail Corp.,* 902 F.2d 174, 177 (2d Cir.1990); *McLee v. Chrysler Corp.,* 109 F.3d 130, 134 (2d Cir.1997). In determining whether a genuine issue of fact has been raised, a court "must resolve all ambiguities and draw all reasonable inferences against the moving party." *Donahue,* 834 F.3d at 57. Courts should "take care not to abort a genuine factual dispute prematurely and thus deprive a litigant of his day in court." *Id.* at 55. Once the movant shows that there are no genuine issues of material fact, the opposing party must produce sufficient evidence to permit a reasonable jury to return a verdict in its favor, identifying "specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 248, 256. If the court finds that there are factual disputes regarding material issues, summary judgment is not appropriate. *See id.* at 249; *see also Repp & K & R Music, Inc. v. Webber,* 132 F.3d 882, 890 (2d Cir.1997) ( "Clearly, the duty of a court on a motion for summary judgment is ... not to decide factual issues. In this regard, the court's task is issue identification, not issue resolution.").

I. *Hunter's Motion for Summary Judgment*

A. *Product Identification*[FN1]

> FN1. Capitol has adopted Hunter's arguments in its cross-motion for summary judgment. Therefore all references to and decisions made based on arguments made by Hunter will apply to Capitol.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 109567 (S.D.N.Y.)
(Cite as: 2002 WL 109567 (S.D.N.Y.))

Hunter argues that it cannot be held liable because Travelers cannot prove that Hunter manufactured the Lamp. In a products liability action, the plaintiff bears the burden of proving that the defendant manufactured the product at issue. *See* 210 E. 86 *St. Corp. v. Combustion Eng'g, Inc.,* 821 F.Supp. 125, 142 (S.D.N.Y.1993). A plaintiff must establish by competent proof that the defendant manufactured and placed the injury-causing defective product into the stream of commerce. *Healey v. Firestone Tire & Rubber Co.,* 87 N.Y.2d 596, 601 (N.Y.1996). The evidence of a manufacturer's identity must establish that it is "reasonably probable, not merely possible or evenly balanced" that defendant was the source of the offending product. *Id.* at 601-02; *Moffett v. Harrison & Burrowes Bridge Contractors, Inc.,* 266 A.D .2d 652, 654 (N.Y.App.Div.1999). A manufacturer's identity may be established by circumstantial evidence, even if the allegedly defective product no longer exists. *Healey,* 87 N.Y.2d at 601. However, speculative or conjectural evidence of a manufacturer's identity is not enough. *Id.* at 602; *see also Franklin v. Krueger Int'l, Inc.,* No. 96 Civ. 2408, 1997 WL 691424, at *4 (S.D.N.Y. Nov. 5, 1997) (finding plaintiff's attorney's mere assertions that the defective chair resembled a chair manufactured by defendant shown in a photograph insufficient evidence).

**\*3** Hunter argues that its Model 20727 lamp is virtually identical to torchiere lamps manufactured or sold by numerous other companies and that there are several differences between Model 20727 and the Lamp, including differences in hole pattern and weight. Hunter claims that the marking "SF Made in Taiwan 211" found on the base of the Lamp is not used on Model 20727 lamps. Hunter claims it provides an Allen wrench and halogen bulb with every lamp and the absence of these items in the Lamp's packaging proves the Lamp was not a Hunter product. Capitol claims not to have sold any lamps during the relevant time period to Titone. Travelers has offered no evidence such as invoices, photos, other documents or deposition testimony to prove the Lamp's purchase thereby connecting it to a store and subsequently to a manufacturer.

Travelers responds that, while there is no receipt for the Lamp's purchase, there is a reimbursement check from Hampton to Titone dated March 1, 1996, indicating that the lamp was purchased before that date. (Titone Trans. at

65) Titone testified that she purchased two lamps for Hampton at Capitol and Fortunoff stores in New Jersey. Travelers argues that because Fortunoff was granted summary judgment and only Capitol remains as a distributor, Capitol sold the Hunter lamp during the relevant time period. Herman Lebersfeld, President of Capitol, testified that Capitol only sold lamps manufactured by Kenroy International, a subsidiary of Hunter. In particular, Capitol sold Hunter Model 20727 lamps during the relevant time period. (Lebersfeld Trans. at 20-22) Capitol cannot account for the sale of every Hunter lamp making it possible that one Model 20727 lamp was purchased by Titone. Travelers submits that it has not been established whether an Allen wrench came with the Lamp. Hampton's valet Rubin Cox assembled the lamp and testified that he does not remember seeing the wrench nor does he remember looking specifically for one. (Cox Trans. at 121) In addition, the physical remains of the Lamp, including the measurements of almost all of Lamp components, match Hunter exemplar lamps. The diameter of the base of the Lamp and the base of both Hunter exemplar lamps is the same. (Crombie Aff. ¶ 8) The lower and upper support poles of Model 20727 have the same diameter, length and weight as those of the Lamp. (Crombie Aff. ¶ 10)

Travelers has presented sufficient circumstantial evidence to create an issue of fact regarding whether Hunter was the manufacturer of the Lamp and Capitol was the distributor. Hampton's reimbursement check to Titone establishes a time frame for the Lamp's purchase, during which time Capitol cannot account for all of its sales of Model 20727 lamps. The similarity between the Lamp and Model 20727 has been shown to a "reasonable probability." Travelers has met its burden. Summary judgment is denied.

B. *Design Defect*

A defectively designed product is one which, when it leaves the seller's hands, is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use. *Voss v. Black & Decker Manuf. Co.,* 59 N.Y.2d 102, 107 (N.Y.1983). A product may be defective when it contains a manufacturing flaw, is defectively designed, or is not accompanied by adequate warnings. *Liriano v. Hobart*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 109567 (S.D.N.Y.)
(Cite as: 2002 WL 109567 (S.D.N.Y.))

*Corp.*, 92 N.Y.2d 232, 237 (N.Y.1998).

### 1. Design Defect

**\*4** Travelers claims that the Lamp was defectively designed and inherently dangerous because the surface of the halogen bulb reaches temperatures of up to 970 degrees Farenheit, the Lamp does not include a heat shield or other protective device to prevent the bulb from making contact with flammable objects, and the Lamp's design caused it to be inherently unstable and susceptible to tipping over. *See* Am. Compl. ¶¶ 70, 76-77. Hunter argues that the Lamp's design was not faulty, but that Hampton's use of the lamp in the downbridge position was misuse which caused it to tip over and ignite the fire. The claims of design defect and product misuse are thus intertwined. Accordingly, because issues of fact remain on the claim of product misuse, *seeinfra* Part I.D., the design defect claim must also be submitted to a jury.

### 2. Duty to Warn

Travelers alleges that the instructions that accompanied the Lamp failed to adequately warn consumers of the dangers associated with its heat, lack of a protective shield or screen, and its instability. *See* Am. Compl. ¶¶ 84, 89-90. Analyzing a failure to warn claim is an intensely fact-specific process which includes assessing the feasibility and difficulty of issuing warnings under the circumstances, the obviousness of the risk from actual use of the product, the knowledge of the particular product user, and proximate cause. *SeeAnderson v. Hedstrom Corp.*, 76 F.Supp.2d 422, 440 (S.D.N.Y.1999). A manufacturer may not be liable if the risks were sufficiently obvious to the user without a warning. Because of the factual nature of the inquiry, whether a danger is obvious is most often a jury question. *Id.* at 441;*Liriano*, 92 N.Y.2d at 309. Hunter argues that the danger here was obvious to Hampton based on his prior experience with the lamp falling over and burning a hole in the rug. However, courts have cautioned that judges should be wary of taking the issue of liability away from juries, even in situations where the relevant dangers might seem obvious. *Anderson*, 76 F.Supp.2d at 447. Therefore, whether the danger of using the lamp in the downbridge

manner was an obvious danger should be determined by a jury.

A manufacturer has a duty to warn against latent dangers resulting from foreseeable uses of its product of which it knew or should have known, as well as a duty to warn of the danger of unintended uses of a product which are reasonably foreseeable. *Liriano*, 92 N.Y.2d at 237. A manufacturer may also be liable for failure to warn of foreseeable misuse. *Id.* at 240. Hunter argues that use in the downbridge position was not foreseeable because the Lamp was not depicted for use as a reading lamp. Hunter's expert Warren testified that proper use of the lamp was indicated by the diagrams, description as "torchiere" and the nature of the assembly. However, no language regarding what Hunter considered the "proper" configuration of its Model 20727 lamp is stated anywhere on the box, or anywhere on Hunter's Assembly Instructions. (Crombie Aff. ¶ 20) Paragraph 6 of Model 20727's Assembly Instructions states: "[t]he set screw is used to limit the movement of the arms. Raise the arm to a vertical position. Use the Allen wrench provided to turn in the set screw. To adjust the position of the arm assembly, loosen the adjusting handle, position the arms to the desired angle, then tighten the adjusting handle." Hunter's instructions allowed for adjustment to any position. The instructions do not warn against using the lamp in the downbridge position. Because the adequacy of warnings furnished by a manufacturer to avoid any foreseeable misuse by a consumer presents questions of fact, *Johnson v. Johnson Chem. Co., Inc.*, 588 N.Y.S .2d 607, 610 (N.Y.App.Div.1992), summary judgment is denied on this ground.

**\*5** Additionally, there is an issue of fact as to proximate cause. Travelers must show that the presence of a warning would have caused Hampton and his staff to change their behavior. Where "a warning would not have given [a user] any better knowledge of the [product's's] danger than he already had from prior use or than was readily discernible from observation, the absence of a warning could not have proximately caused his injuries." *Barnes v. Pine Tree Mach.*, 261 A.D.2d 295, 295-96 (N.Y.App.Div.1999). It is unknown whether, if Hunter had issued a warning against doing so, Hampton and his staff would not have used the lamp in the downbridge position. Hunter argues that the warning would not have had an effect because

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 109567 (S.D.N.Y.)
(Cite as: 2002 WL 109567 (S.D.N.Y.))

Hampton's prior experience with the first lamp falling over and burning the rug did not cause him to change his behavior. Hampton argues that because a serious fire did not result from these previous incidents, he was not aware of the possible damage. Further, because the first lamp ultimately broke, Hampton and his staff could have concluded that it fell over because it was always broken. Hunter contends that Cox's testimony regarding how similar he believed the two lamps to be shows that Hampton and his staff were aware of the dangers. (Cox. Trans. at 130) Therefore, there is an issue of fact as to what effect a warning would have had on the behavior of Hampton and his staff. Summary judgment is denied.

C. *Subsequent modification*

Hunter argues that it cannot be held liable because Cox improperly assembled the Lamp by not using the Allen wrench it claims it provides with every Model 20727 lamp. Hunter argues that using the lamp in the downbridge position would not have been possible had the setscrews been properly tightened with the Allen wrench. Hunter argues that this faulty assembly and use of the lamp in as unintended manner constituted a subsequent modification to the lamp.

When a consumer makes a subsequent modification which *substantially alters* the product and is the proximate cause of plaintiff's injuries, the manufacturer cannot be held liable. *Robinson v. Reed-Prentice,* 49 N.Y.2d 471, 485 (N.Y.1980) (emphasis added). A user's substantial modifications of a product that render a safe product defective are not the manufacturer's responsibility. *Id.* at 479. Material alterations that destroy the "functional utility of a key safety feature" are not a manufacturer's responsibility. *Id.* at 480. When a product's design incorporates a certain safety feature, a manufacturer may be held liable under a design defect theory even though the removal of that safety feature caused the accident, provided the product was purposefully manufactured to permit its use without the safety guard. *Lopez v. Precision Papers,* 67 N.Y.2d 871, 875 (N.Y.1986).

Hunter claims that the setscrews were a safety device; however, Hunter did not submit evidence that the setscrew

was intended or marked as a safety device. There were no warnings or instructions regarding using the lamp in a particular manner. Further, it is unclear whether the Allen wrench was in the box of the lamp Hampton purchased allowing for the recommended assembly. Therefore, issues of fact remain regarding substantial modification and summary judgment is denied.

D. *Product Misuse*

*6 Hunter claims that Hampton's use of the Lamp in the downbridge position constitutes misuse and absolves Hunter of liability. A manufacturer may be liable for failing to warn of foreseeable misuse of its product. *Liriano,* 700 N.E.2d at 304. Foreseeability requires knowledge of a certain misuse by the particular defendant or in the industry generally. *See* *Amatulli v. Delhi Constr. Corp.,* 77 N.Y.2d 525, 533 (N.Y.1991). Without evidence of knowledge, a defendant will not be held liable. *Id.* However, even when a consumer admits misuse, a question of fact remains regarding liability. The general rule is that there may be liability in such cases when it is proved that the abnormal use was reasonably foreseeable. *See* *Johnson Chem. Co.,* 588 N.Y.S.2d at 610, whether a particular misuse is reasonably foreseeable is ordinarily a jury question. *Id.* When a jury might conclude that plaintiff misused the product in a way which ought to have been foreseen by the defendants, an issue of fact has been demonstrated as to whether the warnings furnished by the defendant manufacturer were adequate. *Id.* Here, whether Hampton's use of the lamp was foreseeable and required a warning is a question of fact for the jury. Accordingly, summary judgment is denied.

E. *Breach of Warranty*

Travelers has conceded to Hunter's arguments regarding the warranty claims. Accordingly, those claims are dismissed.

F. *Capitol's Motion*

Capitol moved for summary judgment adopting Hunter's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 109567 (S.D.N.Y.)
(Cite as: 2002 WL 109567 (S.D.N.Y.))

arguments on product identification and defectiveness, and making a separate argument on Travelers' negligence claim. Additionally, Capitol seeks indemnification and reimbursement from Hunter. In response, Hunter argues first that Capitol violated Local Civil Rule 56.1 by not submitting a sworn statement of material facts. Local Civil Rule 56.1 requires there "be annexed to the notice of motion [for summary judgment] a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement may constitute grounds for denial of the motion." Local Civ. R. 56.1(a). The rule further states that "[e]ach statement of material fact by a movant or opponent must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e)." Local Civ. R. 56.1(d). Capitol submitted only the Declaration of its counsel Joseph J. Gulino in support of its motion which makes references to exhibits in two paragraphs when referring to its motion papers and to Lebersfeld's affidavit. (Gulino Decl. ¶¶ 5, 9)

Failure to comply with the requirements of Local Civil Rule 56.1 constitutes grounds for denial of a motion. *MTV Networks v. Lane,* 998 F.Supp. 390, 393 (S.D.N.Y.1998) (denying defendant's motion for summary judgment because his papers failed to establish the absence of a factual dispute); *see also Rossi v. New York City Police Dep't,* No. 94 Civ. 5113(JFK), 1998 WL 65999, at *4 (S.D.N.Y. Feb. 17, 1998) (denying plaintiff's motion for summary judgment for failure to comply with Local Civil Rule 56.1 by not annexing a short and concise statement of material facts). The moving party's failure to comply with the Rule is particularly troubling because the moving party bears the burden of demonstrating that there is no genuine issue of material fact. *Reiss, et al. v. County of Rockland,* No. 84 Civ.1906, 1985 WL 426, at *1 (S.D.N.Y. Mar. 19, 1985) (denying summary judgment where movant submitted no statement at all and granting leave to re-file in compliance with the rule). A court may decide not to consider any statements made by a party in their Rule 56.1 statement that are not supported by a citation to the record. *See Shepard v. Frontier Communication Servs.,* 92 F.Supp.2d 279, 284 (S.D.N.Y.2000) (granting defendants' motion for summary judgment where several statements of disputed facts were not supported by a citation to the record).

**\*7** A district court has broad discretion whether to overlook a party's failure to comply with local court rules. *Holtz v. Rockefelier & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001). While this Court could deny Capitol's motion on the basis of Capitol's failure to comply with Local Civil Rule 56.1, there is no need to do so on that basis as Capitol's motion is denied on other grounds.

*A. Negligence*

Capitol argues that it is not liable in negligence because the lamp was sold in a sealed container and no alterations were made to the lamp. Under New York law, a retailer can be held liable in negligence if it fails to detect a dangerous condition that it could have discovered during a normal inspection while the product was in its possession. *See McLaughlin v. Mine Safety Appliances Co.,* 11 N.Y.2d 62, 68 (1962); *Schwartz v. Macrose Lumber & Trim Co.,* 270 N.Y.S.2d 875, 886-87 (N.Y.Sup.Ct.1966). A seller has a duty to give reasonable warnings of known latent dangers. *McLaughlin,* 11 N.Y.2d at 68-69. However, a retailer cannot be held liable for injuries sustained from the contents of a sealed product even though a testimony have uncovered a potential danger; no such obligation is imposed on a retailer. *Brownstone v. Times Square Stage Lighting Co., Inc.,* 333 N.Y.S.2d 781, 782 (N.Y.App.Div.1972); *Alfieri v. Cabot Corp.,* 235 N.Y.S.2d 753, 757 (N.Y.App.Div.1962), *aff'd* 13 N.Y.2d 1027 (N.Y.1963).

Lebersfeld testified that Capitol assembled several of its lamps, including Model 20727, as floor models for display and sale to customers. (Lebersfeld Trans. at 149-50, 160) Titone also testified that the lamps she purchased were on display in the store showrooms (Titone Trans. at p. 21, 38, 92) and that the salesperson demonstrated using the lamp with the bulb tilted toward either the ceiling or floor. (*Id.* at 24) Capitol claims the packages were sealed and it had no duty to inspect them. No evidence has been submitted regarding whether Capitol inspected the display lamps. An inspection of those lamps may have revealed a danger. Therefore an issue of fact remains as to whether Capitol met its duty to inspect. Summary judgment is denied.

*B. Indemnification and Reimbursement*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 109567 (S.D.N.Y.)
(Cite as: 2002 WL 109567 (S.D.N.Y.))

Capitol argues that it is entitled to indemnification and reimbursement for fees, costs and disbursements from Hunter. Capitol argued that it engaged in no wrongdoing and full responsibility lies with Hunter. Capitol's motion for indemnification is premature.

Indemnity obligations can be created by contract or implied in law. Here there was no contractual agreement; the issue then is whether Capitol is entitled to common law indemnification. The right to indemnification may be implied by law to prevent an unfair result or the unjust enrichment of one party at the expense of another. *Cochrane v. Warwick Assoc., Inc.,* 723 N.Y.S.2d 506, 508 (N.Y.App.Div.2001). The right of common law indemnification belongs to parties found vicariously liable without proof of any negligence or active fault on their own part. *Colrer v. K Mart Corp.,* 709 N.Y.S.2d 758, 759 (N.Y.App.Div.2000). A finding that Capitol was negligent would preclude an indemnity award. Because an issue of fact remains as to Capitol's negligence, this Court cannot at this time find Hunter liable in indemnification. Capitol's motion is denied.

**\*8** Capitol has moved to recover attorney's fees and costs incurred during this litigation. The universal rule is not to allow a litigant to recover damages for the amounts incurred in the successful prosecution or defense of its rights. *Mighty Midgets Inc. v. Centennial Ins. Co.,* 47 N.Y.2d 12, 21-22 (N.Y.1979). Under the American Rule, no attorneys' fees are recoverable absent express statutory authority for such an award. *SeePennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 616, 561-62 (1986); *Jane Doe v. Karadzic,* No. 93 Civ. 0878, 2001 WL 986545, at *2 (S.D.N.Y. Aug. 28, 2001). Here this is no statutory authority for an award. Therefore, Capitol's motion is denied.

*Conclusion*

For the reasons outlined above, Hunter's and Capitol's Motions for summary Judgment are hereby denied. Capitol's motion for indemnification, and reimbursement for costs and fees is denied.

The parties are hereby given a Ready for Trial date of May 13, 2002. A copy of this Court's Pre-trial Requirements is forwarded to counsel with this Opinion.

SO ORDERED.

S.D.N.Y.,2002.
Travelers Indem. Co. of Illinois v. Hunter Fan Co., Inc.
Not Reported in F.Supp.2d, 2002 WL 109567 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 419999 (N.D.N.Y.)
(Cite as: 2010 WL 419999 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Henry BENITEZ, Plaintiff,
v.
J. LOCASTRO, Lt.; Lt. Miller; D. Selsky, Dir. of Shu;
J. Burns; Sgt. Martens; C. Gummerson, Capt.; J.
Rourke, Capt.; M. Bradt; C. Parmiter; J. Burge; T.
Eagen, Dir. of Corrections; J. Wilkinson; R. Smith; C.O.
Baranska; R.N.S. Lennox; J.Porten; J. Mcnamara; John
Does 1-6, C.O.s; R. Smith, R.N.; W. Chilson, Sgt.;
Sergeant Colon; R. Considine, C.O.; Psych. Kneeland;
V. Koneczny; C.O. Clarke; S. Crozier; John Doe, XII,
C.O.; Cho Wolczyk; Sergeant Smith; C.O. Miller; S.
Yorkey, Sgt.; Sgt. Murley; Lt. Easterbrook; C.O.
Loomis; T. Quinn; Sgt. Christopher; C.O. Roux; C.O.
Leonello; C.O. Meyers; M. Kessel; G. Maccucci, C.O.;
E. Amberman; and M. Melindez, Defendants.
No. 9:04-CV-423 (NAM/RET).

Jan. 29, 2010.

Henry Benitez, Malone, NY, pro se.

Hon Andrew M. Cuomo, Attorney General of the State of
New York State, Ed. J. Thompson, Assistant Attorney
General, Syracuse, NY.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Timothy P. Mulvey, Esq., Assistant
Attorney General, of Counsel, Albany, N.Y., for
Defendants.

**MEMORANDUM-DECISION AND ORDER**

Hon. NORMAN A. MORDUE, Chief Judge.

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

**\*1** Plaintiff, an inmate in the custody of the New York
State Department of Correctional Services ("DOCS"),
brought this action under 42 U.S.C. § 1983. The amended
complaint (Dkt. No. 5) alleges various constitutional
deprivations in connection with several incidents at
Auburn Correctional Facility in 2001 and 2002.
Defendants moved for summary judgment dismissing the
action (Dkt. No. 118). Upon referral pursuant to 28 U.S.C.
§ 636(b)(1)(B) and Local Rule 72.3(c), United States
Magistrate Judge Randolph F. Treece issued a thorough
Report and Recommendation (Dkt. No. 139)
recommending that summary judgment be granted in part
and denied in part. Specifically, regarding the Eighth
Amendment excessive force/medical indifference claims
stemming from the events of July 9, 2002, Magistrate
Judge Treece finds questions of fact regarding exhaustion
and recommends as follows: that the claims against Nurse
R. Smith be dismissed; that summary judgment be denied
as to all other July 9, 2002 excessive force claims (*i.e.,* the
claims against J. Rourke and the John Doe defendants);
and that plaintiff be granted leave to file a second
amended complaint to substitute named defendants for the
John Doe defendants. Magistrate Judge Treece
recommends dismissal of plaintiff's Eighth Amendment
conditions-of-confinement claims relative to the following:
deprivation orders issued in November 2001 and July
2002; poor cell ventilation due to cell shield; denial of
meals; and injuries from tight shackles and cuffs.
Magistrate Judge Treece further recommends dismissal of
plaintiff's claims that the deprivation, restraint, and cell
shield orders were retaliatory. In addition, Magistrate
Judge Treece recommends dismissal of plaintiff's due
process claims regarding the disciplinary hearings of
November 21, 2001, July 11, 2002, and July 16, 2002.

Plaintiff filed an objection (Dkt. No. 140) to certain
aspects of the Report and Recommendation. As to all
other portions of the Report and Recommendation, by
failing to object, plaintiff waives further judicial review.
*See Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993).
Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court conducts
a *de novo* review of the portions of the Report and
Recommendation to which plaintiff objects, specifically

Slip Copy, 2010 WL 419999 (N.D.N.Y.)
(Cite as: 2010 WL 419999 (N.D.N.Y.))

the recommendations that the Court dismiss plaintiff's medical indifference claim against Nurse R. Smith stemming from the July 9, 2002 incident, and his Eighth Amendment claims stemming from the deprivation orders issued in November 2001 and July 2002. Upon *de novo* review, the Court agrees with Magistrate Judge Treece's factual summary, analysis, and recommendation regarding these issues. Accordingly, the Court accepts the Report and Recommendation in its entirety.

It is therefore

ORDERED that United States Magistrate Judge Randolph F. Treece's Report and Recommendation (Dkt. No. 139) is accepted in its entirety; and it is further

ORDERED that defendants' motion for summary judgment (Dkt. No. 118) is granted to the extent of dismissing all claims except the Eighth Amendment excessive force claims against Rourke and John Does Nos. 1-6 stemming from the events of July 9, 2002; and it is further

**\*2** ORDERED that plaintiff is granted 30 days from the date of this Memorandum-Decision and Order to file a motion to amend his amended complaint in order to identify John Does Nos. 1-6, which shall include a proposed second amended complaint attached thereto.

IT IS SO ORDERED.

### *REPORT-RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Henry Benitez filed this civil rights action, pursuant to 42 U.S.C. § 1983, alleging that his constitutional rights were violated during several events that allegedly occurred at Auburn Correctional Facility in 2001 and 2002. Specifically, Plaintiff alleges violations of

his constitutional rights as guaranteed by the First Amendment (retaliation), Eighth Amendment (excessive force and conditions of confinement), and Fourteenth Amendment (due process). Dkt. No. 5, Am. Compl. Presently before the Court is Defendants' Motion for Summary Judgment, Dkt. No. 118, which Plaintiff opposes, Dkt. Nos. 137-38.

Previously, this Court issued a Report-Recommendation and Order addressing Defendants' Motion for Judgment on the Pleadings, which was adopted in its entirety by the Honorable Norman A. Mordue, Chief United States District Judge for the Northern District of New York. Dkt. Nos. 106 & 108. Chief Judge Mordue's Order dismissed the following Defendants: Amberman, Christopher, Colon, Easterbrook, Kessel, Konecny, Lennox, Leonello, Loomis, Maccucci, McNamara, Melindez, Meyers, C.O. Miller, Murley, Parmiter, Porten, Quinn, Roux, Sgt. Smith, Wilkinson, and Yorkey. Dkt. No. 108, Order at p. 2.

Defendants' current Motion is brought on behalf of the remaining Defendants.[FN1] For the reasons that follow, it is recommended that Defendants' Motion for Summary Judgment be **GRANTED in part** and **DENIED in part.**[FN2]

FN1. The remaining Defendants are: Locastro, Lt. Miller, Selsky, Burns, Martens, Gummerson, Rourke, Bradt, Burge, Eagen, R. (C.O.) Smith, Baranska, (R.N.) Smith, Chilson, Kneeland, Clarke, Considine, Crozier, and Wolczyk. *See generally* Dkt.

FN2. Because of the volume of claims and Defendants, the Court will recite the undisputed/disputed material facts as it addresses each claim.

### I. DISCUSSION

#### A. Summary Judgment Standard

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 419999 (N.D.N.Y.)
(Cite as: 2010 WL 419999 (N.D.N.Y.))

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and [the moving party] is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through " 'pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any,' " that there is no genuine issue of material fact. F.D.I. C. v. Giammettei, 34 F.3d 51, 54 (2d Cir.1994) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." Glazer v. Formica Corp., 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must "set out specific facts showing [that there is]a genuine issue for trial," and cannot rest "merely on allegations or denials" of the facts submitted by the movant. FED. R. CIV. P. 56(e); see also Scott v. Coughlin, 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. Scott v. Coughlin, 344 F.3d at 289 (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir.1983) and Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir.1995)).

*3 When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. Nora Beverages, Inc. v. Perrier Group of Am., Inc., 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding pro se, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir.1994), accord, Soto v. Walker, 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. See Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir.1991).

**B. Eighth Amendment Claims**

1. *Excessive Force and the Events of July 9, 2002*

Plaintiff asserts that "[o]n July 9, 2002, [he] threw a liquid substance through the narrow food port of his cell, striking [Defendants] Lennox and Martens." Dkt. No. 5, Am. Compl. at ¶ 26. Shortly thereafter

Porten, McNamara, and various other guards approached Benitez's cell and ordered him to submit to mechanical restraints. Benitez then requested to be allowed to speak to a captain. Sergeant Vasile (not a defendant) refused, whereupon Benitez threw a liquid substance though the narrow food port on the gate of his cell.

About 10 minutes after the incident described [ ] above], [Defendant] Rourke walked past Benitez's cell and gave Benitez the finger. Shortly thereafter, Rourke and Defendants John Does Nos. 1-6 approached Benitez's cell. Rourke then asked Benitez whether or not he would come out of his cell. Benitez responded in the affirmative. With a callous and malicious intent to subject Benitez to gratuitous humiliation and punishment, Rourke ordered John Does Nos. 1-6 to forcibly remove Benitez from his cell.

Acting on Rourke's order, John Does Nos. 1-4 rushed into Benitez's cell, whereupon John Doe No. 1 maliciously and sadistically struck Benitez on the top of his head

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 419999 (N.D.N.Y.)
(Cite as: 2010 WL 419999 (N.D.N.Y.))

with a large body shield [made of] plexiglas, knocking Benitez on his bed face down and breaking his eyeglasses. John Does Nos. 1-4 then maliciously and sadistically punched Benitez in his face, head, neck, back, rib cage and arms rapidly and repetitiously, and Benitez passed out.

* * *

While punching Benitez about his body, John Does Nos. 1-4 maliciously and sadistically twisted Benitez's hands, fingers, and feet while simultaneously using enormous pressure to tighten too tightly handcuffs and leg irons that had been placed on Benitez.

**\*4** John Does Nos. 1-6 forcibly removed Benitez from his cell and placed him in a strip cell.... There, John Does 1-6 cut Benitez's clothes off of his person. Benitez, who was then experiencing enormous pain about his entire body, was then "examined" by Defendant Nurse R. Smith.... Nurse Smith willfully and knowingly falsely wrote in Benitez's medical chart that he had minor injuries. Nurse Smith willfully refused to provide Benitez pain relieving medicine, even though she knew that Benitez was then suffering from extreme pain.

Thereafter, John Does Nos. 1-6 walked Benitez naked cuffed and shackled with a restraining strap from P3-cell into A1-cell. There, John Does 1-3 maliciously and violently slammed Benitez against a metal bed frame, causing Benitez to severely strike his face against the metal bed frame. While forcibly holding Benitez['s] face down on the metal frame, John Does Nos. 1-3 maliciously and sadistically punched Benitez on his face, head, back, rib cage, and arms, even though he did not struggle nor resist. John Does Nos. 1-3 then removed the handcuffs, shackles, and restraining strap from Benitez's person and rushed out of the cell.

*Id.* at ¶¶ 26-33.

Plaintiff alleges to have suffered several injuries as a consequence of the above incidents, including a

"laceration in the front of his head," bruising all over his body, and "permanent nerve damage [to his] [ ] wrists, hands, fingers, and ankles." *Id.* at ¶¶ 34-35.

Defendants assert Plaintiff has failed to exhaust all of his claims arising out of the July 9, 2002 incident. The Prisoner Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997(e)(a), states that "[n]o action shall be brought with respect to prison conditions under [section 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002); *see also Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004).

The New York State Department of Corrections has created a three-step grievance process known as the Inmate Grievance Program ("IGP"). *See Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). First, the inmate must file a grievance complaint with the Grievance Clerk within twenty-one (21) days of the incident. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.5(a)(1) (2007). The complaint is then submitted to the Inmate Grievance Resolution Committee (IGRC) to review the grievance. *Id.* at § 701.5(b). Second, if the inmate disagrees with the IGRC decision, then the inmate may appeal to the Superintendent. *See id.* at § 701.5(c). Third, if the inmate disagrees with the Superintendent's determination, an appeal may be taken to the Central Office Review Committee (CORC) who renders a final administrative determination. *Id.* at § 701.5(d). Upon the completion of all three steps, an inmate may "seek relief pursuant to 42 U.S.C. § 1983." *Colon v. Harvey,* 344 F.Supp.2d 896, 897 (W.D.N.Y.2004) (citing *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001) & *Santos v. Hauck,* 242 F.Supp.2d 257, 259 (W.D.N.Y.2003)).

**\*5** The Second Circuit has suggested a three-step inquiry when, as here, the inmate opposes a defendant's assertion that the inmate did not exhaust his remedies.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 419999 (N.D.N.Y.)
(Cite as: 2010 WL 419999 (N.D.N.Y.))

Depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact "available" to the prisoner. *Abney v. McGinnis,* 380 F.3d 663, 667-68 (2d Cir.2004). The court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004), or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense, *Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004). If the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether "special circumstances" have been plausibly alleged that justify "the prisoner's failure to comply with administrative procedural requirements." *Giano v. Goord,* 380 F.3d 670, 676 (citing *Berry v. Kerik,* 366 F.3d 85, 88 (2d Cir.2003)[.]

*Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *see also Braham v. Clancy,* 425 F.3d 177, 181-82 (2d Cir.2005).

In response to Defendants' exhaustion argument, Plaintiff asserts that he was unable to exhaust these claims because (1) he was denied a pen and paper from July 9 through August 8, 2002; (2) from August 8-17, 2002, various Defendants refused to submit his outgoing mail and grievances; and (3) on September 4, 2002, he submitted a seven (7) page Grievance concerning the events of July 9th to Officer Hnatiw,[FN3] but Defendant Parmiter did not process that Grievance in order to obstruct his filing of a federal civil action. Dkt. No. 137, Pl.'s Mem. of Law at pp. 6-9 & Henry Benitez Decl., dated July 15, 2009, at ¶¶ 4-9; *see also* Am. Compl. at ¶¶ 51, 53, 55 & 86.

FN3. Officer Hnatiw is not a Defendant in this action.

With respect to Plaintiff's first allegation, Defendants have

submitted copies of Deprivation Orders indicating that Plaintiff was denied all in-cell property from, at the latest, July 14, 2002, through, at the earliest, July 25, 2002.[FN4] Dkt. No. 118-7, Mark L. Bradt Aff., dated Dec. 9, 2008, Ex. C, Deprivation Orders, dated July 9-25, 2002.

FN4. The first Deprivation Order, dated July 9, 2002, indicates that Plaintiff was deprived only of cell water. Bradt Aff., Ex. C, Deprivation Order, dated July 9, 2002. On July 16, 2002, Bradt signed a Deprivation Order Renewal of the original July 9 Order, but also listed "cell property" as one of the deprivations. *Id.,* Deprivation Order, dated July 16, 2002. Thus, it is unclear if the "cell property" was omitted from the original July 9 Order, or if it was added as an additional deprivation upon renewal of that Order. Also, although Plaintiff alleges that these Deprivation Orders were continued through August 8, 2002, the copies of the Orders provided to the Court run only to July 25, 2002. Am. Compl. at ¶¶ 53 & 55; Brad Aff., Ex. C.

As per Plaintiff's second allegation, the record shows that he filed a Grievance, dated August 17, 2002, complaining that several Defendants refused to take his outgoing mail from August 8-17, 2002. Benitez Decl., Ex. B, Grievance, dated Aug. 17, 2002. The record also reflects that two of Plaintiff's Grievances, dated August 8, 2002, were not stamped received by the IGRC until August 21, 2002. Dkt. No. 118-5, Defs.' 7.1 Statement, Ex. P, Grievances, dated Aug. 8, 2002 (stamped received by the IGRC on Aug. 21, 2002). In one of those Grievances, Plaintiff asserted: "[o]n July 9, 2002, I was forcibly moved from SHU cell G-2 to SHU cell A-1 by an extraction team that, among other things, allegedly broke my glasses," and requested information about the status of the repairs to his broken glasses. *Id.,* Ex. P, Grievance, dated Aug. 8, 2002. That Grievance contains no other allegations concerning the events of July 9.

*6 With respect to Plaintiff's claim that Parmiter refused to process a Grievance he filed on September 4, 2002, there is no evidence presented before us by either side to support or rebut that claim. However, such allegation was arguably raised, albeit with less specificity, in Plaintiff's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 419999 (N.D.N.Y.)
(Cite as: 2010 WL 419999 (N.D.N.Y.))

Amended Complaint: "from August 8, 2002 to September 12, 2002, Parmiter willfully and knowingly wrongly refused to file numerous formal grievances submitted by Benitez." Am. Compl. at ¶ 86.[FN5]

> **FN5.** In our previous Report-Recommendation, we dismissed any due process claim Plaintiff might have intended to assert concerning the failure to process grievances as an independent constitutional violation. Dkt. No. 106 at pp. 20-21.

Considering the above allegations about the obstruction of Plaintiff's grievances, and lack of evidence before us regarding those claims, we find that questions of fact exist with respect to whether the Defendants' own actions inhibited Plaintiff's ability to exhaust available administrative remedies, and therefore, whether they should be estopped from asserting the affirmative defense of failure to exhaust. The record shows that Plaintiff was deprived of all in-cell property for most of July 2002 and, as he points out, DOCS regulations require that grievances be submitted within twenty-one (21) days of the alleged occurrence. N.Y. CODES COMP. R. & REGS, tit. 7, § 705.1(a). Thus, it is possible that even if Plaintiff had filed a grievance after the Deprivation Orders were lifted it may have been denied as untimely. As such, there are also questions as to whether "special circumstances" exist that might justify Plaintiff's failure to exhaust. Therefore, we shall proceed to the merits of Plaintiff's claims surrounding the events of July 9, 2002.

Defendants assert that Plaintiff's excessive force claims against John Does Nos. 1-6 should be dismissed for failure to allege personal involvement on the part of any named Defendant. Defs.' Mem. of Law at p. 27. In response, Plaintiff argues that the Defendants' failure to timely respond to his discovery requests delayed the revelation of the John Doe Defendants' identities. Pl.'s Mem. of Law at pp. 2-3. We note that in an Order, dated August 29, 2006, this Court granted Plaintiff's Motions to Compel Defendants to respond to his outstanding discovery requests, some of which concerned the identities of the John Does. Dkt. No. 88 at pp. 6-7. Then, on June 12, 2007, this Court addressed Plaintiff's unopposed Motion for Sanctions against Defendants for their alleged failure

to comply with our August 2006 Order; we denied Plaintiff's Motion for Sanctions, but ordered Defendants' compliance with our August 2006 Order. Dkt. No. 91, Order at p. 3.

Plaintiff now asserts that the "Defendants recently complied with the Court's June 12, 2007 Order by disclosing to Benitez the identities of the Defendants at issue." Dkt. No. 137, Pl.'s Mem. of Law at p. 3.[FN6] Moreover, Plaintiff asserts his intention to seek leave to file a motion to amend his Amended Complaint to assert claims against these would-be Defendants. *Id.* Given the mixed and prolonged history of discovery in this case, we believe it is appropriate to allow Plaintiff to submit a motion to amend his Amended Complaint in order to identify John Does Nos. 1-6.[FN7] Therefore, Defendants' Motion is **denied** as to Plaintiff's excessive force claims against John Does Nos. 1-6. Should this Report-Recommendation and Order be adopted by the District Court, we shall afford Plaintiff *thirty (30) days* from the date of such adoption to file a motion to amend his Amended Complaint to include the names of John Does Nos. 1-6.

> **FN6.** In that respect, the Court notes that documents submitted in support of the Defendants' current Motion clearly indicate the names of the correctional officers involved in the July 9, 2002 cell extraction. *See* Defs.' 7.1 Statement, Ex. C.

> **FN7.** The Court is aware that any such motion to amend will face serious and possibly fatal hurdles. The Second Circuit's interpretation of the "relation back" doctrine imbedded in Federal Rule of Civil Procedure 15 may leave Plaintiff no recourse as his failure to identify the John Doe Defendants was arguably not do to a mistake, but rather, to his own lack of knowledge. *See Barrow v. Wethersfield Police Dep't,* 66 F.3d 466, 470 (2d Cir.1995) ("Rule 15(c) does not allow an amended complaint adding new defendants to relate back if the newly-added defendants were not named originally because the plaintiff did not know their identities."). However, several courts in this

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 419999 (N.D.N.Y.)
(Cite as: 2010 WL 419999 (N.D.N.Y.))

Circuit, including this one, have held that the aforementioned rule may not be applicable in all circumstances, particularly when a defendant has prevented the plaintiff from discovering the identity of the John Doe defendants and the plaintiff has taken reasonable affirmative steps to discover their identities. *See Jennings v. Dep't of Justice Serv.,* 2008 WL 2967533, at *5 (N.D.N.Y. Mar. 26, 2008) (Report-Recommendation and Order) *adopted in part and rejected in part on other grounds sub nom. by Jennings v. Ciciarelli,* 2008 WL 2967530 (N.D.N.Y. July 30, 2008); *see also, e.g., Byrd v. Abate,* 964 F.Supp. 140, 146 (S.D .N.Y.1997) (stating that "[t]o hold that Rule 15(c) does not permit relation back in such circumstances would permit defense counsel to eliminate claims against any John Doe defendant merely by resisting discovery requests until the statute of limitations has ended"); *Maccharulo v. Gould,* 2009 WL 2495780, at *6 (S.D.N.Y. Aug. 14, 2009) ("Where a plaintiff tries diligently during the limitations period to ascertain the identities of the intended defendants, failure to ascertain the correct names within the period, combined with some 'John Doe' or other generic identification in the pleading, may suffice to establish a factual 'mistake' supporting relation back."). Therefore, it would be rash at this juncture for the Court to rule out the possibility that Plaintiff's forthcoming second amended complaint will not relate back to his original Complaint under Rule 15.

**\*7** Plaintiff's claim against Defendant Rourke should also survive the Defendants' Motion. Although Plaintiff does not allege that Rourke physically participated in the alleged use of excessive force, he claims that Rourke maliciously ordered John Does 1-6 to forcibly remove him from his cell despite his willingness to leave, and then shouted "stop resisting" in order to "encourage John Does Nos. 1-4 to continue to inflict gratuitous humiliation and extreme physical pain on Benitez, even though he knew that Benitez was not resisting John Does Nos. 1-4." Am. Compl. at ¶¶ 29-30. Liberally interpreted, Plaintiff has asserted a claim that Rourke failed to protect him once the alleged beating commenced, and then encouraged the John Does to continue in that conduct. Although the documents

Defendants have attached as Exhibit C to their 7.1 Statement support their contention that Rourke had Plaintiff extracted from his cell in order to place him in a different cell with a more secure food hatch so as to prevent his continued throwing of feces on prison staff, [FN8] nothing in the record answers Plaintiff's allegations that Rourke allowed and encouraged the use of excessive force against him *during* that extraction. Therefore, it is recommended that the Motion be **denied** as to Plaintiff's claims against Rourke.

> FN8. For example, in a copy of a memorandum from Rourke to Deputy Superintendent of Security Bradt dated July 9, 2002, Rourke states that he "went to SHU to help facilitate the move of [Benitez] to A-1 cell which has a more secure cell hatch. On 7/9/02 this inmate had already thrown on (4) staff members in SHU." Defs.' 7.1 Statement, Ex. C-9, Mem. dated July 9, 2002.

However, Plaintiff's claims against Defendant Nurse R. Smith should be **dismissed.** Plaintiff's Eighth Amendment claim against Defendant Nurse Smith is that after he was allegedly beaten by John Does Nos. 1-6 during the cell extraction, "Nurse Smith willfully refused to provide Benitez pain relieving medicine, even though she knew that Benitez was then suffering from extreme pain." Am. Compl. at ¶ 32. "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove deliberate indifference to [his] serious medical needs." *Smith v. Carpenter,* 316 F.3d 178, 183 (2d Cir.2003) (internal quotation marks and citations omitted) (alteration in original). This standard contains both objective and subjective elements. *Id.* "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberative indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Id.* at 183-84 (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) & *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)).

Defendants argue that Plaintiff has failed to allege that he suffered from a serious medical injury. Defs.' Mem. of Law at pp. 28-29. Plaintiff alleges that at the time he was presented before Nurse Smith, he was suffering from

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 419999 (N.D.N.Y.)
(Cite as: 2010 WL 419999 (N.D.N.Y.))

"extreme pain," but he does not allege the nature of that pain, its location, nor whether he communicated to Nurse Smith the nature or location of any injury he might have suffered or his need for pain medication. Plaintiff does allege that as a result of the excessive force used against him, he suffered a "laceration to the front of his head, and abrasions and multiple areas of bright red bruising on his nose, back, chest, stomach, arms, hands, legs and feet," as well as "permanent nerve damage [to his] [ ] wrists, hands, fingers, and ankles." Am. Compl. at ¶¶ 34-35. However, Plaintiff does not allege that Nurse Smith was made aware of any of those aforementioned injuries, nor does he provide any factual basis for his conclusion that he suffered nerve damage. With respect to his claims of bruises and a laceration (the size and depth of which he does not allege), those generally pleaded injuries do not constitute serious medical conditions under the Eighth Amendment. *See, e.g., Dawes v. Coughlin,* 159 F.3d 1346 (2d Cir.1998) (holding that a small laceration on an inmate's elbow was not a serious injury under the Eighth Amendment); *see also Dallio v. Hebert,* 2009 WL 2258964, at *16 (N.D.N.Y. July 28, 2009) (holding that black eyes, bruising, red spots, kick marks, and lacerations did not constitute a serious medical need.) Therefore, we agree with Defendants that Plaintiff's claim that he suffered from a serious medical injury is conclusory and for that reason his claim against Nurse Smith should be **dismissed.**[FN9]

> [FN9.] Plaintiff does not allege that Nurse Smith participated in or was witness to any of the alleged acts of excessive force taken against him.

### 2. *Deprivation Orders*

**\*8** Plaintiff alleges that in November 2001 and July 2002, various Defendants issued Deprivation Orders against him in violation of the Eighth Amendment.[FN10] Plaintiff's allegations regarding November 2001 are as follows:

> [FN10.] Plaintiff also asserts these Deprivation Orders were motivated by retaliatory animus. We address his retaliation claims below in Part I.D.

> Upon Benitez's arrival at Auburn prisoner's SHU on November 14, 2001, Defendant J. Burns [ ] wantonly filed a Deprivation Order ... against Benitez in retaliation for his having sued Burns and various other Auburn prison employees in 1989. As a result, Benitez was denied the following items and services from November 14 to November 26, 2001: all allowable in-cell property; sink and toilet water; showers; one-hour outdoor exercise period; and, among other things, law library services.

Am. Compl. at ¶ 8.

As for the July 2002 allegations, we summarized those claims in our previous Report-Recommendation addressing Defendants' Motion for Judgment on the Pleadings as follows:

> Plaintiff claims that Defendants Bradt and Chilson either approved or issued unspecified deprivation orders causing Plaintiff to be without the following items and services from July 9 through July 14, 2002: all in-cell property, pen, bed sheets, mattress, toilet tissue, running water, showers, exercise periods, and law library services. Am. Compl. at ¶ 51. Plaintiff also claims that from July 14 through July 25, 2002, and from July 25 through August 8, 2002, Defendants Bradt, Chilson, and Martens approved or issued more unspecified orders depriving him of the same items and services listed above. [FN11]*Id.* at ¶¶ 53 & 55.

> [FN11.] In addition to the items listed, Plaintiff asserts he was denied "a water bucket" from July 25 though August 8, 2002. Am. Compl. at ¶ 55.

Dkt. No. 106 at pp. 12-13.

Plaintiff also claims in his Amended Complaint that the above-mentioned July 2002 Deprivation Orders were approved of by Defendants Burge, Kneeland, Rourke, Gummerson, and Wolczyk. Am. Compl. at ¶¶ 52, 54, & 56.

In order to state a valid conditions of confinement claim

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 419999 (N.D.N.Y.)
(Cite as: 2010 WL 419999 (N.D.N.Y.))

under the Eighth Amendment, a plaintiff must allege: (1) the conditions were so serious that they constituted a denial of the "minimal civilized measure of life's necessities," and (2) the prison officials acted with "deliberate indifference." _Wilson v. Seiter,_ 501 U.S. 294, 297-99 (1991) (citation omitted) (cited in _Branham v. Meachum,_ 77 F.3d 626, 630-31 (2d Cir.1996)). With respect to deprivation orders, the Second Circuit has held that it is appropriate to consider whether the order in question "was reasonably calculated to restore prison discipline and security and, in that purposive context, whether the officials were deliberately indifferent to [plaintiff's] health and safety." _Trammell v. Keane,_ 338 F.3d 155, 163 (2d Cir.2003).

Defendants assert that the Deprivation Orders enforced against Plaintiff were issued for valid penological reasons. Mark L. Bradt was a Deputy Superintendent of Security ("DSS") at Auburn from January 7, 2002 through April 30, 2004. Bradt Aff. at ¶ 1. Bradt avers that "in order to make determinations regarding appropriate levels of security and restraint for the inmates in the prison, [he] frequently consulted the disciplinary histories of the inmates at the prison." _Id._ at ¶ 5. Prior to his arrival at Auburn, Plaintiff had a lengthy disciplinary history, which included the following violations of DOCS rules:

**\*9** 1. creating a disturbance (5 times); 2. assault on staff (4 times); 3. lewd conduct (8 times); 4. threats (6 times); 5. unhygienic act (11 times); 6. arson (2 times); 7. flooding (2 times); 8. loss or damage to property (3 times); and 9. violent conduct (2 times).

_Id._ & Ex. A, Pl.'s Disciplinary History.

Bradt states that upon Benitez's arrival at Auburn on November 14, 2001, he was issued an order that deprived him of water, all cell property, bucket, and personal property from November 14-25,[FN12] 2001, because of his history of disruption and throwing things. Bradt Aff. at ¶ 7 & Ex. C, Deprivation Order, dated Nov. 22, 2001. That Deprivation Order was issued by then-DSS John Burns, who rescinded the order on November 26, 2001. _Id._

FN12. The original Deprivation Order was to last from November 14-22, but was renewed on November 23, 24, and 25, 2002. Bradt Aff., Ex. C, Deprivation Order.

On July 9, 2002, Bradt issued Plaintiff an order depriving him of cell water because Plaintiff had thrown "liquid substances on two (2) occasions from his cell onto Auburn C.F. staff members," and had flooded his and other cells in his section. Bradt Aff. at ¶¶ 8-9 & Ex. C, Deprivation Order, dated July 9, 2002. In his Amended Complaint, Plaintiff confirms that he engaged in such conduct. Am. Compl. at ¶¶ 26 ("Benitez threw a liquid substance through the narrow food port of his cell, striking Lennox and Martens.") & 28 ("Benitez [again] threw a liquid substance through the narrow food port on the gate of his cell."). Based on his judgment that Plaintiff continued to pose a security threat, Bradt continued the Deprivation Order until July 14th. Bradt Aff. at ¶ 9. On July 14th, Defendant Sgt. Martens recommended that the July 9th Deprivation Order be renewed because "on 7-9-02 [Benitez] threw feces on staff/nurse" and on "7-10-02 spit on staff while being served misbehavior reports." _Id._ at ¶ 10 & Ex. C, Deprivation Order. On July 16th, Bradt authorized the renewal of the July 9th Deprivation Order, which was apparently expanded [FN13] to include showers, cell property, sheets and mattress, and renewed it again on July 20, 22, 23, and 24, 2002, "because plaintiff posed a continued threat to the safety and security of staff, inmates, or State property." Bradt Aff. at ¶¶ 10-11 & Ex. C, Deprivation Order, dated July 20, 2002.

FN13. _See supra_ footnote 4.

For his part, Plaintiff alleges that these deprivation orders were retaliatory in nature. He points to a July 24, 2002 letter Bradt sent to Kate Rainbolt, a Staff Attorney for Prisoner's Legal Services of New York, in which he stated:

In response to your concerns be advised that inmate Benitez ... is house[d] in "A" tank in the Special Housing Unit at Auburn. He was involved in an Unusual Incident on 7/9/02 involving aggravated harassment. The throwing of ones own human waste on another person isn't normal. He was placed in A-1 cell as it has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 419999 (N.D.N.Y.)
(Cite as: 2010 WL 419999 (N.D.N.Y.))

a more secure feed up hatch. A Mental Health referral was submitted and OMH advised that *because of his agitated state that he be deprived of any item that he could use to harm himself.* He has been given all of his entitled property. Inmate Benitez was placed on a restricted diet in accordance with procedures established in Deputy Commissioner LeClaire's memo dated 4/24/00.

**\*10** Benitez Decl., Ex. D, Lt., dated July 24, 2002 (emphasis added).

Plaintiff argues that the italicized portion of the above letter undermines Bradt's statement that the Deprivation Orders were implemented due to his behavior. Pl.'s Mem. of Law at p. 11. That argument is without merit. The above letter provides additional confirmation of Benitez's gross acts, which Bradt asserts were the basis for the Deprivation Orders. Although Bradt mentions that certain objects were removed due to concerns over Plaintiff's mental health, that does not contradict his averment that the water, sheets, and other items were removed due to Plaintiff's behavior.

It is clear from the record that the above Deprivation Orders were issued in response to Plaintiff's own actions and history of misbehavior. *See Hudson v. McMillan,* 503 U.S. 1, 6 (1992) (noting that "[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." (internal quotation marks and citation omitted)). Plaintiff has offered no evidence beyond his own accusations to suggest otherwise. Because there is no evidence of any deliberate indifference on Defendants' part, it is recommended that these Eighth Amendment claims be **dismissed.**

### 3. *Cell Ventilation*

Plaintiff alleges he filed a Grievance on January 26, 2002, complaining about lack of ventilation in his cell that was causing him "bronchospasm and great difficulty

breathing." Am. Compl. at ¶ 15. Plaintiff asserts that Defendants J. Burge and T. Eagen reviewed his Grievance and failed to remedy the situation, which caused Plaintiff to suffer, on July 1, 2002, "great difficulty breathing and lost consciousness," and a severely injured head. *Id.* at ¶¶ 16-17 & 24.

The record reflects that Plaintiff filed a Grievance, dated January 26, 2002, in which he complained that the plexiglass shield used to cover the opening in his cell did not provide adequate ventilation. Defs.' 7.1 Statement, Ex. K, Grievance, dated Jan. 26, 2002. In a Memorandum, dated April 13, 2002, Sgt. Martens noted that "[t]here are numerous holes drilled in [the] cell shield for adequate ventilation," and that he noticed upon inspection that Benitez "had piled in front of his cell shield four (4) bags of legal work-blocking his ventilation holes." *Id.,* Mem., dated Apr. 13, 2002. Plaintiff appealed the January 26th Grievance to Superintendent Burge, who denied his appeal on April 15, 2002, stating that "[a] private contractor completed a scientific survey of the air quality of all cells in SHU," and that "[a]ll cells meet or exceed air quality standards." *Id.,* Sup't Decision, dated Apr. 15, 2002. CORC also denied Plaintiff's Grievance on appeal. *Id.,* CORC Decision, dated May 15, 2002.

In another Grievance, dated July 1, 2002, Plaintiff complained that

**\*11** [o]n July 1, 2002, at about 7[ ] p.m., I began to sweat profusely and to experience great difficulty breathing normally (I suffer from asthma). Thereafter, I "blacked out" (lost consciousness) and fell from my bed onto the floor, causing injury to my head. I have been experiencing difficulty in breathing normally and have been drifting in and out of [consciousness] for the past 6 months due to inadequate ventilation on the plexiglass which covers the entire front of my assigned cell.

Defs.' 7.1 Statement, Ex. N, Grievance, dated July 1, 2002.

That Grievance was denied after Nurse Administrator A. Driscoll reported that her examination of Plaintiff on July

Slip Copy, 2010 WL 419999 (N.D.N.Y.)
(Cite as: 2010 WL 419999 (N.D.N.Y.))

3, 2002, had revealed no abnormality in Plaintiff's lungs, nor did he exhibit any difficulty breathing. *Id.,* Investigative Rep., dated July 10, 2002.

As Defendants point out, Plaintiff does not allege the nature of his alleged head injury, nor any other ventilation-related incident that occurred during the six-month period from January through July 2002 during which Plaintiff alleges to have been deprived of adequate ventilation. In addition, Plaintiff offers no evidence to substantiate his claims that he was denied adequate ventilation. The evidence available indicates that the protective plexiglass shield, which was imposed due to Plaintiff's affinity for throwing liquid substances from his cell, had holes in it, and that Plaintiff never presented to medical staff with breathing problems.

Given the evidence before us, we find that no questions of material fact exist with respect to these ventilation claims. Therefore, these claims should be **dismissed.**

### 4. *Denial of Meals*

In our previous Report-Recommendation addressing Defendants' Motion for Judgment on the Pleadings, we recommended dismissal of the majority of Plaintiff's claims regarding his alleged denial of meals. Dkt. No. 106 at pp. 11-12. However, we recommended against dismissal of Plaintiff's allegation that he was wantonly deprived breakfast and lunch on January 28, 2002, by Defendants Smith and Baranska, respectively. *Id.* at p. 12; Am. Compl. at ¶¶ 22-23.

Defendants have now submitted a Grievance, dated January 28, 2002, in which Plaintiff asserts that

[o]n 1/28/02, Sgt. Murler informed me that he had been advised that Sgt. Cooper or Lt. Easterbrook had placed me on a so-called pre-hearing restricted diet. I informed Sgt. Murler that any such pre-hearing diet would violate Directive 4933, § 304.2(b)(1)-(4) because that section does not authorize[d] imposition of a pre-hearing diet, and because I have not engage[d] in any misconduct that

would warrant imposition of a restricted or pre-hearing restricted diet. Nevertheless, *I was offered a restricted diet for breakfast and for lunch, both of which I refused.*

Defs.' 7.1 Statement, Ex. J, Grievance, dated Jan. 28, 2002 (emphasis added).

Thus, by Plaintiff's own admission, he was offered both breakfast and lunch on January 28, 2002. Therefore, it is recommended that Plaintiff's remaining meal-deprivation claims be **dismissed.**

### 5. *Tightness of Shackles and Cuffs*

**\*12** Plaintiff alleges that on August 17, 23, 27, 28, and September 3, 2002, Defendant Considine "willfully and wantonly" placed handcuffs and shackles on his ankles and wrists too tightly, causing him "great pain and permanent nerve damage." Am. Compl. at ¶¶ 58-61. Plaintiff also alleges that on September 7, 2002, Defendant Clarke placed shackles on him too tightly, also causing him pain and nerve damage. *Id.* at ¶ 82. Defendants assert that the above allegations are conclusory and insufficient to state a valid claim under the Eighth Amendment as a matter of law. Defs.' Mem. of Law at pp. 30-33. We agree.

Although a cause of action may lie under the Eighth Amendment for injuries caused by the wanton use of extremely tight handcuffs and/or shackles, *see, e.g., Davidson v. Flynn, 32 F.3d 27 (2d Cir.1994),* in this case, Plaintiff does not state enough facts to state a valid claim. Plaintiff does not allege for how long the handcuffs and shackles were applied, nor the circumstances of their application. He simply alleges that they were applied "wantonly" and caused severe pain and nerve damage, without any explanation as to how the nerve damage was caused or how he learned of such injury. *See Jemzura v. Public Service Com'n, 961 F.Supp. 406, 413 (N.D .N.Y.1997)* (citing *Zemsky v. City of New York, 821 F.2d 148, 151 (2d Cir.1987))* for the proposition that "[e]ven a *pro se* Complaint must be dismissed if it contains only conclusory, vague or general allegations") (internal quotations omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 419999 (N.D.N.Y.)
(Cite as: 2010 WL 419999 (N.D.N.Y.))

Therefore, it is recommended that these conclusory allegations be **dismissed** as a matter of law and pursuant to 28 U.S.C. § 1915(e) (2)(B)(ii), which gives the Court the power to dismiss *at any time* a complaint brought by a prisoner proceeding *in forma pauperis* for failure to state a claim.

### D. Retaliation

Plaintiff alleges that the Deprivation, Restraint, and Cell Shield Orders discussed above were issued against him in retaliation for lawsuits he filed in 1989. The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) & *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988)), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

In order to prevail on a retaliation claim, a plaintiff bears the burden to prove that (1) he engaged in constitutionally protected conduct; (2) prison officials took an adverse action against him; and (3) a causal connection exists between the protected speech and the adverse action. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted); *see also Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citation omitted).

**\*13** A plaintiff may meet the burden of proving an inappropriate retaliatory motive by presenting circumstantial evidence of a retaliatory motive, such as temporal proximity, thus obviating the need for direct evidence. *Bennett v. Goord,* 343 F.3d at 138-39 (holding that plaintiff met his burden in proving retaliatory motive by presenting circumstantial evidence relating to, *inter alia,* the temporal proximity of allegedly false misbehavior reports and the subsequent reversal of the disciplinary charges on appeal as unfounded). Other factors that can

infer an improper or retaliatory motive include the inmate's prior good disciplinary record, vindication at a hearing on the matter, and statements by the defendant regarding his motive for disciplining plaintiff. *McEachin v. Selsky,* 2005 WL 2128851, at \*5 (N.D.N.Y. Aug. 30, 2005) (citing *Colon v. Coughlin,* 58 F.3d 865, 872-73 (2d Cir.1995)).

#### 1. *Deprivation Orders*

Plaintiff asserts that the November 2001 and July 2002 Deprivation Orders were issued in retaliation for lawsuits he filed against Burns and other Auburn employees in 1989. Am. Compl. at ¶¶ 8-11. The filing of lawsuits is conduct protected by the First Amendment, however, Plaintiff has failed to show a causal connection between the lawsuits he filed in 1989 and the issuance of the Depravation Orders. As discussed above, Plaintiff has offered no evidence to rebut Defendants proof that the Deprivation Orders were precipitated by Plaintiff's own actions and history of misbehavior. Furthermore, there is no evidence that the Deprivation Orders issued in 2001 were motivated by lawsuits he filed in 1989. Indeed, such a significant temporal gap undermines any allegation of a causal connection. Therefore, it is recommended that these retaliation claims be **dismissed.**

#### 2. *Restraint and Cell Shield Orders*

Plaintiff asserts that Defendant Burns issued retaliatory Restraint and Cell Shield Orders against him on November 14, 2001, which were renewed through June 25, 2002, by Burns, Gummerson, Rourke, and Bradt. Am. Compl. at ¶¶ 8-11. Restraint orders "designate what restraints need to be placed on inmates when they are out of their cells, including hand cuffs and leg irons." Bradt Aff. at ¶ 20. A cell shield is "a transparent cell front covering, equipped to provide adequate ventilation," which are ordered to, *inter alia,* protect against "[s]pitting through the cell door, or the throwing of feces, urine, food, or other objects through the cell door." N.Y. COMP.CODES R. & REGS. tit. 7, § 305.6(a)-(b).

Bradt asserts that Plaintiff was issued Restraint and Cell

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 419999 (N.D.N.Y.)
(Cite as: 2010 WL 419999 (N.D.N.Y.))

Shield Orders upon his arrival at Auburn on November 14, 2001, due to "Benitez's extensive record of threats, violence, and unhygienic acts toward staff" and history of disruptive behavior. Bradt Aff. at ¶¶ 14, 18, 21 & Exs. D-E, Shield and Restraint Orders, dated Nov. 14, 2001 through Sept. 10, 2002. Those Orders were subsequently renewed by Defendants Burns, Rourke, Gummerson, and Bradt on a weekly basis due to Plaintiff's disciplinary history. *Id.* at ¶¶ 15 & 22.

**\*14** Thus, Defendants have provided evidence that the Shield Orders were imposed for valid penological reasons. Beyond his allegations, Plaintiff offers no proof that the Shield and Restraint Orders were issued for any improper reason. Also, as mentioned above, the fact that he sued several Defendants in 1989 is not sufficient to demonstrate a causal connection to the Shield and Restraint Orders issued in 2001 and 2002. Therefore, it is recommended that these retaliation claims be **dismissed.**

### E. Due Process Claims

Plaintiff alleges that his due process rights were violated during the course of three separate Disciplinary Hearings conducted in November 2001 and July 2002. Am. Compl. at ¶¶ 2-7 & 41-50. In order to state a procedural due process claim pursuant to the Fourteenth Amendment, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). Such interests are derived from the Fourteenth Amendment Due Process Clause itself or from state statute or regulations. *Id.* However, because Defendants do not challenge Plaintiff's assertion of a liberty interest, we move directly to the question of whether Plaintiff, prior to his confinement, was afforded the minimum requirements of due process. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974).

A prisoner placed in administrative segregation must be provided (1) advanced written notice of the charges against him at least twenty-four (24) hours prior to the hearing; (2) the opportunity to appear at the hearing, call witnesses, and present rebuttal evidence; and (3) a written statement as to the evidence relied upon and the reasons

for the disciplinary action taken. *Id.* at 564-66; *see also Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986); *Taylor v. Rodriguez,* 238 F.3d 188, 192 (2d Cir.2001) (quoting *Hewitt v. Helms,* 459 U.S. 460, 476 (1983)).

### 1. November 2001 Disciplinary Hearing

Plaintiff alleges Defendant Locastro violated his due process rights at a Disciplinary Hearing that commenced on November 21, 2001. Am. Compl. at ¶¶ 1-6. Specifically, Plaintiff alleges that (1) he was denied the right to present a video as documentary evidence; and (2) Locastro improperly took confidential testimony from Wayne Crozier and, without offering any justification, refused to disclose the substance of such testimony. *Id.*

Plaintiff was transferred from Clinton Correctional Facility to Auburn on November 14, 2001. Am. Compl. at ¶ 8. On November 8, 2001, while still incarcerated at Clinton, Plaintiff was issued a Misbehavior Report accusing him of squirting a brown liquid that smelled like feces from a toothpaste tube on C.O. R. Duprey,[FN14] and charging him with the following violations: assault, threats, disruptive behavior, harassment, and committing an unhygienic act. Defs.' 7.1 Statement, Ex. B, Misbehavior Rep., dated Nov. 8, 2001.

> FN14. R. Duprey is not a Defendant in this action.

**\*15** During the Disciplinary Hearing, which was held at Auburn after Plaintiff's transfer, Plaintiff requested a copy of a security videotape from Clinton that would show the incident and allegedly prove his innocence. *Id.,* Ex. S, Disciplinary Hr'g Tr., dated Mar. 21, 2002, at p. 10. Defendant Locastro, who presided over the Hearing, adjourned the proceeding so Plaintiff could make his evidentiary requests through an assistant. *Id.* at pp. 11-12. When the Hearing resumed, Locastro read into the record a memo from Defendant Lt. Miller indicating that "there is no videotape of the incident available" because the "system which would normally record all the areas of our Special Housing Unit was not operating on 11/08/01." *Id.* at p. 13. Locastro noted that he couldn't "produce

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 419999 (N.D.N.Y.)
(Cite as: 2010 WL 419999 (N.D.N.Y.))

something that's unavailable." *Id.* at p. 14.

Later in the Hearing, Plaintiff asserted that in another recent Disciplinary Hearing held at Auburn concerning charges against him that also stemmed from events occurring at the SHU in Clinton on November 8, 2001, he was provided a videotape of that incident and was able to prove his innocence therewith. *Id.* at pp. 30-33. Notwithstanding that argument and Plaintiff's production of proof of the favorable disposition he received in that Hearing, Locastro still found Plaintiff guilty of creating a disturbance, assault on staff, committing an unhygienic act, and harassment; Locastro found Plaintiff not guilty of making threats. *Id.* at p. 34. In rendering his decision, Locastro relied on the testimony of C.O. Duprey and the confidential testimony of Mr. Wayne Crozier. *Id.*

Plaintiff alleges that Locastro's failure to produce a videotape of the November 8, 2001 incident at Clinton violated his due process rights. The record shows that Locastro attempted to obtain the video, but was informed of its unavailability in a memo from DEP Minter Miller. Locastro did not violate Plaintiff's due process rights when he relied upon Miller's statement that the videotape was unavailable. *See, e.g., Hodges v. Jones,* 873 F.Supp. 737, 744 (N.D.N.Y.1995) ("Due Process does not require that the hearing officer's credibility assessments or weighing of the evidence be evaluated; rather, the relevant standard is whether there is some evidence in the record to support the disciplinary decision.") (citing *Superintendent, Massachusetts Corr. Inst. v. Hill,* 472 U .S. 445, 455 (1985)). After reviewing the Hearing Transcript, it is clear that Locastro's disposition was based on "some evidence," which included Officer Duprey's testimony that Plaintiff squirted liquid fecal matter at him using a toothpaste tube. Defs.' 7.1 Statement, Ex. S, Disciplinary Hr'g Tr. at pp. 26-27. Finally, Plaintiff was provided notice of the charges against him, an opportunity to present other evidence and to question witnesses, and Locastro's disposition statement that included the evidence relied upon. *Id.* at pp. 1-35.

**\*16** Plaintiff also alleges that Locastro violated his due process rights when he took confidential testimony from Wayne Crozier. With respect to that testimony, Defendant Locastro has submitted an Affidavit asserting that

[a]fter reviewing the record and hearing from plaintiff, I decided to conduct a confidential interview, via telephone, of the Mental Health Staff at Clinton CF. I did so to determine if there were any medical or legitimate psychiatric reasons that would mitigate any penalty I might impose on Plaintiff. I excluded plaintiff from the interview as standard DOCS procedure at the time, to protect the mental health care staff from any possible retaliation and to insure their candor in relating whether or not an inmate's behavior could be excused or explained as resulting from mental illness.

I did not seek any evidence related directly to the charges in conducting the confidential interview. I only sought to determine if there were mental health concerns that might have been relevant to plaintiff's behavior.

Dkt. No. 132, Joseph Locastro Aff., dated June 1, 2009, at ¶¶ 3-4. [FN15]

FN15. In their Motion for Summary Judgment, Defendants submitted separately to Chambers for an *in camera* review a portion of the November 2001 Disciplinary Hearing Transcript that contained the confidential testimony of Wayne Crozier, which was identified as Exhibit T. Dkt. No. 118. Thereafter, the Court returned Exhibit T to Defendants' counsel and ordered that it would only approve an *in camera* review upon the submission of a formal request from Defendants. Dkt. No. 119. Thereafter, Defendants filed a Formal Application for permission to submit Exhibit T for an *in camera* review, which was denied. Dkt. Nos. 120 & 129. Subsequently, Defendants submitted Locastro's Affidavit in lieu of submitting Exhibit T. Dkt. No. 132.

Defendants note that pursuant to DOCS regulations, "[w]hen an inmate's mental state or intellectual capacity is at issue," the hearing officer "shall consider evidence regarding the inmate's mental condition or intellectual capacity." N.Y. COMP.CODES R. & REGS., tit. 7, § 254.6(b). Plaintiff has not offered any response to Locastro's averments. There is no evidence to suggest that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 419999 (N.D.N.Y.)
(Cite as: 2010 WL 419999 (N.D.N.Y.))

Plaintiff's due process rights were in any way violated when Locastro interviewed Crozier to ascertain if there existed any mitigating circumstances occasioned by Plaintiff's mental health.

Therefore, it is recommended that these due process claims be **dismissed.**

### 2. *July 11, 2002 Disciplinary Hearing*

On July 11, 2002, Defendant Gummerson presided over a Disciplinary Hearing concerning three separate Misbehavior Reports all issued on July 9, 2002. Plaintiff alleges that on July 11, 2002, Defendants C. Clarke and S. Crozier "willfully and knowingly falsely told Gummerson that Benitez had refused to attend [the hearing]." Am. Compl. at ¶ 41. Benitez asserts that Gummerson

wilfully and wantonly commenced the hearing ... without making an attempt to interview [him] personally in order to ascertain (a) whether Benitez had been provided a copy of the misconduct reports ...; (b) whether Benitez had made a knowing, voluntary, and intelligent waiver of his right to attend the hearing; and (c) whether Benitez had been advised of the consequences of his failure to attend the hearing.

*Id.* at ¶ 42.

Furthermore, Plaintiff asserts that after he was found guilty of charges, Clarke and Crozier refused to provide him with a copy of the hearing disposition sheet. *Id.* at ¶ 44.

Defendants have provided a copy of a Waiver Form, dated July 11, 2002, signed by Defendant Crozier, which indicates that Plaintiff refused to attend the Hearing and also refused to sign the waiver form acknowledging such refusal. Defs.' 7.1 Statement, Ex. D, Waiver Form, dated July 11, 2002. Defendants have also submitted a copy of an Inter-Departmental Communication from Clarke to Gummerson, in which Clarke states that on July 11, 2002,

he delivered a copy of the disposition rendered in the July 11th Tier III Disciplinary Hearing as well as an appeal form to Benitez. *Id* ., Inter-Dep't Comm., dated July 11, 2002. Finally, a case data worksheet reflects that Plaintiff was provided copies of the three Misbehavior Reports on July 10, 2002. *Id.,* Case Data Worksheet, dated July 10, 2002.

**\*17** Beyond his own accusations, Plaintiff has offered nothing to rebut the Defendants' documentary case. *See* Pl.'s Mem. of Law at pp. 16-19. Although Plaintiff alleges that Gummerson knew that he did not have copies of the July 9th Misbehavior Reports because he was under Deprivation Orders and "that Clarke and Crozier had falsely notified him [on July 11, 2002] that Benitez had refused to attend the hearing," Pl.'s Mem. of Law at p. 17, there is nothing in the record to substantiate those claims. *See Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."). Furthermore, Plaintiff has offered no legal support for his conclusion that a hearing officer is required to personally interview an inmate in order to assure the voluntariness of his waiver of appearance, nor has the Court's research revealed any precedents supporting such conclusion. Therefore, because Plaintiff received a copy of the Misbehavior Report, waived his right to attend the Disciplinary Hearing, and was provided a copy of its disposition, it is recommended that these claims be **dismissed.***See Dawes v. Carpenter,* 899 F.Supp. 892, 897 (N .D.N.Y.1995) (citing *Boddie v. Connecticut,* 401 U.S. 371 (1971) for the proposition that "[d]ue process requires only that an accused have an opportunity to be heard, an opportunity that can be waived").

### 3. *July 16, 2002 Disciplinary Hearing*

Plaintiff makes similar allegations concerning his July 16, 2002 Disciplinary Hearing: (1) John Doe No. 7 denied him a copy of the Misbehavior Report; (2) Clarke and Considine "falsely told Defendant Wolcyzk [ ] that Benitez had refused to attend" the Disciplinary Hearing; (3) Wolcyzk "wantonly commenced the hearing without making an attempt to interview Benitez personally" in order to determine if his waiver was voluntarily and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 419999 (N.D.N.Y.)
(Cite as: 2010 WL 419999 (N.D.N.Y.))

intelligently made; and (4) Clarke and Crozier "refused to provide [him] a copy of the hearing disposition sheet." Am. Comp. at ¶¶ 45-47 & 49.

The July 16, 2002 Disciplinary Hearing concerned a Misbehavior Report issued against Plaintiff on July 10, 2002. Defs.' 7.1 Statement, Ex. E, Misbehavior Rep., dated July 10, 2002. Once again, Defendants have submitted documentary evidence that Plaintiff waived his right to be present at the Disciplinary Hearing and was provided a copy of the disposition. A "Refusal to Attend Hearing" Form, dated July 16, 2002, reflects that Plaintiff refused to attend the July 16 Tier III Hearing and also refused to sign the refusal form. *Id.,* Refusal to Attend Hr'g Form, dated July 16, 2002. Also in the record is an Inter-Departmental Communication from Clarke to Wolczyk indicating that he delivered Plaintiff a copy of Wolcyzk's disposition on July 17, 2002, as well as an appeal form. *Id.,* Inter-Dep't Comm., dated July 16, 2002. Finally, a Case Data Worksheet shows that Plaintiff was given a copy of the July 10 Misbehavior Report. *Id.,* Case Data Worksheet, dated July 11, 2002.

**\*18** Contrariwise, Plaintiff has offered no evidence in support of his allegations. Therefore, because Plaintiff has failed to show a material question of fact exists with respect to these due process claims, it is recommended that they be **dismissed.**

### F. Failure to Serve

Under Federal Rule of Civil Procedure 4(c)(1), the plaintiff is responsible for service of the summons and complaint for each defendant within a specified time period. Specifically, the plaintiff must effectuate service of process within 120 days of the filing of the complaint. FED. R. CIV. P. 4(m). FN16 Failure to properly serve any defendant in accordance with the Federal Rules will result in the court, upon motion or on its own initiative, to dismiss the case without prejudice as to that defendant. *Id.*

FN16. Under the Local Rules for the Northern District of New York, a plaintiff must effectuate service within sixty (60) days. N.D.N.Y.L .R.

4.1(b).

In this case, there is no indication that the Defendants John Does Nos. 1-7, and C.O. Smith FN17 were properly served. Because Plaintiff's claims against John Doe No. 7 and C.O. Smith lack merit, granting Plaintiff the opportunity to properly serve these unnamed Defendants would be futile. Thus, it is recommended that Plaintiff's claims against John Doe No. 7 and C.O. Smith be **dismissed.** As previously discussed, we have recommended that Plaintiff's claims against John Does Nos. 1-6 not be dismissed. Should the District Court adopt that recommendation, we will afford Plaintiff the opportunity to file a motion to amend his Amended Complaint in order to name John Does Nos. 1-6. If such motion is submitted and granted, we would at that time direct the effectuation of service on John Does Nos. 1-6.

FN17. C.O. Smith is named "R. Smith" on the Docket, but we have referred to him as "C.O. Smith" in order distinguish him from Defendant Nurse R. Smith. *See* Dkt. No. 106 at p. 4 n. 3. Nurse R. Smith has been served with process, Defendant C.O. Smith has not. Dkt. Nos. 13 & 37.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that the Defendants' Motion for Summary Judgment (Dkt. No. 118) be **GRANTED in part** and **DENIED in part** in accordance with the above opinion; and it is further

**RECOMMENDED,** that should the District Court adopt this Report-Recommendation, the only remaining Defendants will be Rourke and John Does Nos. 1-6; and it is further

**ORDERED,** that should the District Court adopt this

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 419999 (N.D.N.Y.)
(Cite as: 2010 WL 419999 (N.D.N.Y.))

Report-Recommendation, Plaintiff shall be afforded ***thirty (30) days*** from the date of such adoption to file a motion to amend his Amended Complaint in order to identify John Does Nos. 1-6, which shall include a proposed Second Amended Complaint attached thereto; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2010.
Benitez v. Locastro
Slip Copy, 2010 WL 419999 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Slip Copy, 2009 WL 890661 (N.D.N.Y.)
(Cite as: 2009 WL 890661 (N.D.N.Y.))

**C**  Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Anthony G. GILL, Plaintiff,
v.
F. CALESCIBETTA, et al., Defendants.
**No. 9:00-CV-1553 (GTS/DEP).**

March 31, 2009.

West KeySummary
**Federal Civil Procedure 170A  ☞  2497.1**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2497 Employees and Employment
Discrimination, Actions Involving
                    170Ak2497.1 k. In General. Most Cited
Cases
A triable issue of material fact existed with respect to a
former inmate's claim that he was terminated from his
mess hall job in retaliation for his filing of grievances,
in violation of his free speech rights. The officials claimed
the inmate was excused and removed from his position for
health reasons after having asthma attacks while in the
mess hall. However, the record revealed a significant
question of fact regarding the motivation for the inmate's
removal as he was removed very soon after filing the
grievances. In addition, the job removal could be
sufficiently adverse to deter a similarly situated person
from exercising rights guaranteed under the First
Amendment. Thus, summary judgment was precluded on
the issue of whether the job removal was an act of
retaliation. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. §
1983.

Anthony G. Gill, Bronx, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Michael G. McCartin, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

*DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court in this *pro se* prisoner civil
rights action are Defendants' motion for summary
judgment (Dkt. No. 45), and United States Magistrate
Judge David E. Peebles's Report-Recommendation
recommending that one of Plaintiff's retaliation claims be
dismissed, and that the remaining three retaliation claims
withstand dismissal (Dkt. No. 102). Neither party has filed
Objections to the Report-Recommendation. For the
reasons set forth below, the Report-Recommendation is
accepted and adopted in its entirety, and Defendants'
motion for summary judgment is granted in part and
denied in part.

**I. RELEVANT BACKGROUND**

On October 11, 2000, Plaintiff filed this action against
thirteen (13) individuals employed by the New York State
Department of Correctional Services, at Auburn
Correctional Facility. Although Plaintiff's Complaint
asserts a number of constitutional violations on the part of
these thirteen Defendants, the only claims that remain after
the Second Circuit's February 1, 2006, Summary Order are
Plaintiff's four (4) retaliation claims against five (5)
Defendants. (Dkt. No. 78.) [FN1] With regard to these
retaliation claims, generally, in his Complaint, Plaintiff
alleges that his rights under the First Amendments were
violated when Defendants retaliated against him on four
separate occasions for filing grievances. (*See generally*
Dkt. No. 1.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Slip Copy, 2009 WL 890661 (N.D.N.Y.)
(Cite as: 2009 WL 890661 (N.D.N.Y.))

FN1. The remaining Defendants in this action are F. Calescibetta, Sergeant Letourneau, R. French, B. Harrington, and Chris Pidlypchak. (*See* Dkt. No. 102, at 8.)

On April 16, 2001, Defendants filed their Answer to Plaintiff's Complaint. (Dkt. No. 26.) On October 11, 2002, Defendants filed a motion for summary judgment. (Dkt. No. 45.) On February 12, 2003, Plaintiff filed a response in opposition to Defendants' motion for summary judgment. (Dkt.Nos.60, 61.) On September 10, 2003, District Judge Joseph M. Hood issued a Memorandum-Decision and Order granting Defendants' motion for summary judgment and dismissing Plaintiff's Complaint with prejudice. (Dkt. No. 68.) On October 10, 2003, Plaintiff filed a Notice of Appeal to the Second Circuit from the Decision and Order. (Dkt. No. 73.) On February 1, 2006, the Second Circuit issued a Summary Order, affirming in part and remanding in part Judge Hood's Memorandum-Decision and Order. (Dkt. No. 78.) Specifically, the Second Circuit remanded Plaintiff's four (4) retaliation claims against the five (5) Defendants, with specific instruction that the Court "determine, in light of the Second Circuit's intervening decision of *Gill v. Pidlypchak,* 389 F.3d 379 (2d. Cir.2004), whether there exists a genuine issue of material fact as to whether defendants engaged in retaliatory conduct that would 'deter a similarly situated individual of ordinary firmness from exercising his constitutional rights.' " *Gill v. Calescibetta,* 157 F. App'x. 395 (2d Cir.2005). (*See also* Dkt. No. 78.)

In February 2007, the parties submitted supplemental briefing on the retaliation issue. (Dkt.Nos.94, 95.) In their brief, Defendants concede that triable issues of fact exist regarding the portion of Plaintiff's retaliation claim relating to the two periods of keeplock confinement he experienced. (Dkt. No. 95.) However, Defendants argue that the remaining two retaliation claims (which deal with the termination of Plaintiff's employment in the prison mess hall, and the posting of one of his grievances in the mess hall) should be dismissed. (Dkt. No. 95.)

**\*2** On March 11, 2009, Magistrate Judge Peebles issued

a Report-Recommendation recommending that Defendants' motion be granted in part and denied in part. (Dkt. No. 102.) Specifically, Magistrate Judge Peebles recommended (1) that Plaintiff's retaliation claim against Defendants Pidlypchak and Calescibetta relating to the posting of Plaintiff's grievances in the mess hall be dismissed, but (2) that Plaintiff's retaliation claim relating to his termination from employment in the prison mess hall be referred for trial, along with Plaintiff's two retaliation claims relating to his keeplock confinement.FN2 Familiarity with the grounds of the Report-Recommendation is assumed in this Decision and Order.

FN2. Because Defendants acknowledge that triable issues of fact exist with regard to the two incidents in which Plaintiff was placed in keeplock confinement after filing grievances, Magistrate Judge Peebles did not address the merits of these claims, but instead properly concluded that they are "ill-suited for resolution on motion for summary judgment." (Dkt. No. 102.)

## II. APPLICABLE LEGAL STANDARDS

### A. Standard of Review on Objection from Report-Recommendation

When specific objections are made to a magistrate judge's report-recommendation, the Court makes a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C).FN3 When only general objections are made to a magistrate judge's report-recommendation, the Court reviews the report-recommendation for clear error or manifest injustice. *See Brown v. Peters,* 95-CV-1641, 1997 WL 599355, at \*2-3 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) [collecting cases], aff'd without opinion, 175 F.3d 1007 (2d Cir.1999).FN4 Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See Batista v. Walker,* 94-CV-2826, 1995 WL 453299, at \*1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890661 (N.D.N.Y.)
(Cite as: 2009 WL 890661 (N.D.N.Y.))

[citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

> FN3. On *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g.*, *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

> FN4.*See also Vargas v. Keane,* 93-CV-7852, 1994 WL 693885, at *1 (S.D.N.Y. Dec.12, 1994) (Mukasey, J.) ("[Petitioner's] general objection [that a] Report ... [did not] redress the constitutional violations [experienced by petitioner] ... is a general plea that the Report not be adopted ... [and] cannot be treated as an objection within the meaning of 28 U.S.C. § 636."), aff'd, 86 F.3d 1273 (2d Cir.), *cert. denied,*519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (1996).

**B. Standard Governing Motion for Summary Judgment**

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett,* 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must come forward with "specific facts showing a genuine issue [of material fact] for trial." Fed.R.Civ.P. 56(e)(2).

**\*3** A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party." *Anderson,* 477 U.S. at 248. As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998) [citation omitted]; *see also*Fed.R.Civ.P. 56(e)(2). As the Supreme Court has famously explained, "[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts" [citations omitted].*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* [citation omitted].

Implied in the above-stated burden-shifting standard is the fact that, where a nonmoving party fails to adequately respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute-even if that nonmoving party is proceeding *pro se.*[FN5] (This is because

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890661 (N.D.N.Y.)
(Cite as: 2009 WL 890661 (N.D.N.Y.))

the Court extends special solicitude to the *pro se* litigant, in part by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.) [FN6] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules. [FN7] For this reason, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a moving party's statement to have been admitted where the nonmoving party has failed to properly respond to that statement [FN8] -even where the nonmoving party was proceeding *pro se* in a civil rights case. [FN9]

FN5. *Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

FN6. *Krug v. County of Rennselaer,* 04-CV-0640, 2006 WL 2669122, at *3 (N.D.N.Y. Sept.18, 2006) (McAvoy, J.) ("When dealing with a *pro se* party, certain procedural rules apply so as to insure that the *pro se* litigant in not disadvantaged by the lack of legal training. In this regard, the Local Rules require that [a *pro se* party be informed of the consequences of failing to respond to a motion for summary judgment, before those consequences may be imposed].") [citations omitted]; *see also Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996) ("This Court has also held that summary judgment should not be entered by default against a *pro se* plaintiff who has not been given any notice that failure to respond will be deemed a default.") [citations omitted]; *see also* Jessica Case, *"Pro Se Litigants at the Summary Judgment Stage: Is Ignorance of the*

*Law an Excuse?"* 90 Ky. L.J. 701, 704, n. 24 (Spring 2001) ("The Second, Fourth, Seventh, Tenth, Eleventh, and D.C. Circuit Courts of Appeals mandate that notice of summary judgment requirements be given to *pro se* litigants.... The Ninth Circuit requires notice of summary judgment requirements for *pro se* prisoner litigants only.") [citations omitted].

FN7. *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *McKaskle v. Wiggins,* 465 U.S. 168, 184, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) ("Nor does the Constitution require judges to take over chores for a *pro se* [litigant] that would normally be attended to by trained counsel as a matter of course."); *Mohasco Corp. v. Silver,* 447 U.S. 807, 826, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980) ("[I]in the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law [even when that strict adherence inures to the detriment of a *pro se* litigant]."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*"[P]ro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law.") [citation omitted]; *LoSacco v. City of Middletown,* 71 F.3d 88, 92 (2d Cir.1995) ("Although *pro se* litigants should be afforded latitude, ... they generally are required to inform themselves regarding procedural rules and to comply with them.... This is especially true in civil litigation.") [internal quotation marks and citations omitted]; *Edwards v. I.N.S.,* 69 F.3d 5, 8 (2d Cir.1995) ("[W]hile a *pro se* litigant's pleadings must be construed liberally, ... *pro se*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890661 (N.D.N.Y.)
(Cite as: 2009 WL 890661 (N.D.N.Y.))

litigants generally are required to inform themselves regarding procedural rules and to comply with them .") [citations omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ( "[T]he right [to benefit from reasonable allowances as a *pro se* litigant] does not exempt [the *pro se* ] party from compliance with relevant rules of procedural and substantive law.") [internal quotation marks and citations omitted].

FN8. Among other things, Local Rule 7.1(a)(3) requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L.R. 7.1(a)(3).

FN9.*See, e.g., Hassig v. N.Y.S. Dep't of Environmental Conservation,* 01-CV-0284, Decision and Order, at 7 (N.D.N.Y. filed March 4, 2004) (McAvoy, J.), *aff'd,*No. 04-1773, 2005 WL 290210 (2d Cir. Feb.2, 2005); *Lee,* 2004 U.S. Dist. LEXIS 20746, at *12-13, 15, *aff'd,* No. 04-1921, 2004 U.S.App. LEXIS 21432; *Harvey v. Morabito,* 99-CV-1913, 2003 WL 21402561, at *1, 3-4 (N.D.N.Y. June 17, 2003) (Sharpe, M.J.), *adopted by* 99-CV-1913, Order, at 2-3 (N.D.N.Y. filed Jan. 15, 2004) (Munson, J.), *aff'd,*No. 04-1008, 115 F. App'x 521 (2d Cir. Dec.23, 2004); *Krug,* 2006 WL 2669122, at *2-3;*Fox,* 2006 U.S. Dist. LEXIS 9147, at *2-3; *Singleton v. Caron,* 03-CV-0455, 2005 WL 2179402, at *3-4 (N.D.N.Y. Sept.5, 2005) (Peebles, M.J.), *adopted by* 03-CV-0455, 2006 WL 2023000, at *3 (N.D.N.Y. July 18, 2006) (Sharpe, J.); *Govan,* 289 F.Supp.2d at 295;*Butler v. Weissman,* 00-CV-1240, 2002 WL 31309347, at *3 (N.D.N.Y. June 20, 2002) (Sharpe, M.J.), *adopted by* 00-CV-1240, Decision and Order, at 1-2 (N.D.N.Y. filed July 22, 2002) (Kahn, J.); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 & n. 1 (N.D.N.Y.1999) (McAvoy, C.J.); *Costello v. Norton,* 96-CV-1634, 1998 WL 743710, at * 1, n. 2 (N.D.N.Y. Oct.21, 1998) (McAvoy, C.J.); *Squair v. O'Brien & Gere*

*Eng'rs, Inc.,* 96-CV-1812, 1998 WL 566773, at *1, n. 2 (N.D.N.Y. Aug.21, 1998) (Scullin, J.); *see also Monahan v. N.Y. City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing, in *pro se* civil rights case, district courts' discretion to adopt local rules like 7.1[a][3] "to carry out the conduct of its business").

### III. ANALYSIS

Neither party has objected to any portion of Magistrate Judge Peebles's Report-Recommendation. As a result, the Court reviews the entire Report-Recommendation under the "clear error" standard. After carefully reviewing all of the papers in this action, including Magistrate Judge Peebles's Report-Recommendation, the Court concludes that the Report-Recommendation is not clearly erroneous. Magistrate Judge Peebles employed the proper legal standards, accurately recited the established facts of this case, and reasonably applied the law to those facts. As a result, the Court accepts and adopts the Report-Recommendation in its entirety for the reasons stated therein.[FN10]

FN10. The Court notes that the Report-Recommendation would survive even a de novo review.

For example, Magistrate Judge Peebles correctly determined that filing a grievance is a protected activity, and that removal from a prison job may constitute adverse action under certain circumstances. In addition, Magistrate Judge Peebles correctly determined that there is a question of fact as to whether Plaintiff's removal from his prison job constitutes retaliation, given that he was removed from his job in the mess hall within close temporal proximity to his filing grievances relating to the conditions of the mess hall. This Court agrees with Magistrate Judge Peebles that it is quite possible that the motivation for Plaintiff's removal from his position in the mess hall was his asthma and/or asthmatic attack while in the mess hall kitchen recreation area. However, as Magistrate Judge Peebles also noted, the affidavit of Dr. Anthony Graceffo, submitted by Defendants in support of their motion for summary judgment, is evidence of a question of material

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890661 (N.D.N.Y.)
(Cite as: 2009 WL 890661 (N.D.N.Y.))

fact as to the motivation for Plaintiff's removal. As a result, the Court finds, for the same reasons as Magistrate Judge Peebles, that there is an issue of fact as to whether Plaintiff's removal was pretextual.

**\*4** For all of these reasons, the Court accepts and adopts the Report-Recommendation

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Peebles's Report-Recommendation (Dkt. No. 102) is ***ACCEPTED*** and ***ADOPTED*** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 45) is ***GRANTED* in part and *DENIED* in part;** and it is further

**ORDERED** that Plaintiff's retaliation claim relating to his termination from employment in the prison mess hall survive Defendants' motion for summary judgment and be referred for trial, along with Plaintiff's two retaliation claims relating to his keeplock confinement.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Anthony Gill, a former New York State prison inmate who is not unfamiliar to the federal court system, having instituted a host of suits in this and other districts while incarcerated, has commenced this proceeding pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights. Although his complaint originally contained a significantly broader array of assertions, plaintiff's claims have since been winnowed down to four separate instances of alleged retaliation on the part of various of the defendants, in violation of his rights under the First Amendment.

Following the entry of summary judgment dismissing all of plaintiff's claims and a subsequent partial reversal of the resulting judgment by the United States Court of Appeals for the Second Circuit, the action is now back before this court for consideration of plaintiff's remaining retaliation claims. Procedurally, the matter is being considered by the court as a renewal of defendants' earlier-filed summary judgment motion. Both parties have submitted supplemental briefing in connection with the four remaining claims, and specifically addressing whether one or more of them can be disposed of on summary judgment as a matter of law.

Having carefully considered the parties' submissions, in light of the standard under which retaliation claims are reviewed, I recommend a finding that while one of plaintiff's retaliation claims is susceptible of resolution on motion for summary judgment, triable issues of material fact exist with respect to the remaining three, and accordingly that the action proceed to trial in connection with those claims.

I. *BACKGROUND*[FN1,FN2]

FN1. Because only plaintiff's retaliation causes of action remain in the case, I will recount only the facts giving rise to those claims.

FN2. In light of the procedural posture of the case the following recitation is drawn from the record now before the court, with all inferences drawn, and ambiguities resolved, in favor of the plaintiff. *See Wells-Williams v. Kingsboro Psychiatric Ctr.,* No. 03-CV-134, 2007 WL 1011545, at \*2 (E.D.N.Y. Mar. 30, 2007) (citations omitted). It should be noted, however, that many if not most of plaintiff's allegations are sharply contested by the defendants.

Plaintiff is a former prison inmate previously entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"); at the times relevant to his claims plaintiff was designated to the Auburn Correctional Facility ("Auburn"), located in Auburn, New

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890661 (N.D.N.Y.)
(Cite as: 2009 WL 890661 (N.D.N.Y.))

York. *See generally* Complaint (Dkt. No. 1). On July 17, 2000 Gill, who is a non-smoker claiming to suffer from chronic asthma and sinus ailments, began working in the prison mess hall where, apparently consistent with the DOCS policy regarding the use of tobacco products, "no smoking" signs are posted in various locations. Complaint (Dkt. No. 1) ¶¶ 3-5. Plaintiff maintains that despite those notices and the underlying policy prohibiting such conduct, various defendants repeatedly smoked cigarettes in the mess hall area during their shifts, and additionally allowed inmates to smoke in the kitchen recreation areas, forcing Gill to be exposed to secondhand smoke, or environmental tobacco smoke ("ETS"). *Id.* at ¶¶ 8-12.

**\*5** On August 7 and 8, 2000, while in the mess hall kitchen recreation area, plaintiff experienced two severe asthma attacks, requiring hospitalization and resulting in his being placed on "excuse from work" ("EFW") status by medical personnel at the facility. Complaint (Dkt. No. 1) at ¶ 13. Gill also contends he suffered from headaches during and after working in the mess hall area. *Id.* at ¶ 16.

Plaintiff filed a grievance on or about August 11, 2000, complaining of defendants' lax enforcement of the DOCS "no-smoking" policy in Auburn's mess hall and his resulting exposure to ETS. Complaint (Dkt. No. 1) at ¶ 14 and Exh. C. Plaintiff maintains that in retaliation for the filing of that grievance, defendant Calescibetta lodged a false misbehavior report against him, resulting in Gill's placement in keeplock confinement for a period of sixteen days.[FN3] *Id.* at ¶¶ 15, 19, 23, 25-26, 51 and Exh. C. Upon his release from restricted confinement on August 30, 2000, plaintiff returned to his position at the mess hall, where he worked until on or about September 17, 2000. *Id.* at ¶¶ 27, 44-45.

> **FN3.** Keeplock is a form of confinement restricting an inmate to his or her cell, separating the inmate from others, and depriving him or her of participation in normal prison activities. *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989); *Warburton v. Goord,* 14 F.Supp.2d 289, 293 (W.D.N.Y.1998) (citing *Gittens* ); *Tinsley v. Greene,* No. 95-CV-1765, 1997 WL 160124, at \*2 n. 2 (N.D.N.Y. Mar. 31, 1997) (Pooler, D.J. & Homer, M.J.) (citing, *inter alia,*

*Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995)). Inmate conditions while keeplocked are substantially the same as in the general population. *Lee v. Coughlin,* 26 F.Supp.2d 615, 628 (S.D.N.Y.1998). While on keeplock confinement an inmate is confined to his or her general population cell for twenty-three hours a day, with one hour for exercise. *Id.* Keeplocked inmates can leave their cells for showers, visits, medical exams and counseling, and can have cell study, books and periodicals. *Id.* The primary difference between keeplock and the general population confinement conditions is that keeplocked inmates do not leave their cells for out-of-cell programs, and are usually allowed less time out of their cells on the weekends. *Id.*

Following his release from keeplock confinement Gill was pressed by prison officials, including defendants Letourneau, Harrington and French, to withdraw his grievance regarding ETS exposure. *See, e.g.* Complaint (Dkt. No. 1) ¶¶ 33, 35-37. Plaintiff asserts that as a result of his refusal to accede to that request defendants Letourneau and Harrington caused him again to be placed in keeplock confinement, this time for an additional fifteen days. *Id.* at ¶¶ 33, 35-38, 40, 63.

Plaintiff's complaint alleges two additional instances of alleged retaliation. According to Gill, he was discharged from his prison mess hall position by defendant Letourneau in September of 2000 in retaliation for his having filed grievances, and was informed that he was no longer permitted into the mess hall area in light of his asthma. Complaint (Dkt. No. 1) ¶¶ 46, 71; *see also* Plaintiff's Rule 7.1(a)(3) Statement (Dkt. No. 60) ¶ 26. Plaintiff also asserts that on September 25, 2000, again in retaliation for having filed grievances, defendants Pidlypchak and Calescibetta obtained a copy of one of his grievances and posted it in the mess hall area for review by those in general inmate population. *Id.* at ¶¶ 48, 77.

## II. *PROCEDURAL HISTORY*

Despite its age and somewhat tortured history, the salient portions of the suit's procedural history can be succinctly

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890661 (N.D.N.Y.)
(Cite as: 2009 WL 890661 (N.D.N.Y.))

summarized. Plaintiff commenced the action on October 11, 2000, Dkt. No. 1. As defendants, plaintiff's complaint names Corrections Officers Calescibetta, Pidlypchak, Mattes, Harvey, French and Harrington; Corrections Sergeants M. Murray and Letourneau; Lieutenant Ashby; Edward A. Dann, Deputy Superintendent for Security; Captain G. Gummerson; Auburn Superintendent Hans Walker, and Inmate Grievance Program Supervisor Cheryl Parmiter. *Id.* Plaintiff's complaint asserts a variety of claims arising under the First, Eighth and Fourteenth Amendments, as well as the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*

**\*6** On October 11, 2002 defendants moved for the entry of summary judgment in their favor on each of plaintiff's claims. Dkt. No. 45. That motion, which was vigorously opposed by the plaintiff, resulted in the issuance of a decision and order on September 10, 2003 by District Judge Joseph M. Hood, sitting by designation, granting the motion and dismissing plaintiff's complaint in its entirety, with prejudice. Dkt. No. 68. Addressing plaintiff's claims of retaliation, which are the focus of this report, Judge Hood found that plaintiff did not establish that defendants' actions, allegedly prompted by retaliatory animus, had the desired effect of deterring Gill from exercising his protected First Amendment rights, particularly in light of his prodigious history of litigation and filing of countless inmate grievances. Decision and Order (Dkt. No. 68) at pp. 11-13. Believing such actual chilling to be a prerequisite to a finding of unlawful retaliation, Judge Hood ordered dismissal of the retaliation claims as a matter of law. *Id* . Judgment was subsequently entered on September 10, 2003, dismissing plaintiff's retaliation claims as well as the balance of his complaint based upon Judge Hood's decision. Dkt. No. 69.

Plaintiff appealed the judgment of dismissal to the United States Court of Appeals for the Second Circuit. Dkt. No. 73. In a summary order issued on December 7, 2005, that court affirmed the district court's determination except as to plaintiff's First Amendment retaliation claims. *Gill v. Calescibetta,* 157 Fed. Appx. 395 (2d Cir.2005) (unpublished disposition); *see also* Dkt. No. 78 (mandate). Addressing plaintiff's retaliation claims, the Second Circuit noted that "in the narrow context of prisoner retaliation suits, a prisoner need not demonstrate 'actual chill[,]' " citing its opinion in *Gill v. Pidlypchak,* 389 F.3d

379, 384 (2d Cir.2004), which post-dated Judge Hood's decision. *Gill,* 157 Fed. Appx. at 397. The Second Circuit remanded the matter to this court for evaluation of whether defendants subjected Gill to a sufficiently adverse action to constitute retaliation, describing the necessary inquiry as limited to determining whether "there exists a genuine issue of material fact as to whether defendants engaged in retaliatory conduct that would 'deter a similarly situated individual of ordinary firmness from exercising his [or her] constitutional rights.' " *Id.* (citing *Gill,* 389 F.3d at 381).

This lingering issue, which was the subject of supplemental briefing by the parties, *see* Dkt. Nos. 94-95, and involves only defendants Calescibetta, Letourneau, French, Harrington and Pidlypchak, is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U .S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).[FN4] *See* Fed.R.Civ.P. 72(b); *see also* Dkt. No. 93.

> **FN4.** I previously recommended that this matter be dismissed, based on plaintiff's repeated failure to notify the court of changes in his current address, pursuant to Local Rule 41.2(b). Dkt. No. 97. Since the issuance of that recommendation, however, plaintiff has resumed compliance with this court's local rules and has supplied the court with his address changes on several occasions. *See* Dkt. Nos. 99, 101. Accordingly, my prior recommendation was withdrawn, and this matter was returned to me for further review regarding plaintiff's retaliation claims. *See* Text Order dated February 20, 2008.

III. *DISCUSSION*

A. *Failure To Provide Discovery*

**\*7** In his supplemental briefing Gill complains of defendants' failure to answer interrogatories propounded by him on March 13, 2006, shortly after the remand of this matter by the Second Circuit. *See* Plaintiff's Supplemental

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890661 (N.D.N.Y.)
(Cite as: 2009 WL 890661 (N.D.N.Y.))

Brief (Dkt. No. 94) at pp. 6-7. In deference to his *pro se* status, I have construed this portion of plaintiff's brief as interposing an objection to the granting of summary judgment based upon the defendants' failure to provide discovery, pursuant to Rule 56(f) of the Federal Rules of Civil Procedure.

Rule 56(f) states that

> [s]hould it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such order as is just.

Fed.R.Civ.P. 56(f). As can be seen, Rule 56(f) provides a narrow exception to the availability of summary judgment in instances where a party simply cannot fairly respond to a summary judgment motion because of the inability, through no fault of the opposing party, to acquire evidence which is available and would preclude the entry of summary judgment. *See Burlington Coat Factory Warehouse Corp. v. Esprit de Corp.,* 769 F.2d 919, 925-27 (2d Cir.1985); *Crystalline H₂O, Inc. v. Orminski,* 105 F.Supp.2d 3, 6-9 (N.D.N.Y.2000) (McAvoy, J.). In order to successfully assert a Rule 56(f) defense to a summary judgment motion a litigant must provide specific indication of the evidence sought, its relevance to the issues underlying the motion, the efforts that were made to attain that evidence, and why those efforts have been unsuccessful. *Hudson River Sloop Clearwater, Inc. v. Department of Navy,* 891 F.2d 414, 422 (2d Cir.1989) (citing *Burlington,* 769 F.2d at 926-27);*Young v. Corbin,* 889 F.Supp. 582, 584-85 (N.D.N.Y.1995) (McAvoy, C.J.).

In this case, as defendants appropriately note, discovery closed February 22, 2002 under the court's case management order issued pursuant to Rule 16 of the Federal Rules of Civil Procedure. Dkt. No. 30; *see also* Northern District of New York Local Rule 16.2. I note, moreover, that plaintiff's interrogatories were improperly

served at a point in time when the case was stayed by order of District Judge Lawrence E. Kahn, issued on March 6, 2006, Dkt. No. 82, and were appropriately disregarded by the defendants for both of these reasons.[FN5]*Zhao v. City of New York,* No. 07 Civ. 3636(LAK)(MHD), 2008 WL 2940598, at *1 (S.D.N.Y. July 24, 2008) (untimeliness of discovery request in violation of case management order sufficient basis for denial).

> **FN5.** The service of plaintiff's interrogatories was followed with a request by him to the court, dated March 13, 2006, for permission to serve additional interrogatories exceeding the twenty-five question limit imposed under Rule 33 of the Federal Rules of Civil Procedure. Dkt. No. 83. That request was denied by text order issued on March 23, 2006 with the added notation "[t]his action was STAYED in its entirety by Order of Judge Kahn filed on 3/9/06." *See* 3/23/06 Text Order.

This action has been pending for more than eight years, and discovery has been closed for seven. Rather than adding an element to the retaliation standard, in which case Gill legitimately could claim a need for further discovery, the Second Circuit's decision eliminated what was thought by the district court to be a required showing, but did not otherwise alter the standard to be applied. Under these circumstances, I recommend that plaintiff's request for additional discovery be denied, and that the court determine that defendants' failure to answer Gill's interrogatories presents no impediment to the issuance of a decision on the balance of the pending summary judgment motion.

B. *Summary Judgment Motion Standard*

**\*8** Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890661 (N.D.N.Y.)
(Cite as: 2009 WL 890661 (N.D.N.Y.))

56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A moving party seeking the entry of summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507-08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only

when "there can be but one reasonable conclusion as to the verdict").

## C. Retaliation

**\*9** Though often challenging in its application, the standard under which retaliation claims such as those raised by Gill are gauged is by now well-established, and easily articulated. When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588-90 (2d Cir.1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds,* *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (same).

When analyzing retaliation claims, courts resort to the burden shifting algorithm established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and its progeny including, *inter alia, St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). *See Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 76-77 (2d Cir.2001); *Graham v. Long Island R.R.,* 230 F.3d 34, 38 (2d Cir.2000); *Heinemann v. Howe and Rusling,* 529 F.Supp.2d 396, 405 (W.D.N.Y.2008). Under that model, the plaintiff bears the initial burden of demonstrating a *prima facie* case of discrimination utilizing the standard set forth above. *Holtz,* 258 F.3d at 76-77. Upon the establishment of such a *prima facie* case, the burden of going forward shifts to the defendant to articulate a legitimate non-discriminatory reason for taking the action under consideration. *Brock v. Casey Truck Sales, Inc.,* 839 F.2d 872, 876 (2d Cir.1988). Once such a reason has been cited, the burden of production reverts to the plaintiff, who retains the ultimate burden of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890661 (N.D.N.Y.)
(Cite as: 2009 WL 890661 (N.D.N.Y.))

establishing both pretext and that retaliation was a motivating factor in the determination, by a preponderance of evidence. *Holtz,* 258 F.3d at 77. *See also, Brock,* 839 F.2d at 876.

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted). In the prison context, an "adverse action" is considered retaliatory when it "would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill,* 389 F.3d at 381 (quotations and citations omitted).

**\*10** Analysis of retaliation claims thus requires careful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case-specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to the entry of summary judgment dismissing plaintiff's retaliation claims. *Flaherty,* 713 F.2d at 13.

In his complaint, Gill asserts four separate allegations of retaliatory conduct, claiming that (1) defendant

Letourneau discharged him from his prison job at the Auburn mess hall in retaliation for his filing of grievances, Complaint (Dkt. No. 1) at ¶¶ 46, 71; (2) defendants Pidlypchak and Calescibetta obtained one of his grievances and displayed it in the mess hall area in retaliation for Gill's filing of grievances, *id.* at ¶¶ 48, 77; (3) defendant Calescibetta filed a false misbehavior report against him and placed him in keeplock confinement for sixteen days, in retaliation for his filing of grievances regarding the underenforcement of Auburn's smoking policy, Complaint (Dkt. No. 1) at ¶¶ 15, 19-20, 23, 25-26, 51 and Exh. C; and (4) defendants Letourneau and Harrington placed him in keeplock confinement for fifteen days for refusing to withdraw a filed grievance, *id.* at ¶¶ 33, 35-38, 40, 63. In their supplemental brief, defendants acknowledge the existence of triable fact issues surrounding the portion of plaintiff's retaliation cause of action related to the two periods of keeplock confinement, but argue that the remaining two retaliation claims, addressing the termination of his employment in the prison mess hall and the posting of one of his grievances, are subject to dismissal as a matter of law and that no reasonable factfinder could find otherwise.

*1. Removal Of The Plaintiff From His Prison Job*

While plaintiff maintains that he was removed from his job in the prison mess hall as a direct consequence of his filing of grievances, defendants contend that Gill was excused and removed from his position for health reasons after sustaining asthma attacks, headaches, and sinus ailments while present in the mess hall or shortly after leaving, and that no reasonable factfinder could conclude otherwise. Defendants' Supplemental Memorandum (Dkt. No. 95) at p. 5. According to defendants, Gill's removal could not constitute adverse action because the discharge occurred to safeguard his health and to address his multiple grievances related to smoking in the mess hall. *Id.*

It is well-established, as defendants seemingly acknowledge, that the filing by plaintiff's filing of numerous grievances complaining of smoking in the mess hall is protected activity sufficient to satisfy the first element of a retaliation cause of action. *See Graham,* 89 F.3d at 80. The analysis of plaintiff's retaliation claim thus turns upon whether the termination of his mess hall job

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890661 (N.D.N.Y.)
(Cite as: 2009 WL 890661 (N.D.N.Y.))

assignment constituted a sufficiently adverse action, and whether he can establish the requisite link between his filing of grievances, as a protected activity, and that action.

**\*11** The termination of a job assignment can under circumstances constitute adverse action, for purposes of the retaliation analysis. *Baker v. Zlochowon,* 741 F.Supp. 436, 439 (S.D.N.Y.1990) ("a claim for relief can be stated under section 1983 for job for reassignments or terminations which were in retaliation for an inmate's efforts to seek vindication of his [or her] legal rights ..."); *see also Gill v. Mooney,* 824 F.2d 1235, 1248-49 (2d Cir.1987); *Jackson v. Cain,* 864 F.2d 1235, 1248-49(5th Cir.1989)* "[A]ny 'otherwise routine administrative decision,' made in retaliation for the exercise of constitutional rights could give rise to a cause of action." *Baker,* 741 F.Supp. at 439, (quoting *Gill v. Mooney,* 824 F.2d at 194). In this instance a reasonable factfinder could conclude that the termination of plaintiff's mess hall position was sufficiently adverse to deter a similarly situated person of ordinary firmness from exercising rights guaranteed under the First Amendment. *Davis v. Artuz,* 133 F.3d 906, 1998 WL 29763, \*1 (2d Cir.1998); *see also Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (citing, *Flaherty,* 1713 F.2d at 14).

The critical issue, then, is establishment of a nexus between the two. In this instance a *prima facie* case of retaliation has been stated; the close proximity in time between the filing of grievances and plaintiff's removal from his mess hall position alone could suffice to meet this relatively modest burden. *Ayers v. Stewart,* 101 F.3d 687, 1997 WL 34609, at \*1 (2d Cir.1999); *see also Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (citing *Flaherty,* 713 F.2d at 14).

In response to plaintiff's retaliation claim, defendants maintain that Gill was removed from his position due to his health condition, and in response to his complaints regarding lack of enforcement of the smoking policy. Defendants' Supplemental Memorandum (Dkt. No. 95) at p. 5. Plaintiff asserts that this proffered reason is pretextual, and that retaliation was the true motivating factor.

The record reveals a significant question of fact regarding the motivation for plaintiff's removal from his mess hall position. While a reasonable factfinder could conclude that plaintiff was removed from his mess hall position due to his asthma, that result is not necessarily compelled. In an affidavit given in support of plaintiff's original summary judgment motion by Dr. Anthony Graceffo, a clinical physician employed by the DOCS and assigned to Auburn, it is noted that while Gill complained of respiratory problems and asthma attacks on numerous occasion to prison medical officials, he never mentioned alleged exposure to ETS at the Auburn mess hall, adding that "[i]f [Gill] had made it known to the medical staff that he was being exposed to second-hand smoke in the messhall [sic], and that second-hand smoke exacerbated his respiratory problems, the medical staff very likely would have investigated the conditions at the mess hall, inquired of the facility administration about the alleged underenforcement of DOCS' strict no-smoking policy, and if necessary, restricted Gill's employment so that he would not continue to be exposed to second-hand smoke." Graceffo Aff. (Dkt. No. 47) ¶¶ 1, 10. Tellingly, there is no indication in the record that any such investigation was made.

**\*12** Based upon the record now before the court, a reasonable factfinder could conclude that plaintiff's removal from his mess hall position was improperly motivated by the filing of his grievances. Accordingly, I recommend against dismissal of this aspect of plaintiff's retaliation claim as a matter of law. *Contrast Crenshaw v. Herbert,* 445 F.Supp.2d 301, 303-04 (W.D.N.Y.2006) (finding that inmate was not subject to retaliation when he was removed from certain prison jobs after filing a grievance where the record revealed that he was removed from his nurse's aide position due to his own fears for his safety, and his laundry job for poor performance).

2. *The Posting Of Plaintiff's Grievance*

Plaintiff further argues that defendants Calescibetta and Pidlypchak retaliated against him by posting one of his grievances in the Auburn mess hall. Defendants contend that even assuming plaintiff's allegations are true, at most the implication created by the posting of plaintiff's grievance is that he has been labeled a "snitch" or an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890661 (N.D.N.Y.)
(Cite as: 2009 WL 890661 (N.D.N.Y.))

informant, a matter which is not considered an adverse action under the relevant case law.

A statement uttered by a prison official, in retaliation for protected activity, reasonably calculated and intended to incite inmates, prisoners, or fellow corrections workers to retaliate against an inmate can form the basis for a cognizable retaliation claim under section 1983. *Islam v. Goord,* No. 05 Civ. 7502(RJH) 2006 WL 2819651, at *5 (S.D.N.Y. September 29, 2006) (citing *Williams v. Muller,* No. 99 Civ. 1680(SAS) 2001 WL 936297, at *4 (S.D.N.Y. March 16, 2002). Not every statement made by a prison guard regarding an inmate's exercise of free speech, however, constitutes adverse action under the applicable retaliation analysis. *Dawes,* 239 F.3d at 493. Rather, "[a]bsent some factual showing that the comments by the prison officials actually risked inciting other inmates against [the plaintiff]" *id.,* a court should not assume that other inmates would be incited to attack the plaintiff for complaining about a prison guard's conduct. *See Dawes,* 235 F.3d 489 (finding that a prison guard telling other inmates that plaintiff was an informant does not constitute adverse action); *see also Morales v. Mackalm,* 278 F.3d 126, 131-32 (2d Cir.2002), *abrogated on other grounds, Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (asserting that prison official's labeling plaintiff a "stoolie" in the presence of other inmates was not adverse action).

Analogous to those cases involving verbal harassment by prison officials, which is not actionable in the absence of resulting physical harm to a plaintiff, the mere posting of a grievance in the Auburn prison mess hall, although perhaps supporting the implication that the plaintiff is a complainer or a snitch, without more, likely would not deter a similarly situated individual of ordinary firmness from filing grievances. *See, e.g., Snyder v. McGinnis,* No. 03-CV-0902, 2004 WL 1949472, at *11 (W.D.N.Y. Sept. 2, 2004) (finding that inmate's retaliation claim against prison official who publically referred to plaintiff as a "snitch" and a child molester must fail because plaintiff failed to allege that he was subsequently physically harmed by his fellow inmates); *Williams v. Muller,* No. 98 CIV. 5204, 2001 WL 936297, at *4 (S.D.N.Y. Aug. 17, 2001) (holding that prison official's alleged spreading of rumors intended to incite inmates to harm plaintiff was insufficient to support a retaliation claim in the absence of

physical harm to plaintiff).

**\*13** Although Gill claims, in markedly conclusory terms, that his "life, safety and well-being" were in "grave danger" as a result of defendants' posting his grievance regarding their lack of enforcement of the prison smoking ban amidst a prison population comprised primarily of smokers, *see* Complaint (Dkt. No. 1) ¶ 48, the record is devoid of any evidence that defendants' actions actually prompted other inmates to harm him. In that regard, the record lacks evidence that he was assaulted by other inmates or sustained any physical injuries because others believe him to be an informant. In fact, Gill testified at his deposition that after the grievance was posted, no inmates or employees of DOCS inflicted any harm on him. Goglia Decl. (Dkt. No. 46) (Gill Dep. Tr.) at pp. 121-22. Although he claims that he was "indirectly" threatened after the posting of the grievance, Gill is unable to name any individuals who initiated these threats, nor does he make any allegations beyond the claim that these unidentified inmates called him "a rat and a snitch." *Id.* at 122-23.

Based on the foregoing, I recommend a finding that the mere posting by defendants Calescibetta and Pidlypchak of plaintiff's ETS grievance, without more, did not constitute adverse action, and that no reasonable factfinder could conclude otherwise. I therefore recommend dismissal of this aspect of plaintiff's retaliation claim.

### C. *Qualified Immunity*

Defendant Letourneau, the only defendant implicated in this portion of plaintiff's retaliation claim, asserts that he is entitled to qualified immunity with respect to plaintiff's allegation that he was fired from his job in the prison mess hall for filing a grievance regarding the prison nonsmoking policy.

Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890661 (N.D.N.Y.)
(Cite as: 2009 WL 890661 (N.D.N.Y.))

*Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (citations omitted). Accordingly, governmental officials sued for damages "are entitled to qualified immunity if 1) their actions did not violate clearly established law, or 2) it was objectively reasonable for them to believe that their actions did not violate such law." *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir.1999) (citing *Salim v. Proulx,* 93 F.3d 86, 89 (2d Cir.1996)); *see also Zellner v. Summerlin,* 494 F.3d 344, 367 (2d Cir.2007); *Iqbal v. Hasty,* 490 F.3d 143, 152 (2d Cir.2007). The law of qualified immunity seeks to strike a balance between overexposure by government officials to suits for violations based upon abstract rights and an unduly narrow view which would insulate them from liability in connection with virtually all discretionary decisions. *Locurto v. Safir,* 264 F.3d 154, 162-63 (2d Cir.2001); *Warren,* 196 F.3d at 332. As the Second Circuit has observed,

**\*14** [q]ualified immunity serves important interests in our political system, chief among them to ensure that damages suits do not unduly inhibit officials in the discharge of their duties by saddling individual officers with personal monetary liability and harassing litigation.

*Provost v. City of Newburgh,* 262 F.3d 146, 160 (2d Cir.2001) (internal quotations omitted) (citing, *inter alia, Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics,* 456 F.2d 1339, 1348 (2d Cir.1972)).

Until recently, it was generally agreed that a proper qualified immunity analysis entailed a three step inquiry. *Harhay v. Town of Ellington Bd. of Educ.,* 323 F.3d 206, 211-12 (2d Cir.2003). As a threshold matter a court considering the issue was charged with first determining whether, based upon the facts alleged, the plaintiff had facially established a constitutional violation. *Id .; Gilles v. Repicky,* 511 F.3d 239, 243-44 (2d Cir.2007). If the answer to this inquiry was in the affirmative, then the focus turned to whether the right in issue was clearly established at the time of the alleged violation. *Id.* (citing *Saucier v. Katz,* 533 U.S. 194, 201-02, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001)); *see also Poe v. Leonard,* 282 F.3d 123, 132-33 (2d Cir.2002). Finally, upon determining that the plaintiff had a clearly established, constitutionally protected right which was violated, the

court next considered whether it was nonetheless objectively reasonable for the defendant to believe that his or her action did not abridge that established right. *Harhay,* 323 F.3d at 211;*Poe,* 282 F.3d at 133 (quoting *Tierney v. Davidson,* 133 F.3d 189, 196 (2d Cir.1998) (quoting, in turn, *Salim,* 93 F.3d at 89)).

The United States Supreme Court recently had the opportunity to reconsider the analysis prescribed in *Saucier,* holding that while the sequence of the inquiry set forth in that case is often appropriate, it should no longer be regarded as compulsory. *Pearson v. Callahan,* 555 U.S. ----, 129 S.Ct. 808, 172 L.Ed.2d 565, 2009 WL 128768, at *9 (Jan. 21, 2009). In *Pearson,* the Court reasoned that while the *Saucier* protocol promotes the development of constitutional precedent and is "especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable," the rigidity of the rule comes with a price. *Id.* at *10, 129 S.Ct. At 818. The Court noted, for example, that the inquiry often wastes both scarce judicial and party resources on challenging questions that have no bearing on the outcome of the case. *Id.* Given that the intended purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Court opined that the rigid catechism prescribed by Saucier may serve to defeat this goal by requiring the parties "to endure additional burdens of suit-such as the cost of litigating constitutional questions and delays attributable to resolving them-when the suit otherwise could be disposed of more readily." *Id.* (quotations and citations omitted). As a result of its reflection on the matter, the Pearson Court concluded that because the judges of the district courts and courts of appeals "are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the ... prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Id.* at *9, 129 S.Ct. at 818.

**\*15** I have already found that a plausible claim of unlawful retaliation has been alleged based upon plaintiff's removal from his mess hall position. The constitutional right at issue-the First Amendment right to be free from

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890661 (N.D.N.Y.)
(Cite as: 2009 WL 890661 (N.D.N.Y.))

retaliation in return for having engaged in protected activity-was clearly established at the time of the alleged violation in April of 2006. *Rivera v. Senkowski,* 62 F.3d 80, 85 (2d Cir.1995) (citing *Franco,* 854 F.2d at 589-90). From the limited record now before the court, I discern no basis to conclude that defendant Letourneau would have been reasonable in his belief that terminating plaintiff from his job in the prison mess hall, in retaliation for Gill having engaged in protected activity in the form of filing grievances, did not violate plaintiff's First Amendment rights. Accordingly, I recommend a finding at this juncture that defendant Letourneau is not entitled to qualified immunity from suit, though with leave to raise the issue at trial.[FN6] *See id.* at 85-86.

> FN6. In light of my determination on the merits I have not engaged in a separate qualified immunity analysis regarding the portion of plaintiff's retaliation claim growing out of the posting of his grievance.

IV. *SUMMARY AND RECOMMENDATION*

Currently under consideration are retaliation claims by Gill against five of the defendants in this case. Of the four remaining claims, defendants concede that two present triable issues of fact, making them ill-suited for resolution on motion for summary judgment. Of the remaining two, I find the existence of triable issues of fact regarding the claim arising out of plaintiff's removal from his mess hall position, precluding the entry of summary judgment on that claim, but conclude that no reasonable factfinder could determine that the posting of plaintiff's grievance in the mess hall was sufficiently adverse to deter a similarly situated person of ordinary firmness from engaging in protected activity under the First Amendment, and thus recommend summary dismissal of that claim as a matter of law.

Based upon the foregoing it is therefore hereby

RECOMMENDED, that defendants' motion for summary judgment (Dkt. No. 45), to the extent that it relates to the remaining retaliation claims, be GRANTED, in part, and

that plaintiff's claim against defendants Pidlypchak and Calescibetta, related to the posting of grievances in the mess hall, be dismissed, but that the remaining three retaliation causes of action, against defendants Calescibetta, Letourneau, French, and Harrington, be referred for trial based upon the existence of genuinely disputed issues of material fact which must be resolved before those claims can be adjudicated.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2009.
Gill v. Calescibetta
Slip Copy, 2009 WL 890661 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C**   Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
No. 97-CV-1385 LEK DRH.

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. See Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN1]

FN1. This matter was referred to the undersigned
pursuant to 28 U.S.C. § 636(b) and
N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments.[FN2] In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

## I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. Id. at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. Id. at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. Id. at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. Id. at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. Id. at ¶¶ 22, 27-28.

## II. Motion to Dismiss

**\*2** When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Staron v. McDonald's Corp., 51 F.3d 353, 355 (2d Cir.1995) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir.), cert. denied, 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

## III. Discussion

### A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); Rhodes v. Chapman, 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. Farmer, 511 U.S. at 837.

### 1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes,* 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. Compare *Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and* *Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with* *Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare

Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,*524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

*4 Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

### B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware that* there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at *3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at *3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

### V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Karus LAFAVE, Plaintiff,
v.
CLINTON COUNTY, Defendants.
**No. CIV.9:00CV0744DNHGLS.**

April 3, 2002.

Karus Lafave, Plaintiff, Pro Se, Plattsburgh, for the Plaintiff.

Maynard, O'Connor Law Firm, Albany, Edwin J. Tobin, Jr., Esq., for the Defendants.

REPORT-RECOMMENDATION [FN1]

FN1. This matter was referred to the undersigned for Report-Recommendation by the Hon. David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and L.R. 72.3(c).

SHARPE, Magistrate J.

I. INTRODUCTION

*1 Plaintiff, *pro se,* Karus LaFave ("LaFave") originally filed this action in Clinton County Supreme Court. The defendant filed a Notice of Removal because the complaint presented a federal question concerning a violation of LaFave's Eighth Amendment rights (Dkt. No. 1). Currently before the court is the defendant's motion to dismiss made pursuant to Rule 12(b)(6) and in the alternative, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure (Dkt. No. 5). LaFave, in response, is

requesting that the court deny the motion, excuse his inability to timely file several motions, and to permit the matter to be bought before a jury [FN2]. After reviewing LaFave's claims and for the reasons set forth below, the defendant's converted motion for summary judgment should be granted.

FN2. It should be noted that the date for dispositive motions was February 16, 2001. The defendant's motion to dismiss was filed on September 29, 2000. On January 9, 2001, this court converted the defendant's motion to dismiss to a motion for summary judgment, and gave LaFave a month to respond. On April 16, 2001, after three months and four extensions, LaFave finally responded.

II. BACKGROUND

LaFave brings this action under 42 U.S.C. § 1983 claiming that the defendant violated his civil rights under the Eighth Amendment [FN3]. He alleges that the defendant failed to provide adequate medical and dental care causing three different teeth to be extracted.

FN3. LaFave does not specifically state that the defendant violated his Eighth Amendment rights but this conclusion is appropriate after reviewing the complaint.

III. FACTS [FN4]

FN4. While the defendant provided the court with a "statement of material facts not in issue" and LaFave provided the court with "statement of material facts genuine in issue," neither provided the court with the exact nature of the facts.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

Between January and July of 1999, LaFave, on several occasions, requested dental treatment because he was experiencing severe pain with three of his teeth. After being seen on several occasions by a Clinton County Correctional Facility ("Clinton") doctor, he was referred to a dentist. Initially, LaFave's mother had made an appointment for him to see a dentist, but he alleges that Nurse LaBarge ("LaBarge") did not permit him to be released to the dentist's office [FN5]. Subsequently, he was seen by Dr. Boule, D.D.S ., on two occasions for dental examinations and tooth extractions.

>   FN5. This appears to be in dispute because the medical records show that LaFave at first stated that his mother was going to make arrangements, but later requested that the facility provide a dentist.

### IV. DISCUSSION

#### A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc ., 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); accord F.D.I.C. v. Giammettei, 34 F.3d 51, 54 (2d Cir.1994).* The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).* Once this burden is met, it shifts to the opposing party who, through affidavits or otherwise, must show that there is a material factual issue for trial. Fed.R.Civ.P. 56(e); see *Smythe v. American Red Cross Blood Services Northeastern New York Region, 797 F.Supp. 147, 151 (N.D.N.Y.1992).*

Finally, when considering summary judgment motions, *pro se* parties are held to a less stringent standard than attorneys. *Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); Haines v. Kerner, 404*

U.S. 519, 520-21, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir.1990).* With this standard in mind, the court now turns to the sufficiency of LaFave's claims.

#### B. *Eighth Amendment Claims*

**\*2** LaFave alleges that his Eighth Amendment rights were violated when the defendant failed to provide adequate medical care for his dental condition. The Eighth Amendment does not mandate comfortable prisons, yet it does not tolerate inhumane prisons either, and the conditions of an inmate's confinement are subject to examination under the Eighth Amendment. *Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 1975, 128 L.Ed.2d 811 (1994).* Nevertheless, deprivations suffered by inmates as a result of their incarceration only become reprehensible to the Eighth Amendment when they deny the minimal civilized measure of life's necessities. *Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) (quoting Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)).*

Moreover, the Eighth Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency ..." against which penal measures must be evaluated. See *Estelle v. Gamble, 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d (1976).* Repugnant to the Amendment are punishments hostile to the standards of decency that " 'mark the progress of a maturing society.' " *Id.* (quoting *Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958)* (plurality opinion)). Also repugnant to the Amendment, are punishments that involve " 'unnecessary and wanton inflictions of pain.' " *Id. at 103,97 S.Ct. at 290 (quoting Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)).*

In light of these elementary principles, a state has a constitutional obligation to provide inmates adequate medical care. See *West v. Atkins, 487 U.S. 42, 54, 108 S.Ct. 2250, 2258, 101 L.Ed.2d 40 (1988).* By virtue of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

their incarceration, inmates are utterly dependant upon prison authorities to treat their medical ills and are wholly powerless to help themselves if the state languishes in its obligation. *See Estelle,* 429 U.S. at 103, 97 S.Ct. at 290. The essence of an improper medical treatment claim lies in proof of "deliberate indifference to serious medical needs." *Id.* at 104, 97 S.Ct. at 291. Deliberate indifference may be manifested by a prison doctor's response to an inmate's needs. *Id.* It may also be shown by a corrections officer denying or delaying an inmate's access to medical care or by intentionally interfering with an inmate's treatment. *Id.* at 104-105, 97 S.Ct. at 291.

The standard of deliberate indifference includes both subjective and objective components. The objective component requires the alleged deprivation to be sufficiently serious, while the subjective component requires the defendant to act with a sufficiently culpable state of mind. *See Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). A prison official acts with deliberate indifference when he " 'knows of and disregards an excessive risk to inmate health or safety.' " *Id.* (*quoting Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979). However, " 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Id.*

**\*3** However, an Eighth Amendment claim may be dismissed if there is no evidence that a defendant acted with deliberate indifference to a serious medical need. An inmate does not have a right to the treatment of his choice. *See Murphy v. Grabo,* 1998 WL 166840, at \*4 (N.D.N.Y. April 9, 1998) (*citation omitted* ). Also, mere disagreement with the prescribed course of treatment does not always rise to the level of a constitutional claim. *See Chance,* 143 F.3d at 703. Moreover, prison officials have broad discretion to determine the nature and character of medical treatment which is provided to inmates. *See Murphy,* 1998 WL 166840, at \*4 (*citation omitted* ).

While there is no exact definition of a "serious medical condition" in this circuit, the Second Circuit has indicated what injuries and medical conditions are serious enough to implicate the Eighth Amendment. *See Chance,* 143 F.3d at 702-703. In *Chance,* the Second Circuit held that an inmate complaining of a dental condition stated a serious

medical need by showing that he suffered from great pain for six months. The inmate was also unable to chew food and lost several teeth. The Circuit also recognized that dental conditions, along with medical conditions, can vary in severity and may not all be severe. *Id.* at 702. The court acknowledged that while some injuries are not serious enough to violate a constitutional right, other very similar injuries can violate a constitutional right under different factual circumstances. *Id.*

The Second Circuit provided some of the factors to be considered when determining if a serious medical condition exists. *Id.* at 702-703. The court stated that " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain' " are highly relevant. *Id.* at 702-703 (*citation omitted* ). Moreover, when seeking to impose liability on a municipality, as LaFave does in this case, he must show that a municipal "policy" or "custom caused the deprivation." *Wimmer v. Suffolk County Police Dep't,* 176 F.3d 125, 137 (2d Cir.1999).

In this case, the defendant maintains that the medical staff was not deliberately indifferent to his serious medical needs. As a basis for their assertion, they provide LaFave's medical records and an affidavit from Dr. Viqar Qudsi[FN6], M.D, who treated LaFave while he was incarcerated at Clinton. The medical records show that he was repeatedly seen, and prescribed medication for his pain. In addition, the record shows that on various occasions, LaFave refused medication because "he was too lazy" to get out of bed when the nurse with the medication came to his cell (*Def. ['s] Ex. A, P. 4*) .

FN6. Dr. Qudsi is not a party to this action.

According to the documents provided, Dr. Qudsi, examined LaFave on January 13, 1999, after LaFave reported to LaBarge that he had a headache and discomfort in his bottom left molar (*Qudsi Aff., P. 2*). Dr. Qudsi noted that a cavity was present in his left lower molar. *Id.* He prescribed Tylenol as needed for the pain

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

and 500 milligrams ("mg") of erythromycin twice daily to prevent bacteria and infection. *Id.* On January 18, 19, and 20, 1999, the medical records show that LaFave refused his erythromycin medication (*Def. ['s] Ex. B, P. 1).*

*\*4* Between January 20, and April 12, 1999, LaFave made no complaints concerning his alleged mouth pain. On April 12, 1999, LaFave was examined by LaBarge due to a complaint of pain in his lower left molar (*Def. ['s] Ex. A, P. 4* ). Dr. Qudsi examined him again on April 14, 1999. *Id.* He noted a cavity with pulp decay and slight swelling with no discharge. *Id.* He noted an abscess in his left lower molar and again prescribed 500 mg erythromycin tablets twice daily and 600 mg of Motrin three times daily for ten days with instructions to see the dentist. *Id.* On the same day, LaBarge made an appointment for LaFave to see an outside dentist that provides dental service to facility inmates, Dr. Boule *(Qudsi Aff., P. 3).*

On May 3, 1999, LaBarge was informed by LaFave that his mother would be making a dental appointment with their own dentist and that the family would pay for the treatment (*Def. ['s] Ex. A, P. 4* ). On that same day, Superintendent Major Smith authorized an outside dental visit. *Id.* On May 12, 1999, he was seen by LaBarge for an unrelated injury and he complained about his lower left molar (*Def .['s] Ex. A, P. 5* ). At that time, LaFave requested that LaBarge schedule a new appointment with Dr. Boule because the family had changed their mind about paying for an outside dentist. *Id.* LaBarge noted that he was eating candy and informed him of the deleterious effects of candy on his dental condition. *Id.* Thereafter, LaBarge scheduled him for the next available date which was June 24, 1999, at noon. *Id.*

On June 2, 1999, LaFave again requested sick call complaining for the first time about tooth pain in his upper right molar and his other lower left molar (*Def. ['s] Ex. A, P. 6* ). He claimed that both molars caused him discomfort and bothered him most at night. *Id.* LaFave confirmed that he had received treatment from Dr. Boule for his first lower left molar one week before. *Id.* The area of his prior extraction was clean and dry. *Id.* There was no abscess, infection, swelling, drainage or foul odor noted. *Id.* LaBarge recommended Tylenol as needed for any further tooth discomfort. *Id.*

On June 21, 1999, LaFave again requested a sick call and was seen by LaBarge (*Def. ['s] Ex. A, P. 6* ). No swelling, drainage or infection was observed. *Id.* However, LaBarge noted cavities in LaFave's lower left molar and lower right molars. *Id.* LaBarge made arrangements for Dr. Qudsi to further assess LaFave. *Id.* On June 23, 1999, Dr. Qudsi examined his right lower molar and noted decay in that area (*Def. ['s] Ex. A, P. 7* ). In addition, he noted that LaFave had a cavity in his second left lower molar. *Id.* He prescribed 500 mg of erythromycin twice daily for 10 days and 600 mg of Motrin three times daily for 10 days, with instructions to see a dentist. *Id.*

On June 30, 1999, Officer Carroll reported that LaFave was again non-compliant with his medication regimen as he refused to get up to receive his medication (*Def. ['s] Ex. A, P. 8* ). On July 7, 1999, he again requested sick call complaining of a toothache in his lower right molar (*Def. ['s] Ex. A, P. 9* ). Again, LaFave was non-compliant as he had only taken his erythromycin for five days instead of the ten days prescribed. *Id.* During the examination, Dr. Qudsi informed LaFave that extraction of these teeth could be necessary if he did not respond to conservative treatment. *Id.* At that time, LaFave informed Dr. Qudsi that he was going to be transferred to another facility. *Id.* Dr. Qudsi advised LaFave to follow-up with a dentist when he arrived at the new facility. *Id.* Dr. Qudsi prescribed 500 mg Naproxin twice daily for thirty days with instructions to follow-up with him in two weeks if the pain increased. *Id.* The following day, LaFave requested sick call complaining to LaBarge that he had taken one dose of Naproxin and it was not relieving the pain. *Id.* He was advised that he needed to take more than one dose to allow the Naproxin to take effect. *Id.*

*\*5* On July 17, 1999, LaFave was again seen by Dr. Qudsi and he indicated that he did not believe he was benefitting from the prescribed course of conservative treatment with medication (*Def. ['s] Ex. A, P. 10* ). Subsequently, LaBarge made a dental appointment for him on July 23 [FN7], 1999, at 3:15 p.m. *Id.* On July 23, 1999, a second extraction was conducted. *Id.* On July 28, 1999, he was again seen by Dr. Qudsi, for an ulceration at the left angle of his mouth for which he prescribed bacitracin ointment. *Id.* At this time, LaFave continued to complain of tooth

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

pain so he was prescribed 600 mg of Motrin three times daily. *Id.*

> FN7. The medical records contain an error on the July 17, 1999, note which indicted that an appointment was set for June 23, 1999, however, it should have been recorded as July 23, 1999.

On August 4, 1999, he was seen for feeling a sharp piece of bone residing in the area of his lower left molar (*Def. ['s] Ex. A, P. 11* ). Dr. Qudsi recommended observation and to follow-up with dental care if his condition continued. *Id.* The defendant maintains that given all of the documentation that he was seen when he requested to be seen and prescribed numerous medications, the medical staff was not deliberately indifferent to his serious medical needs. The defendant contends that at all times, professional and contentious dental and medical treatment were provided in regards to his various complaints.

In his response, LaFave disagrees alleging that the county had a custom or policy not to provide medical treatment to prisoners. However, LaFave does not allege in his complaint that the county had a "custom or policy" which deprived him of a right to adequate medical or dental care. In his response to the motion for summary judgment, for the first time, LaFave alleges that the county had a policy which deprived him of his rights. He maintains that his continued complaints of pain were ignored and although he was prescribed medication, it simply did not relieve his severe pain.

This court finds that the defendant was not deliberately indifferent to his serious dental and medical needs. Moreover, even if this court construed his complaint to state a viable claim against the county, LaFave has failed to show that the county provided inadequate medical and dental treatment. As previously stated, an inmate does not have the right to the treatment of his choice. The record shows that he was seen numerous times, and referred to a dentist on two occasions over a six month period. While LaFave argues that the dental appointments were untimely, the record shows that the initial delay occurred because he claimed that his mother was going to make the appointment but later changed her mind. In addition, the

record demonstrates that he did not adhere to the prescribed medication regime. On various occasions, LaFave failed to get out of bed to obtain his medication in order to prevent infection in his mouth. Although it is apparent that LaFave disagreed with the treatment provided by Clinton, the record does not show that the defendant was deliberately indifferent to his serious medical needs. Accordingly, this court recommends that the defendant's motion for summary judgment should be granted.

**\*6** WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that the defendant's motion for summary judgment (Dkt. No. 5) be GRANTED in favor of the defendant in all respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2002.
Lafave v. Clinton County
Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Jamal KEARSEY, Plaintiff,
v.
Adeyemi WILLIAMS, Defendant.
**No. 99 Civ. 8646 DAB.**

Sept. 1, 2005.

*MEMORANDUM & ORDER*

BATTS, J.

**\*1** Plaintiff Jamal Kearsey, proceeding *pro se,* has filed the above-captioned case against Defendant Dr. Adeyemi Williams ("Dr.Williams") pursuant to 42 U.S.C. § 1983 alleging that Dr. Williams violated Plaintiff's Eighth Amendment rights by being deliberately indifferent to Plaintiff's serious medical needs. Defendant has moved to dismiss the Complaint for failure to exhaust administrative remedies, for failure to state a claim, and because Defendant is shielded by qualified immunity.[FN1] For the reasons stated herein, Defendant's Motion to Dismiss is DENIED.

> FN1. This Court granted Defendant's Motion to Dismiss for failure to exhaust administrative remedies in its June 6, 2002 Order but vacated that Order on September 20, 2004 upon Plaintiff's motion pursuant to Fed.R.Civ.P. 60(b). *See Kearsey v. Williams,* No. 99 Civ. 8646, 2004 WL 2093548 (S.D.N.Y. Sept. 20, 2004).

I. BACKGROUND

In his Complaint, Plaintiff alleges that while he was incarcerated at Rikers Island Correctional Facility ("Rikers"), Defendant, a doctor at Rikers, violated Plaintiff's Eighth Amendment rights by refusing to provide him with an asthma pump when Plaintiff experienced breathing difficulties. Specifically, on April 4, 1999, Plaintiff requested to speak with a doctor because the heat in his cell was aggravating his asthma. (Compl. at 3-4.) When Dr. Williams went to Plaintiff's cell, Plaintiff stated that his chest had "tighten[ed] up" and that he "couldn't breath[e]," and requested that Dr. Williams take him "downstairs" to get an asthma pump. (Id. at 4.) Dr. Williams declined to take Plaintiff downstairs but said that he would send a pump to Plaintiff's cell that evening. (Id.) After a period of time, a corrections officer called Dr. Williams and he also informed him of Plaintiff's medical condition. (Id.) Dr. Williams told the officer that he would bring the asthma pump. (Id.) Plaintiff alleges that Dr. Williams forgot to bring the pump. (Id.)

Plaintiff complained for a third time to Dr. Williams of his inability to breathe and stated that he was experiencing chest pain. (Id.) Once again, Dr. Williams responded by promising to send an asthma pump that evening. (Id.) Plaintiff subsequently asked for Defendant's name, to which Dr. Williams allegedly responded, "I won't send you anything now!" (Id.) Dr. Williams then handed Plaintiff a note with his name. (Id. at 5.) No pump was given to Plaintiff. Shortly after Dr. Williams left, Plaintiff borrowed an asthma pump from a fellow minute, although that pump was different from the one Plaintiff was used to. (Id.) Plaintiff complained of chest pains and breathing difficulties for the rest of the day. (Id.) On April 6, 1999, Plaintiff was having blood work done and spoke with a nurse about his medical condition. (Id.) The nurse ordered an emergency pump that arrived later in the day. (Id.)

On June 24, 1999, Plaintiff filed a Complaint pursuant to 42 U.S.C. § 1983 alleging that Defendant exhibited deliberate indifference to his serious medical needs in violation of Plaintiff's Eighth Amendment rights. Defendant has filed a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that Plaintiff failed to exhaust administrative

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997(e), and, in particular, the exhaustion procedure established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7, that Plaintiff failed to state a cause of action for which relief can be granted, and that Defendant is shielded from liability based on the doctrine of qualified immunity. (Def.'s Mem. Law at 1, 3, 20.) On June 6, 2002, this Court issued an Order granting Defendant's Motion to Dismiss on the ground that Plaintiff failed to comply with the grievance procedures established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7. *Kearsey v. Williams*, No. 99 Civ. 8646, 2002 WL 1268014, at *2 (S.D.N.Y. June 6, 2002).

**\*2** Plaintiff filed a Motion for Relief from Judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure.[FN2] Plaintiff argued that the Court had erred in holding that he was required to exhaust the grievance procedures established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7, because those procedures are required only of inmates at state-run facilities, whereas Rikers, as a municipally-run facility, has different grievance procedures. *Kearsey*, No. 99 Civ. 8646, 2004 WL 2093548, at *2 (S.D.N.Y. Sept. 20, 2004). In its September 20, 2004 Order, the Court vacated its dismissal Order, finding Plaintiff was not required to exhaust the grievance procedures established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7. *Id.* at *4.

> FN2. Plaintiff was represented by counsel when he filed the 60(b) Motion.

Because the Court's June 6, 2002 Order did not reach the additional grounds in Defendant's Motion to Dismiss, the remaining motions were *subjudice*. In this Order, the Court considers Defendant's remaining arguments: that Plaintiff has failed to state a cause of action and that Defendant is entitled to qualified immunity.

## II. DISCUSSION

### A. Rule 12(b)(6) Standard

In a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court "must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff." *Bolt Elec., Inc. v. City of New York*, 53 F.3d 465, 469 (2d Cir.1995) (citations omitted). "The district court should grant such a motion only if, after viewing [the] plaintiff's allegations in this favorable light, it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir.1999). A court's review of such a motion is limited and "the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Burnheim v. Litt*, 79 F.3d 318, 321 (2d Cir.1996). In fact, it may appear to the court that "a recovery is very remote and unlikely but that is not the test." *Branham v. Meachum*, 72 F.3d 626, 628 (2d Cir.1996).

These liberal pleading standards "appl[y] with particular force where the plaintiff alleges civil rights violations or where the complaint is submitted *prose.*" *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir.1998). It is well-settled that *prose* complaints are held "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 521 (1972).

### B. Eighth Amendment

Defendant moves to dismiss the Complaint on the grounds that Plaintiff has failed to state a cause of action under 42 U.S.C. § 1983.

### 1. Standard for § 1983 deliberate indifference claim

Section 1983 of Title 42, United States Code, enables a plaintiff to bring a cause of action against a "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Thus, a plaintiff bringing a § 1983 action must

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

demonstrate that "the conduct complained of was committed by a person acting under color of state law ... [and that] this conduct deprived a person of rights ... secured by the Constitution or laws of the United States." *Greenwich Citizens Committee, Inc. v. Counties of Warren and Washington Indus. Development Agency,* 77 F.3d 26, 29-30 (2d Cir.1996) (quoting *Parratt v. Taylor,* 451 U.S. 527, 535 (1981)) (internal quotations omitted). Section 1983 is not in itself "a source of substantive rights," but instead "provides a method for vindicating federal rights elsewhere conferred." *Patterson v. County of Oneida, N.Y.,* 375 F.3d 206, 225 (2d Cir.2004) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3 (1979)).

**\*3** One such source of federal rights is the Eighth Amendment of the Constitution, which states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. In *Estelle v. Gamble,* the Supreme Court held that prison employees' "deliberate indifference [to an inmate's] serious medical needs" violates the inmate's Eighth Amendment rights and is actionable under § 1983. *Estelle v. Gamble,* 429 U.S. 97, 104-05 (1976). A plaintiff pursuing a § 1983 claim for deliberate indifference to serious medical needs must meet a two-prong standard by demonstrating a serious medical need (the objective prong) and by showing that the defendant employee possessed the requisite culpable mental state (the subjective prong). See*Farmer v. Brennan,* 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

2. Serious medical need

The objective prong of the deliberate indifference standard requires a showing of a "sufficiently serious" medical need. *Hathaway,* 99 F.3d at 553 (internal quotations and citations omitted). While "it is a far easier task to identify a few exemplars of conditions so plainly trivial and insignificant as to be outside the domain of Eighth Amendment concern than it is to articulate a workable standard for determining 'seriousness' at the pleading stage," several factors are helpful in determining the seriousness of a medical condition. *Chance,* 143 F.3d at 702-03 (quoting *Gutierrez v. Peters,* 111 F.3d 1364, 1372 (7th Cir.1997)).

A serious medical need is generally characterized by "a condition of urgency that may result in degeneration or extreme pain" or "the unnecessary and wanton infliction of pain." *Chance,* 143 F.3d at 702 (citation omitted). Whether "a reasonable doctor or patient would find [the condition] important and worthy of comment or treatment" reflects on the seriousness of the medical need, as does the effect of the condition on the inmate's "daily activities" and the extent to which the condition causes "chronic and substantial pain." *Id.* (citation omitted). The refusal to treat a patient suffering from what ordinarily would not be considered a serious medical condition also raises Eighth Amendment concerns if the condition is easily treatable and degenerative. See*Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000) (holding that "the refusal to treat an inmate's tooth cavity unless the inmate consents to extraction of another diseased tooth constitutes a violation of the Eighth Amendment"). The constitutional implications of a decision not to treat an inmate's medical condition depend on the specific facts of the case-"a prisoner with a hang-nail has no constitutional right to treatment, but ... prison officials [who] deliberately ignore an infected gash ... might well violate the Eighth Amendment." *Id.* at 137-37 (internal quotations and citations omitted).

**\*4** While the failure to treat an inmate's generalized asthmatic condition may not implicate the Eighth Amendment, "an actual asthma attack, depending on the severity, may be a serious medical condition." *Scott v. DelSignore,* No. 02 Civ. 029F, 2005 WL 425473, at \*9 (W.D.N.Y. Feb. 18, 2005); see*also Patterson v. Lilley,* No. 02 Civ. 6056, 2003 WL 21507345, at \*3-4 (S.D.N.Y. June 30, 2003). Indeed, "it is common knowledge that a respiratory ailment, such as asthma, can be serious and life-threatening." *Whitley v. Westchester County,* No. 97 Civ. 0420, 1997 WL 659100, at \*4 (S.D.N.Y. Oct. 22, 1997). An acute asthma attack is inarguably a "condition of urgency" that may cause "substantial pain" and that "reasonable doctor[s] or patient[s] would find important and worthy of comment or treatment." *Chance,* 143 F.3d at 702 (citation omitted); see*Whitley,* No. 97 Civ. 0420(SS), 1997 WL 659100, at \*4.

Plaintiff has alleged that on three separate occasions, he

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

informed Defendant that he was unable to breathe. (Compl. at 4-5.) He also complained that his chest had "tighten[ed] up," and, later, that he was experiencing "chest pains." (Id.) Plaintiff resorted to using a fellow inmate's inhaler when Defendant refused to provide him with one, which suggests the seriousness of his need. (Id. at 5.) Moreover, by alleging in his Complaint that his asthma "started to act up," Plaintiff describes a time-specific incident more in line with an asthma attack than with a generalized asthmatic condition. (Id. at 4.)

Defendant cites *Reyes v. Corrections Officer Bay,* No. 97 Civ. 6419, 1999 WL 681490 (S.D.N.Y. Sept. 1, 1999), as a case similar to this one where the court found that the plaintiff did not allege a sufficiently serious medical condition. However, unlike the plaintiff in *Reyes,* who went ahead with his scheduled visit with his family after complaining of an asthma attack, Plaintiff continued to complain to officers of his condition. Plaintiff resorted to self-medication, by borrowing an asthma pump from a fellow inmate in order to alleviate his condition. In light of these facts, it can hardly be said that Plaintiff was merely suffering from "discomfort."

Accordingly, the Court finds that in his Complaint, Plaintiff alleges facts that he experienced an asthma attack, serious enough to constitute a sufficiently serious medical need for purposes of an Eighth Amendment claim.

3. Deliberate indifference

To satisfy the subjective prong of the deliberate indifference standard, Plaintiff must prove that the prison official was aware of, and consciously disregarded, the prisoner's medical condition. *Chance,* 143 F.3d at 703;*seealso Farmer,* 511 U.S. at 837. The prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Chance,* 143 F.3d at 702 (quoting *Farmer,* 511 U.S. at 837). While purposefully refusing to treat a serious medical condition constitutes deliberate indifference, it need not be the official's purpose to harm the inmate; "a state of mind that is the equivalent of criminal recklessness" is sufficient. *Hathaway,* 37 F.3d at 553.

**\*5** A physician's mere negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a § 1983 action. *Estelle,* 429 U.S. at 105-06;*Chance,* 143 F.3d at 703. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle,* 429 U.S. at 106. Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under § 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

In the instant case, Plaintiff informed Defendant on a number of occasions that he was unable to breathe and that he was experiencing chest pains. (Compl. at 4.) While Defendant's initial decision not to take Plaintiff downstairs for immediate treatment is the sort of prisoner-physician dispute regarding the particularities of medical care that is outside the scope of the Eighth Amendment, the unmistakable inference to be drawn from Plaintiff's allegation that Defendant refused to provide an asthma pump when Plaintiff asked for Defendant's name is that Defendant withheld medical care as retaliation or punishment for Plaintiff's conduct. (Id.) Because consciously delaying treatment in order to punish or retaliate against an inmate meets the subjective standard for deliberate indifference, the Court finds that the Complaint adequately alleges that Defendant acted with the requisite culpable mental state in refusing to treat Plaintiff's asthma attack.

C. Qualified Immunity

Defendant's final argument for dismissal is that, as a government official, Dr. Williams is entitled to qualified immunity.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

At the outset, the Court notes that while a defendant may assert a qualified immunity defense on a Rule 12(b)(6) motion, "that defense faces a formidable hurdle when advanced on such a motion." *McKenna v. Wright,* 386 F.3d 432, 434 (2d Cir.2004). This is because "[n]ot only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Id.* (internal quotations and citations omitted). The plaintiff thus benefits from all reasonable inferences against the defendant's qualified immunity defense on a Rule 12(b)(6) motion. *Id.*

The defense of qualified immunity protects public officers, including prison physicians, from civil actions related to their conduct while they are acting in an official capacity so long as they do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Ford v. McGinnis,* 352 F.3d 582, 596 (2d Cir.2003). Such a defense "serves important interests in our political system. It protects government officials from liability they might otherwise incur due to unforeseeable changes in the law governing their conduct." *Sound Aircraft Services, Inc. v. Town of East,* 192 F.3d 329, 334 (2d Cir.1999). Qualified immunity also serves the important public interest of "protecting public officials from the costs associated with the defense of damages action ... [including] the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from accepting public positions." *Crawford-El v. Britton,* 523 U.S. 574, 590 at fn. 12 (1998).

**\*6** Qualified immunity shields a defendant from liability "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Englarged Sch. Dist.,* 293 F.3d 246, 250 (2d Cir.2001); *Brosseau v. Haugen,* 125 S.Ct. 596, 599 (2004) ("Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted"); *see*

*alsoHarlow,* 457 U.S. at 818-19.

"[A] court evaluating a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Wilson v. Layne,* 526 U.S. 603, 609 (1999); *see also Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993). Determining the constitutional question first serves two purposes: it spares the defendant of unwarranted demands and liability "customarily imposed upon those defending a long drawn-out lawsuit" and determining the constitutional question first "promotes clarity in the legal standards for official conduct, for the benefit of both the officers and the general public ." *Id.*

If a deprivation of a constitutional right has been alleged, a court must determine whether the constitutional right was clearly established by determining: (1) if the law was defined with reasonable clarity, (2) if the Supreme Court or the law of the Second Circuit affirmed the rule, and (3) whether a reasonable defendant would have understood from existing law that the conduct was lawful. *See Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998). "[T]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 634, 640 (1987).

As the Supreme Court made clear in *Saucier,* determining whether the right in question was clearly established requires particularized, case-specific analysis. *Id.* at 201-02. The case-specific nature of the inquiry does not mean that official conduct is protected by qualified immunity whenever "courts had not agreed on one verbal formulation of the controlling standard." *Id* . at 202-03. A "general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct" even if courts have not ruled on the constitutionality of the specific act in question, and previously decided cases with comparable but not identical facts influence the clarity of the right in question. *Hope v. Pelzer,* 536 U.S. 730 at 741 (2002) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). The fundamental question is whether "the state of the law" at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

the time of the alleged violation gave the defendant "fair warning" that his conduct was unconstitutional. *Id.*

**\*7** Even if the right is clearly established, "defendants may nonetheless establish immunity by showing that reasonable persons in their position would not have understood that their conduct was within the scope of the established protection." *LaBounty v. Coughlin,* 137 F.3d 68, 73 (2d Cir.1998). "[R]easonableness is judged against the backdrop of the law at the time of the conduct.... [T]his inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau,* 125 S.Ct. at 599.

In the present matter, the Court has already determined that Plaintiff's allegations, taken as true, indicate that Defendant violated Plaintiff's Eighth Amendment rights by refusing to treat Plaintiff's asthma attack in retaliation for Plaintiff's request for Defendant's name. *See supra* at 10-13.

With regard to whether the right allegedly violated was clearly established at the time of the violation, neither the Supreme Court nor the Second Circuit has held that an asthma attack constitutes a serious medical condition for purposes of a deliberate indifference claim. In considering whether Defendant nonetheless had fair warning of the unconstitutionality of the conduct he is alleged to have engaged in, the Court notes that the Second Circuit has repeatedly held as unlawful denials of treatment that "cause or perpetuate pain" falling short of torture and not resulting in death. *Brock v. Wright,* 315 F.3d 158, 163 (2d Cir.2003). Among the conditions the Second Circuit has deemed serious for Eighth Amendment purposes are a tooth cavity, *Harrison,* 219 F.3d at 137; a degenerative hip condition, *Hathaway,* 99 F.3d 550, 551-52; a painful tissue growth, *Brock,* 315 F.3d at 161; a ruptured Achilles tendon that caused pain and swelling, *Hemmings v. Gorczyk,* 134 F.3d 104, 106-07 (2d Cir.1998); and an eye condition that led to blindness in one eye, *Koehl v. Dalsheim,* 85 F.3d 86, 87 (2d Cir.1996). These various conditions, held to be sufficiently serious, are not life-threatening, although they are painful. An asthma attack, however, can be both painful and fatal. Given the state of the law in the Second Circuit, Defendant had ample warning that the law prohibits a prison doctor from

consciously withholding medical care from an inmate with a painful and potentially fatal medical condition.

The Court finds that at this early stage of litigation, Defendant has not shown that he is entitled to qualified immunity.

### III. CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss is DENIED.

Defendant shall file an Answer to the Complaint within thirty (30) days of this Order.

SO ORDERED.

S.D.N.Y.,2005.
Kearsey v. Williams
Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.